AUDREY STRAUSS
United States Attorney for the
Southern District of New York
By:   RACHAEL DOUD
        JACOB M. BERGMAN
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* INTEGRA MED ANALYTICS LLC,<br><br>Plaintiff,<br><br>v.<br><br>ISAAC LAUFER, MONTCLAIR CARE CENTER, INC., EAST ROCKAWAY CENTER LLC, EXCEL AT WOODBURY FOR REHABILITATION AND NURSING, LLC, LONG ISLAND CARE CENTER INC., TREETOPS REHABILITATION & CARE, SUTTON PARK CENTER FOR NURSING & REHABILITATION, LLC, SUFFOLK RESTORATIVE THERAPY & NURSING, LLC, OASIS REHABILITATION AND NURSING, LLC, and FOREST MANOR CARE CENTER, INC.,<br><br>Defendants. | **17 Civ. 9424 (CS)**<br><br>**<u>COMPLAINT-IN-INTERVENTION OF THE UNITED STATES OF AMERICA</u>**<br><br>**JURY TRIAL DEMANDED** |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ISSAC LAUFER, TAMI WHITNEY, PARAGON MANAGEMENT SNF LLC, MONTCLAIR CARE CENTER, INC., EAST ROCKAWAY CENTER LLC, EXCEL AT WOODBURY FOR REHABILITATION AND NURSING, LLC, LONG ISLAND CARE CENTER INC., TREETOPS REHABILITATION & CARE CENTER LLC, SUTTON PARK CENTER FOR NURSING & REHABILITATION, LLC, SUFFOLK | |

RESTORATIVE THERAPY & NURSING, LLC,
OASIS REHABILITATION AND NURSING,
LLC, FOREST MANOR CARE CENTER, INC.,
SURGE REHABILITATION & NURSING LLC,
and QUANTUM REHABILITATION & NURSING
LLC,

Defendants.

The United States of America (the "United States" or the "Government"), by and

through its attorney, Audrey Strauss, United States Attorney for the Southern District of New

York, brings this Complaint-In-Intervention against Issac Laufer, who is a part owner of ten of

the eleven above-captioned skilled nursing facilities located in and around the Southern District

of New York and operates all of the facilities; Tami Whitney, the Coordinator of Rehabilitation

Services at those facilities; Paragon Management SNF LLC ("Paragon"), the management

company through which Laufer operates those facilities; and the skilled nursing facilities

themselves (individually, a "Facility", and together, the "Facilities") (collectively,

"Defendants"), to recover treble damages sustained by, and civil penalties and restitution owed

to, the Government under the False Claims Act ("FCA"), 31 U.S.C. §§ 3729 *et seq*., and, in the

alternative, to recover damages sustained by the Government under the common law, and alleges

as follows:

## PRELIMINARY STATEMENT

1.      From at least 2010 through September 2019 (the "Relevant Period"), Defendants

knowingly submitted, or caused to be submitted, false claims to Medicare Part A for

unreasonable, unnecessary, or unskilled therapy services that the Facilities provided to residents.

Defendants also made false statements in connection with those false claims, including

statements erroneously certifying that Defendants complied with applicable Medicare

requirements.  Defendants carried out this fraudulent billing scheme in two principal ways.  First,

Defendants systematically and deliberately worked to keep patients in residence at the Facilities

and on therapy longer than necessary or reasonable in order to maximize the amount billed to Medicare for their stays.  Second, while the patients were at the Facilities, Defendants routinely put patients on higher levels of rehabilitation therapy than reasonable or necessary in order to bill Medicare at a higher rate for the services Defendants were providing.  Defendants Laufer and Whitney instructed and pressured Facility employees to engage in these practices, in order to maximize profits and in contravention of the law.

2.     Specifically, Whitney tracked the number of Medicare days used by each patient at the Facilities and expected staff at the Facilities to justify discharges that were substantially short of 100 days—not for any medical reason, but because 100 days was the maximum stay compensable by Medicare.  Laufer received daily updates from the Facilities reporting the number of Medicare patients that had been discharged and, when he believed the Facilities were not making enough money, instructed Whitney to curb discharges in order to maximize Medicare reimbursement.  Laufer's directives were not based on any information about patients' clinical needs; on the contrary, Laufer was explicit that his goal was to increase revenue.

3.     To carry out Laufer's directives, Whitney and the Facilities devised various strategies to prolong patient stays.  For example, the Facilities used challenging balance tests as a pretext to keep Medicare patients at the Facilities after they were ready to be discharged.  In some instances, the Facilities went so far as to intentionally stunt patients' progress in order to create the appearance of a continued need for services and residential care.

4.     Similarly, Whitney endeavored to maximize the amount of therapy provided to patients, again without regard to their clinical needs, and reported to Laufer on this practice. Whitney directed the Facilities to put virtually all Medicare patients on the highest, and thus most expensive, level of therapy, and chastised or overrode employees who failed to do so.  This

scheme led to the provision of, and billing for, therapy with little or no benefit to patients, and therapy that did not involve the provision of skilled services.

5.     Laufer's and Whitney's deliberate efforts to prolong patient stays and maximize rehabilitation levels, all in order to inflate Medicare billing, were successful.  During the Relevant Period, the Facilities kept Medicare Part A patients at the Facilities longer, and provided more Ultra High rehabilitation to their patients, than the vast majority of skilled nursing facilities in the nation.

6.     By billing for rehabilitation services that were not reasonable or necessary, Defendants presented, or caused to be presented, false claims to Medicare.  Additionally, by falsely certifying their compliance with applicable Medicare requirements, Defendants made false statements material to the payment of false claims.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over the claims brought under the FCA pursuant to 31 U.S.C. § 3730(a) and 28 U.S.C. §§ 1331 and 1345, and over the common law claims pursuant to 28 U.S.C. § 1345.

8.     This Court may exercise personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which provides for nationwide service of process.

9.     Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because Laufer, Whitney, Paragon, and several of the Facilities transact business in this District and because a substantial part of the events giving rise to the claims herein occurred within this District.  Defendants submitted claims for services rendered to individuals who lived in Facilities in this District.  Venue is proper in this District as to the remaining Facilities pursuant to the doctrine of pendent venue.

## THE PARTIES

10.     Plaintiff is the United States of America.  Through its Department of Health and Human Services ("HHS"), and more specifically through the Centers for Medicare and Medicaid Services ("CMS"), a component agency within HHS, the Government administers the Medicare Program, including, as relevant here, Medicare Part A.

11.     Relator Integra Med Analytics LLC is a Texas limited liability company.  Relator is an associated company of Integra Research Group LLC, which specializes in using statistical analysis to identify health care data patterns that suggest fraud.  On December 1, 2017, Relator filed an action pursuant to the FCA alleging that Laufer and nine of the Facilities caused false claims to be submitted to Medicare in violation of the FCA, by prolonging patient stays in the Facilities and providing high-level rehabilitation therapy, without any medical justification to do so.

12.     Defendant Issac Laufer is an owner of ten of the eleven Facilities, in most cases together with other investors.  The remaining Facility, Long Island Care Center, Inc., is owned by Laufer's father, together with other investors.  Issac Laufer operates each of the eleven Facilities.

13.     Defendant Paragon Management SNF LLC is a limited liability company that Laufer owns and through which he manages the Facilities.  Laufer created Paragon in order to provide support for the Facilities and consolidate cross-Facility operations such as payroll. Paragon, as ultimately directed by Laufer, exercises authority over hiring and firing decisions with respect to the administrators that manage the day-to-day operations of the Facilities.

14.     Defendant Tami Whitney is an employee of Paragon and the Coordinator of Rehabilitation Services for the Facilities.  As such, she is involved in decisions regarding the provision of, and billing for, rehabilitation services at the Facilities.

15.     Defendant Marquis Rehabilitation & Nursing Center ("Marquis"), d/b/a Montclair Care Center, Inc. and/or Emerge Nursing and Rehabilitation, is a New York corporation located at 2 Medical Plaza, Glen Cove, New York 11542.  Montclair is a skilled nursing facility ("SNF") with the assigned National Provider Identifier ("NPI") number 1639234149.

16.     Defendant Lynbrook Restorative Therapy and Nursing ("Lynbrook"), d/b/a East Rockaway Center LLC, is a New York limited liability company located at 243 Atlantic Avenue, Lynbrook, New York 11563.  Lynbrook is a SNF with the assigned NPI number 1265724298.

17.     Defendant Excel at Woodbury for Rehabilitation and Nursing, LLC ("Excel") is a New York limited liability company located at 8533 Jericho Turnpike, Woodbury, New York 11797.  Excel is a SNF with the assigned NPI number 1376989376.

18.     Defendant Long Island Care Center, Inc. ("LICC") is a New York corporation located at 144-61 38th Avenue, Flushing, New York 11354.  LICC is a SNF with the assigned NPI number 1780661785.

19.     Defendant North Westchester Restorative Therapy and Nursing Center ("North Westchester"), d/b/a Treetops Rehabilitation & Care Center LLC, is a New York limited liability company located at 3550 Lexington Avenue, Mohegan Lake, New York 10547.  Treetops is a SNF with the assigned NPI number 1427100064.

20.     Defendant Sutton Park Center for Nursing & Rehabilitation LLC ("Sutton Park") is a New York limited liability company located at 31 Lockwood Avenue, New Rochelle, New York 10801.  Sutton Park is a SNF with the assigned NPI number 1376788513.

21.     Defendant Momentum at South Bay for Rehabilitation and Nursing ("Momentum"), d/b/a Suffolk Restorative Therapy & Nursing LLC, is a New York limited liability company located at 340 East Montauk Highway, East Islip, New York 11730.  Suffolk is a SNF with the assigned NPI number 1508167230.

22.     Defendant Oasis Rehabilitation and Nursing, LLC ("Oasis") is a New York limited liability company located at 6 Frowein Road, Center Moriches, New York 11934.  Oasis is a SNF with the assigned NPI number 1316360845.

23.     Defendant Glen Cove Center for Nursing and Rehabilitation ("Glen Cove"), d/b/a Forest Manor Care Center, Inc., is a New York corporation located at 6 Medical Plaza, Glen Cove, New York 11542.  Forest Manor is a SNF with the assigned NPI number 1366438418.

24.     Defendant Surge Rehabilitation and Nursing LLC ("Surge") is a New York limited liability company located at 49 Oakcrest Ave, Middle Island, New York 11953.  Surge is a SNF with the assigned NPI number 1205372042.

25.     Defendant Quantum Rehabilitation and Nursing LLC ("Quantum") is a New York limited liability company located at 63 Oakcrest Avenue, Middle Island, New York 11953. Quantum is a SNF with the assigned NPI number 1215473053.

## THE FALSE CLAIMS ACT

26.      The False Claims Act was originally enacted in 1863 to address fraud on the Government in the midst of the Civil War, and it reflects Congress's objective to "enhance the Government's ability to recover losses as a result of fraud against the Government."  *See* S. Rep. No. 99-345, at 1 (1986), *reprinted in* 1986 U.S.C.C.A.N. 5266.

27.      As relevant here, the FCA establishes treble damages liability to the Government where an individual or entity "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval[;]" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]"  31 U.S.C. §§ 3729(a)(1)(A), (a)(1)(B).

28.      "Knowingly," within the meaning of the FCA, is defined to include acting in reckless disregard or deliberate indifference of the truth or falsity of information, as well as a

defendant's actual knowledge of such falsity.  *See id.* § 3729(b)(1).  Further, "no proof of specific intent to defraud" is required to establish liability under the FCA.  *Id.*

29.     For purposes of Section 3729(a)(1)(B), the FCA defines "material" as "having a natural tendency to influence, or capable of influencing, the payment or receipt of money or property."  *Id.* § 3729(b)(4).

30.     In addition to treble damages, the FCA also provides for assessment of a civil penalty for each violation or each false claim.[1]  *See* 31 U.S.C. § 3729(a)(1).

## MEDICARE REIMBURSEMENT FOR SNF CARE

31.     Medicare is a federally operated health insurance program administered by CMS, benefiting individuals 65 and older and the disabled.  *See* 42 U.S.C. § 1395c *et seq.*

32.     The Medicare program is divided into four "parts" that cover different services. Medicare Part A generally covers inpatient hospital services, home health and hospice care, and skilled nursing and rehabilitation care.  Under Medicare Part A, CMS reimburses institutional healthcare providers a predetermined, fixed amount under a prospective payment system ("PPS").  Specifically, healthcare providers submit claims to CMS for medical services rendered, and CMS in turn pays the providers for those services based on payment rates established by the Government.

33.     Medicare Part A covers only those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury."  *See* 42 U.S.C. § 1395y(a)(1)(A).  In the context of skilled rehabilitation therapy, this means that the services furnished must be consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs;

---

[1]     As adjusted by applicable laws and regulations, the range of civil penalties for FCA violations occurring between September 29, 1999, and November 1, 2015, is $5,500 to $11,000, *see* 28 U.S.C. § 2461 (notes); 64 Fed. Reg. 47,099, 47,103 (1999); and the range of civil penalties for FCA violations occurring after November 1, 2015, is $10,781 to $21,563, *see* 82 Fed. Reg. 9,131–9,136 (2017).

must be consistent with accepted standards of medical practice; and must be reasonable in terms of duration and quantity.  *See* Medicare Benefit Policy Manual, Ch. 8, § 30; *see also* 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. §§ 409.31(a)-(c) (explaining that, to justify SNF care, a medical practitioner must certify on a continuing basis that services are required because the individual needs skilled services on a daily basis).

34.     To assess whether services are reasonable and necessary, and therefore eligible for reimbursement, Medicare rules require proper and complete documentation of the services rendered to beneficiaries.  In particular, the Medicare statute provides that:

> no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

42 U.S.C. § 1395g(a).

35.     To submit claims to Medicare, each SNF must submit a Medicare Enrollment Application in which the SNF certifies, among other things, that:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . .  I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

*See* CMS Form 855A.

36.     Under the PPS, Medicare pays a SNF a predetermined daily rate for each day of skilled nursing and rehabilitation services provided to a patient.  *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998).  Subject to certain conditions, Medicare Part A covers up to 100 days of care in a SNF for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days.  42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

37.     Among the conditions that Medicare imposes on its Part A SNF benefit are that: (1) the patient requires skilled nursing care or skilled rehabilitation services (or both) on a daily basis; (2) the daily skilled services are services that, as a practical matter, can only be provided in a skilled nursing facility on an inpatient basis; (3) the services are provided to address a condition for which the patient received treatment during a qualifying hospital stay or that arose while the patient was receiving care in a skilled nursing facility (for a condition treated during the hospital stay); (4) the services are ordered by a physician; and (5) the services provided require the skills of technical or professional personnel such as registered nurses, licensed practical (vocational) nurses, physical therapists, occupational therapists, and speech pathologists or audiologists and are furnished directly by, or under the supervision of, such personnel.  42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. §§ 409.31(a)-(c).

38.     Medicare requires that a physician or certain other practitioners certify that these conditions are met at the time of a patient's admission to the SNF and recertify the patient's continuing need for skilled rehabilitation therapy services at regular intervals thereafter, with the first recertification required no later than the fourteenth day of the stay and additional recertifications required at intervals not exceeding thirty days.  *See* 42 U.S.C. § 1395f(a)(2); Medicare General Information, Eligibility, and Entitlement Manual, Ch. 4, §§ 40.3 & 40.4.

39.     Skilled therapy services may include the disciplines of physical, occupational, and speech therapy.  In order for the services in question to be considered skilled rehabilitation, they must be "so inherently complex that [they] can be safely and effectively performed only by, or under the supervision of, professional or technical personnel."[2]  *See* 42 C.F.R. § 409.32(a).

---

[2]     Examples of skilled rehabilitation services include: therapeutic exercises which must be performed by or under the supervision of a qualified physical or occupational therapist; gait evaluation and training; range of motion exercises that are part of the active treatment of a specific disease state that resulted in mobility deficits; maintenance therapy when the specialized

40.     The purpose of skilled rehabilitation services is to help patients recover or improve their function and, to the extent possible, restore their level of function to the level prior to the patient's most recent hospitalization.  *See generally* 42 C.F.R. § 409.31(b)(2); *id.* § 409.33. If the services can be safely and effectively furnished by non-skilled personnel, then the services are not considered skilled and are no longer reasonable and necessary rehabilitation services and, therefore, are excluded from coverage under Medicare parts A and B.  *See generally id.* § 409.31(a)(2); *see also Physical, Occupational, and Speech Therapy Services,* CMS (September 5, 2012), *located at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medical-Review/Downloads/TherapyCapSlidesv10_09052012.pdf.

41.     Prior to October 1, 2019, the Medicare reimbursement rate paid to a SNF for each patient was based, in part, on the patient's anticipated "need for skilled nursing care and therapy."  *Final Rule for Medicare Program's Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities*, 64 Fed. Reg. 41,644 (July 30, 1999).  Specifically, the daily PPS rate that Medicare paid a SNF depended, in part, on the Resource Utilization Group ("RUG") to which a patient was assigned, and each distinct RUG was intended to reflect the anticipated costs associated with providing nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.

---

judgment of a qualified therapist is needed to design and establish a maintenance program; ultrasound, shortwave or microwave therapy; hot pack, hydrocollator, infrared treatments, paraffin baths, and whirlpool; and speech services necessary for the restoration of speech or hearing function.  *See* 42 C.F.R. § 409.33(c).  However, the "[g]eneral supervision of exercises which have been taught to the patient; including the actual carrying out of maintenance programs, *i.e.*, the performance of the repetitive exercises required to maintain function do not require the skills of a therapist and would not constitute skilled rehabilitation services.  *See id.* § 409.33(d).  Similarly, "repetitious exercises to improve gait, maintain strength, or endurance; passive exercises to maintain range of motion in paralyzed extremities, which are not related to a specific loss of function; and assistive walking do not constitute skilled rehabilitation services."  *See id.*

42.      Under this system, there were five general rehabilitation RUG levels for those beneficiaries that required rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL").  The RUG level to which a patient was assigned depended on the number of skilled therapy minutes and the number of therapy disciplines the patient received during a seven-day assessment reference period (also known as the "look back period").  The chart below reflects the requirements for the five rehabilitation RUG levels and the corresponding daily reimbursement ranges during federal fiscal year 2019:

| Rehabilitation RUG Level | Requirements to Attain RUG Level | Daily Reimbursement Range |
|---|---|---|
| Ultra High (RU) | At least 720 minutes per week total therapy combined from at least two therapy disciplines; one therapy discipline must be provided at least 5 days per week | $527.80 – $832.61[3] |
| Very High (RV) | Between 500 and 719 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $467.12 – $741.10 |
| High (H) | Between 325 and 499 minutes per week total therapy; one therapy discipline must be provided at least 5 days per week | $373.88 – $671.44 |
| Medium (RM) | Between 150 and 324 minutes per week total therapy; therapy must be provided at least 5 days per week but can be any mix of disciplines | $389.13 – $615.93 |
| Low (RL) | Minimum 45 minutes per week total therapy; therapy must be provided at least 3 days per week but can be any mix of disciplines | $259.69 – $540.92 |

63 Fed. Reg. 26,252, 26,262 (May 12, 1998); 83 Fed. Reg. 39,162, 39,175 (Aug. 8, 2019).

---

[3]      These rates applied to SNFs in urban areas.  The specific reimbursement amount within each range depended on additional factors, including the patient's ability to perform certain activities of daily living such as eating and toileting, and the patient's need for extensive services such as intravenous treatment, or ventilator or tracheostomy care.  63 Fed. Reg. 26,252, 26,262 (May 12, 1998).

43.     The Ultra High RUG level was "intended to apply only to the most complex cases requiring rehabilitative therapy well above the average amount of service time."  63 Fed. Reg. 26,252, 26,258 (May 12, 1998).  In announcing the final PPS rule, CMS also made clear that SNFs should tailor the number of therapy minutes to patients' clinical needs rather than providing exactly the minimum needed to trigger a specific RUG level, explaining that the RUG system "uses minimum levels of minutes per week as qualifiers . . . .  These minutes are minimums and are not to be used as upper limits for service provision . . . .  Any policy of holding therapy to the bare minimum, regardless of beneficiary need, is inconsistent with the statutory requirements . . . and will result in poor outcomes, longer lengths of stay, and a degradation in the facility's quality of care."  64 Fed. Reg. 41,644, 41,662 (July 30, 1999).

44.     Prior to October 1, 2019, a SNF was required to determine each patient's RUG as of specific assessment reference dates ("ARDs").  A patient's RUG as of the ARD then determined the applicable daily reimbursement rate prospectively for a specific timeframe.  For fiscal year 2019, the Medicare assessment schedule was as follows:

| RUG Assessment Type | Assessment Reference Date Window (including grace days) | Medicare Payment Days Determined by RUG |
| --- | --- | --- |
| 5-day | 1-8 | Days 1-14 |
| 14-day | 13-18 | Days 15-30 |
| 30-day | 27-33 | Days 31-60 |
| 60-day | 57-63 | Days 61-90 |
| 90-day | 87-93 | Days 91-100 |

83 Fed. Reg. 39,162, 39,229 (Aug. 8, 2019).

45.     SNFs reported therapy treatment times for each assessment reference period on a Minimum Data Set ("MDS") form that was completed as of each ARD in a patient's stay.  *See* 64 Fed. Reg. at 41,661; 42 C.F.R. § 413.343.  Prior to October 1, 2010, a SNF would electronically transmit the MDS form to a state's health department or other appropriate agency, which in turn would transmit the data to CMS.  42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. §

483.315(h)(1)(v) (2008).  From October 1, 2010, through September 30, 2019, SNFs submitted the MDS form directly to CMS.  42 C.F.R. § 483.20(f)(3) (2012).

46.     Completion of the MDS was a prerequisite to payment under Medicare.  *See* 63 Fed. Reg. at 26,265.  The MDS form required a certification by the provider stating, in part: "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements.  I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."  MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care Screening.  A patient's RUG information is also incorporated into the Health Insurance Prospective Payment System ("HIPPS") code, which Medicare uses to determine the payment amount owed to the nursing facility.  The HIPPS code must be included on the CMS-1450 form (the claim form used to bill Medicare), which SNFs submit monthly to Medicare via intermediaries known as Medicare Administrative Contractors that process and pay Medicare claims on behalf of CMS.  Medicare Claims Processing Manual, Ch. 25, § 75.5.

47.     Prior to the commencement of skilled therapy in any discipline, a therapist certified in that discipline must evaluate the patient and develop a treatment plan that is approved by a physician.  *See* 64 Fed. Reg. at 41,660-61; 42 C.F.R. §§ 409.17, 409.23.  The therapy time-reporting rules made clear that "[t]he time it takes to perform the formal initial evaluation and develop the treatment goals and the plan of treatment may not be counted as minutes of therapy received by the beneficiary."  64 Fed. Reg. at 41,661; *see also* Resident Assessment Instrument (RAI) Manual, Ch. 3 at O-19 (Oct. 2014) ("The therapist's time spent on documentation or on initial evaluation is not included.").  HHS explained that "[t]his policy was established because we do not wish to provide an incentive for facilities to perform initial evaluations for therapy services for patients who have no need of those specialized services."  64 Fed. Reg. at 41,661.

The policy was not intended, however, to deprive providers of compensation for performing initial evaluations, because "the cost of the initial assessment [was] included in the payment rates for all Medicare beneficiaries in covered Part A SNF stays." *Id.* at 41,661-62.

48.     As of October 1, 2019, CMS no longer reimburses Part A skilled nursing care under a therapy-driven RUG Rate system.  Instead, CMS now reimburses skilled nursing care under the Patient Driven Payment Model, or PDPM.  This change was motivated in part by concerns that, under the RUG Rate system, SNFs were providing therapy for purposes of increasing billing, rather than based on patients' needs.  *See* 83 Fed. Reg. 39162, 39184 (Aug. 8, 2018).  For example, CMS observed that, over time, both the percentage of patients in the Ultra High therapy level and the percentage of residents receiving just enough therapy to qualify for the Ultra High and Very High therapy levels had increased.  *Id.*  CMS noted that "potential explanatory factors" for these observed trends, such as "internal pressure within SNFs that would override clinical judgment," were "troubling and entirely inconsistent with the intended use of the SNF benefit."  *Id.*

49.     In light of these concerns, CMS designed the PDPM system to focus payments on the unique, individualized needs and characteristics of each patient, rather than on the simple volume of services being provided.  While a patient's need for rehabilitative therapy is still a relevant part of the patient categorization, in determining payment the PDPM relies more heavily on what the patient is likely to need, rather than the volume of therapy the facility chooses to provide.  *See* 83 Fed. Reg. 39162 (Aug. 8, 2018); 84 Fed. Reg. 38,728 (Aug. 7, 2019); *see also* SNF PPS: Patient Driven Payment Model, *available at* https://www.cms.gov/Medicare/Medicare -Fee-for-Service-Payment/SNFPPS/Downloads/MLN_Call_PDPM_Presentation_508.pdf.

## FACTUAL BACKGOUND

50.     Issac Laufer is the owner and operator of Paragon.  Over the last decade, Laufer has acquired numerous SNFs in the suburbs surrounding New York City—all of which are managed through Paragon.  Most recently, Laufer acquired Quantum and Surge in 2016, and Marquis in 2018.[4]

51.     During the Relevant Period, each of the Facilities was overseen by an administrator.  The Facility's MDS coordinator and the directors of rehabilitation, social services, admissions, diet, nursing, food service, maintenance, and housekeeping reported to the administrator.  Tami Whitney, a Paragon employee, oversaw rehabilitation therapy for all of the Facilities.  Whitney reported to the Director of Business Development for Paragon, who reported to Issac Laufer.  However, Whitney also took direction directly from Issac Laufer as described below.  At present, Laufer owns ten of the eleven SNFs named as defendants in this action (in whole or in part) and operates each of the eleven Facilities through Paragon.

52.     During the Relevant Period, new patients were admitted to the Facilities immediately following their discharge from a hospital.  Before a patient was discharged, the Facility received a document called a Patient Review Instrument ("PRI"), which was prepared by the hospital and contained basic information about the patient, such as the patient's condition, the care the patient required, the patient's diagnosis and the patient's insurance (or lack thereof).  According to the typical procedure, the hospital would send this information to a Facility's admissions department and, in consultation with the Facility's director of nursing and sometimes the director of rehabilitation, the Facility would decide whether it had the resources to admit the patient.

_____

[4]     Prior to 2018, Marquis was owned by Issac Laufer's father, and Issac Laufer was closely involved in the operation of the Facility.

53.     In or around 2014, this process changed when Laufer also authorized marketing employees of Paragon—who were non-medical professionals embedded in hospitals and tasked with promoting the Facilities to hospital patients who were almost ready to be discharged—to make admissions decisions on their own.  In other words, a Paragon marketing employee embedded at a hospital could decide, without any required consultation with medical or rehabilitation professionals, that a particular patient should be admitted to a Facility.

54.     At times during the Relevant Period, a Facility's admissions department would disagree with a marketer's determination that a patient could be admitted; however, according to a former Paragon administrator, these disputes were usually resolved in the marketer's favor and the patient was admitted over the Facility's objection.

55.     During the Relevant Period, once patients were admitted to a Facility, they were evaluated by an individual in the Facility's rehabilitation department (often the rehabilitation director).  Following the evaluation, a plan of care was developed that set forth which services each patient should receive, the patient's level of rehabilitation (*i.e.*, the amount of therapy), the patient's rehabilitation goals, and the patient's anticipated length of stay.  In addition, an MDS was completed and periodically reviewed and/or updated throughout the individual's stay at a Paragon Facility, as well as at discharge.  As described in detail below, during the Relevant Period, before the applicable regulations changed in October 2019, Whitney applied intense pressure to administrators and rehabilitation directors at the Facilities to assign virtually all Medicare Part A patients to the Ultra High rehabilitation level and maximize their lengths of stay, regardless of their clinical needs.

56.     During the Relevant Period, each Facility held a weekly "discharge" meeting.  These meetings were typically attended by the relevant department heads (nursing, rehabilitation, diet, and social work) and the MDS coordinator.  During the meeting, the Facility's patient roster

was reviewed and the MDS coordinator stated how many days of Medicare coverage each Medicare-eligible patient had left.  In addition, for individuals who were close to their scheduled discharge date, the rehabilitation department provided an assessment of that individual's progress and how much longer they would likely need therapy.  Ultimately, when a patient was about to be discharged, the social services department arranged for the individual to receive any equipment the patient might need (such as a walker) and a discharge summary form was generated.  During the Relevant Period, if the rehabilitation department believed that a Medicare patient was ready for discharge but that person had not used up most of his or her 100 Medicare days, Whitney, who often attended these meetings in person, frequently pressured the Facility to prevent such a discharge.  Laufer did not attend these discharge meetings but the administrators of the Facilities and Whitney kept Laufer abreast of the Facilities' metrics, including in regular text messages reporting the number of Medicare beneficiaries discharged each day and for the month.

## DEFENDANTS' FRAUDULENT CONDUCT

57.    From at least 2010 through September 2019, Whitney, with Laufer's knowledge and at his behest, directed employees at the Facilities to engage in two types of practices that caused the submission of false claims to Medicare for unreasonable, unnecessary, or unskilled therapy.  First, the Facilities deliberately attempted to keep Medicare-eligible patients at the Facilities and on therapy for as close as possible to the 100 days compensable by Medicare Part A, regardless of the patients' clinical needs.  To accomplish this, Whitney worked with employees of the Facilities to devise strategies for convincing patients to stay longer than clinically necessary, including intentionally limiting patients' ability to function independently and using challenging balance tests in misleading ways to artificially prolong patient stays. Whitney reported on these efforts to Laufer, who objected when, in his view, too many Medicare

patients were being discharged, and instructed Whitney—without regard to patients' medical needs—to prevent that from happening.

58.     Second, Facility management, at Whitney's instruction and with Laufer's knowledge, sought to maximize Medicare billings for rehabilitation therapy, again without regard to patients' clinical needs.  They did so by directing Facility staff to assign all or most Medicare Part A patients to the Ultra High therapy level, regardless of the patients' actual needs.  As a result, the Facilities billed Medicare for rehabilitation therapy that was unnecessary and therefore not clinically appropriate, and for therapy that did not involve the provision of skilled services.

59.     These practices, which took place at each of the eleven Paragon-managed Facilities, were part of a concerted effort by Laufer, and in turn, Whitney, to maximize Medicare billing by providing therapy to the most patients at the highest level and for the longest period compensable by Medicare—without limitation based on what was reasonable or necessary, and hence in violation of Defendants' legal obligations.

**I.      Defendants Prolonged Patients' Stays at the Facilities Without Regard to Their Clinical Needs in Order to Maximize Medicare Reimbursement**

60.     During the Relevant Period, the Facilities routinely sought to extend the stays of Medicare Part A patients without regard to the patients' clinical needs, in order to maximize reimbursement from Medicare.  Whitney directed Facility employees to extend patient stays in this manner; Whitney, in turn, was instructed by Laufer to avoid patient discharges—and thereby increase patient stays—without any regard to patients' medical conditions.

61.     In his communications with Whitney, Laufer made clear that maximizing profits was his number one priority—and that extending stays of Medicare patients was a critical way to accomplish that.  In order to monitor the Facilities' performance on that front, Laufer tracked discharges of Medicare patients from the Facilities and, when he considered the discharge

numbers to be too high, instructed Whitney to reduce the number of discharges and thereby extend patient stays.  These instructions never referenced patients' clinical needs or what was medically appropriate; indeed, Laufer did not have any information about those issues.  Instead, Laufer made explicit that his directives regarding discharges were purely driven by profit.

62.     In order to track how long the Facilities were keeping patients, Laufer expected the administrator of each Facility to send him a daily update reporting the number of patient admissions, discharges, and hospitalizations, broken down by whether the patient had Medicare or other insurance, and to justify the number of discharges of Medicare patients.  When the numbers were not to his liking, Laufer instructed Whitney to prevent patients from being discharged.  Laufer never cited any medical or clinical justification, and acknowledged that he in fact had no information about patients' medical needs.

63.     For example, on April 26, 2018, the Administrator of Lynbrook sent Laufer an update detailing the number of admissions and discharges and the number of patients on Medicare versus other insurance at the Facility.  The Administrator assured Laufer that "all the discharges" were "long stays."

64.     Dissatisfied with the numbers, Laufer sent messages to Whitney stating: "What is going on here???  Were falling apart!" and "Can u pls see whats going on at lynbrook with [community discharges]"—*i.e.*, discharges of patients back into the community.  Whitney responded that she was "concerned that [the Administrator] needs to be stronger when it comes to not allowing her staff to raise the white flag."  She continued that the Director of Rehabilitation was "clear on goal," but "when [the Administrator] says not to have families have bitter taste in mouth, sometimes he doesn't put up the fight he should."  Laufer, without any information concerning the actual rehabilitation or medical needs of the patients at Lynbrook, responded by pressuring Whitney to slow discharges at the Facility, saying "We can't have more

tami! Were falling apart," and telling Whitney to "[m]ake sure [the Administrator] knows she has a problem."

65.     This was not the first time Laufer pressured Whitney to prevent patient discharges from Lynbrook without any reference to, or information regarding, the actual rehabilitation needs of the patients.  On May 24, 2017, Laufer wrote to Whitney that she needed to "jump on [Lynbrook community discharges]."  Whitney responded by assuring Laufer that they had done what they could to extend patients' lengths of stay, responding, "I am very comfortable with how they handle their discharges, especially this last month.  Most are over 90 days.  They had a few difficult situations that did lead to [discharge] but they truly did everything they could."

66.     Similarly, on November 20, 2017, Laufer told Whitney to "jump on quantum for [community discharges]."  Laufer noted that the number of discharges was double what it had been the prior month, and he was speaking to the Director of Business Development for Paragon about it.  Whitney responded that there were only two discharges that "could have gone better on our end."  Laufer proceeded to ask Tami, "Whats happening," noting "2 is 2," and discharging those beneficiaries early cost the Quantum Facility "42K$ a month."  Whitney responded that "[t]he patients are horrific," and "yes, I totally agree . . . even 1 is too many," but noted that four of the eight discharges from Quantum were at 100 days.

67.     Similarly, on March 15, 2018, Laufer, after receiving an update with Marquis' metrics and again without any knowledge concerning the patients' needs or conditions, instructed Whitney to prevent patients from being discharged from the Facility, writing, "U have to curb [discharge] pace . . . [a] bit til we fill up . . . . Were hurting."  According to Whitney, with respect to this message, "[Laufer's] goal was to make money, and he wants people to stay as long as they can so we can make lots of money."

68.     Laufer in fact emphasized to Whitney that he wanted her to focus on limiting discharges, and hence prolonging patient stays, as a way of increasing revenue.  On October 18, 2017, for example, Laufer sent Whitney messages stating, "Max rev[enue].  Watch [discharges], is always priority #1," and "I don't want to take ur focus away from that.  So I think twice b4 hitting u up with a cost issue.  Im afraid $$ focus will suffer if I pull your eyes away from rev[enue]/ [discharges] etc."  Laufer went on to point out Facilities that he believed, without any awareness of the patients' clinical needs, were allowing patients to be discharged too soon, noting "[Glencove] has kinda sucked in [discharge] area as well,"  "[North Westchester] can do waaay better here," and for September, "[S]urge, [L]ynbrook, [and] [Marquis] were high."  Laufer added, "This is for sure our #1 place to make more profit."

69.     Whitney got Laufer's message: longer Medicare patient stays mean more profits.  Accordingly, Whitney devised—and instructed employees of the Facilities on—ways to keep Medicare patients as close as possible to the maximum 100 days compensable by Medicare.

70.     To track whether the Facilities were keeping patients as close to 100 days as possible, Whitney required each Facility to prepare a monthly discharge calendar that specified when each patient was scheduled to leave, whether the individual was a Medicare patient, and, if he or she was, how many days of the 100-day Medicare benefit the patient would have used up by the scheduled date of discharge.  According to employees of several of the Facilities, Whitney frequently challenged discharge determinations when a Medicare patient was set to be released before being at the Facility for at least 85 or 90 days, and would sometimes overrule employees who believed patients were ready to be discharged.  According to one of these employees, the goal was not to keep patients for exactly 100 days but for slightly less than that, in order to avoid creating a red flag.  In communicating these directives Whitney made clear that the purpose of

these targets was to get close to using the maximum Medicare benefit—and that her directives were not based on an assessment of what therapy was reasonable and necessary for the patient.

71.     When Medicare patients were discharged without staying close to 100 days, employees of the Facilities were expected to justify to Whitney why the patients had been discharged.  For instance, in a March 8, 2019 message, the Director of Rehabilitation at Emerge explained to Whitney that she had planned for a particular patient "[t]o go on his 100 day but we can't convince [him] to stay anymore."  On March 13, 2019, the same employee told Whitney that when Whitney looked at the discharge calendar for the Facility, "you[ are] going to see [a patient] on the calendar with only 33 days."  The employee explained that she had had "many meetings" with the patient's family "about why he needs to stay" and even "offer[ed] copay waivers which they declined," but "[i]t was extremely difficult to even get them to stay till Monday."  In neither case did the employee explain why extending these patients' stays would be justified based on their therapy needs.

72.     Because patients, either of their own accord or through a healthcare proxy (like a family member), had the ability to decide to leave the Facilities when they chose, Whitney and the Facilities devised strategies to convince patients and their family members to have the patients stay longer.

73.     For example, Facility management expected therapists to devise new goals that the patients had to meet, to avoid discharging them before Medicare billings had been maximized.  According to one therapist, if the original goal was to have a patient walk 20 feet, the therapist might extend the goal to 25 feet, in order to try to prolong the patient's stay. Another therapist was instructed by Facility management, when completing therapy notes, to exaggerate the amount of assistance patients required in order to ensure that they remained eligible for therapy and would stay in the Facility.

74.     At times, the drive to keep Medicare patients at the Facilities for as close as possible to 100 days resulted in the Facilities intentionally stunting patients' progress so that they would not reach the point where they could be discharged.  According to one employee, for example, the Lynbrook Director of Rehabilitation did not permit rooms in that Facility to have walkers, despite the fact that walkers would increase patients' ability to ambulate.  According to the employee, the Director implemented this practice so the patients could not improve and the families of the patients would not see their loved ones walking, thereby reducing pressure from the patients and their families to discharge Facility residents.  Another employee reported that, at Momentum, patients were kept in wheelchairs so they would not progress.

75.     Whitney reported to Laufer on the Facilities' success in prolonging stays, particularly for high-functioning patients who likely could have been discharged earlier from a medical standpoint.  In a July 11, 2016 message, for example, Laufer asked Whitney whether she had reviewed the discharges from Lynbrook for the past two months. Whitney responded that she had and "[t]here were a few in both months that could have possibly been avoided but overall they maxed out," though "sometimes it's tough to keep the higher level ones."  Whitney also said that she had been working with the rehabilitation team "to get more specific programs w[ith] more specific policies that provide concrete timelines" and was "[h]oping that w[ould] extend some high level patients."

76.     Similarly, in a June 26, 2017 message, Laufer observed—without referring to or inquiring about the patients' clinical needs—that discharges from Momentum had been "hig[h] for a few months."  Whitney responded that she had been working with the administrator of the Facility on "strategies" to reduce discharges but "[t]here population has gotten younger and smarter" and "[t]hey need to learn how to deal w[ith] them."

77.     Whitney also reported to Laufer on the efficacy of specific strategies for

prolonging patient stays—some of which were deliberately designed to prevent patients from

gaining independence.  For example, in a January 15, 2016 message, Whitney told Laufer that

"[a] lot of the patients are incontinent and constantly need to go to the bathroom," but "[i]f we

allow them to take themselves they will think they are ready to go home.  So we tell them they

have to use call bell and wait for aide to take them."

78.     These strategies were successful.  In an April 25, 2018 message, for example,

Whitney wrote to Laufer that she appreciated him "having faith in [her]" and she was "see[ing] a

difference in discharge prevention already!"

79.     Another strategy that Whitney and the Facilities implemented to extend patient

stays was the use of balance tests.  One such test, the Berg Balance Scale, is a clinical test used

to assess a person's balance based on fourteen tasks.  Whitney suggested that the Facilities

should administer the Berg test when a patient wanted to be discharged, because it could

convince the patient that he or she was at risk of falling and needed to stay longer.

80.     Over time, Whitney refined this approach by installing a Balance Master—a high-

tech machine costing tens of thousands of dollars that is used, among other things, to test

balance—at each Facility.  The Facilities used the Balance Masters for the express purpose of

identifying purported balance deficiencies in patients otherwise ready for discharge.  These

alleged deficiencies then became pretexts for keeping patients at the Facilities longer than

necessary.

81.     In fact, the balance scores generated by the Balance Masters lacked context and

generally did not serve a clinically valid role in discharge decisions.  Among other issues,

patients did not have a baseline balance score when they entered the Facility (*i.e.*, they were not

put on the Balance Master when they arrived at the Facility), so their Balance Master scores

could not be compared against anything.  This meant that the results could not be used to determine whether the patients were improving or had returned to their prior levels of function—which, as discussed above, is meant to be the purpose of skilled rehabilitation services.  *See* 42 C.F.R. § 409.31(b)(2).

82.     Furthermore, Balance Master tests were very easy to fail, and employees noted that even a top athlete might do so.  Even Whitney—who is substantially younger than the majority of the patients at the Facilities—acknowledged that she herself had been on a Balance Master and "did not do well."

83.     Simply put, Defendants used the Balance Master as a tool to prevent discharges, not as a clinical device to help with patients' rehabilitation.  The Facilities put patients on the Balance Master at the point that they were arguably ready to be discharged in order to convince them (or their families) that the patients had balance deficiencies and should stay longer.  Indeed, when the Balance Master at one of the Facilities was out of use because the rehabilitation operation was shifting locations, Whitney sent Laufer a message asking when the process would be complete because "[t]he balance master is not currently hooked up bc of transition and we really need it to prolong high level discharges."[5]

84.     These schemes had a significant effect on the average length of patient stays at the Facilities.  In particular, Medicare Part A patients at the eleven Facilities stayed, on average, longer than Medicare Part A patients at the vast majority of skilled facilities nationwide.

## II.     Defendants Put Patients in Higher Levels of Therapy Than Was Justified Based on Their Clinical Needs in Order to Maximize Medicare Reimbursement

85.     In addition to prolonging patients' stays at the Facilities to increase the amount billed to Medicare, Defendants also sought to bill Medicare for as much skilled therapy as

---

[5]  "High level discharges" refers to discharges involving higher functioning patients.

possible during the time the patients were at the Facilities, again without regard to the patients'
actual medical needs.  As described in more detail below, Defendants' goal was to put virtually
every patient on the Ultra High—*i.e.*, the most expensive—therapy level, regardless of their
clinical situation.

86.    According to Facility employees, there was no wiggle room when it came to
determining how much rehabilitation therapy Medicare patients would receive.  Rather than rely
on the therapists who evaluate patients upon admission and are supposed to use their professional
judgment to recommend appropriate and tailored therapy, facility management expected
therapists to provide Medicare Part A patients with sixty minutes of occupational therapy and
physical therapy per day, six times per week across the board, putting them into the Ultra High
rehabilitation category and affording the Facility the ability to be reimbursed by Medicare at the
highest possible rate.

87.    Among other effects, this across-the-board practice resulted in high levels of
therapy being provided to patients who, due to their conditions, could not be expected to benefit
from it.  Additionally, the Facilities' efforts to reach at least the minimum minute threshold
necessary to bill for Ultra High rehabilitation led to the provision of "therapy" that did not rise to
the level of skilled services—but was nevertheless billed as such.

88.    For example, even patients who were completely incapacitated and could not be
expected to meaningfully improve, and patients who, due to their conditions, could not tolerate a
substantial amount of physical activity, were inappropriately provided rehabilitation at the Ultra
High level.  A therapist at Oasis, for example, reported simply moving the arms and legs of
patients who were not cognitively present—activities that do not constitute skilled therapy and
were performed simply to reach the requisite number of therapy minutes for the Ultra High level.
An employee of Glen Cove reported that patients were put on Ultra High therapy even if, due to

27

their medical situation, they were unable to tolerate it.  And in one instance, a therapist

complained that even when a patient was not actually engaging in therapy, the therapist was

nevertheless told by the director of rehabilitation to continue and "just write something" in the

patient's chart.  Another therapist, at North Westchester, reported that, because she had to fill the

therapy minutes regardless of patients' needs, she resorted to playing checkers with the patients.

89.     The directive to put patients on the highest therapy level possible without regard

to their medical needs came from Whitney, who expected the Facilities to put new patients on

Ultra High therapy by default.

90.     For example, each Facility's director of rehabilitation was in theory tasked with

determining RUG levels for the patients at his or her Facility.  If the levels were not sufficiently

high, however, Whitney would intervene and dictate what they should be.  For instance, in an

April 4, 2018 message, Whitney told the Director of Rehabilitation at Sutton Park to "pls look at

your RUGs billing," because "[s]ome of the trends with the books seem weird," asking "why

was that person only on RH"—*i.e.*, being given therapy at the High, rather than Ultra High, level.

91.     Whitney, in turn, reported on this strategy to Laufer.  For example, in a November

22, 2013 message, Whitney told Laufer that she had visited Excel and LICC and the "rehab

levels" were "well balanced" but there was "room for improving and prolong dropping residents

down a category" and she would "stay on top of this."

92.     Similarly, in a December 9, 2015 message, Whitney reported to Laufer that she

was at LICC and "the whole team" was "great" except for the Director of Rehabilitation.  Laufer

sent Whitney a voice note in response, stating that the prior year she had said the Director of

Rehabilitation was good, and asking what had changed.  Whitney responded, stating that the

prior year there were about fifty Medicare patients and the Director had been putting "everyone

on ultra appropriately" and keeping people "the appropriate length of stay," but now it was

"quite the opposite," because the Director was "discharging people too soon," and her levels were "all off."

93.     Whitney's pressure to place patients on the Ultra High therapy level by default had the desired effect: the Facilities billed for more Ultra High therapy than the vast majority of skilled facilities nationwide, including in terms of both the average number of therapy days per patient billed to Medicare at the Ultra High level and the proportion of overall therapy that was billed at the Ultra High level.

## DEFENDANTS' PRACTICES LED TO THE SUBMISSION OF FALSE CLAIMS AND FALSE STATEMENTS TO MEDICARE

94.     The Facilities' practice of routinely prolonging patient stays and placing patients on high levels of rehabilitation without regard to their clinical needs led the Facilities to bill Medicare for services that were not reasonable or necessary or skilled, and thus resulted in the submission of false claims for reimbursement to Medicare during the Relevant Period.

95.     As detailed above, this conduct took place at each Facility at the direction of Laufer and Whitney, and directly contravened Defendants' obligation to comply with Medicare requirements.  In particular, Defendants' profit-maximizing practices with respect to Medicare patients violated the requirements that the services billed to Medicare Part A must be reasonable and necessary, *i.e.*, consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs and accepted standards of medical practice, as well as reasonable in terms of duration and quantity.  *See* 42 U.S.C. § 1395y(a)(1)(A); Medicare Benefit Policy Manual, Ch. 8, § 30.

96.     These practices led to the submission of false claims for reimbursement to Medicare.  Specifically, the Facilities submitted to Medicare, via Medicare Administrative Contractors, Form 1450s containing HIPPS codes that falsely represented the Facilities' entitlement to be reimbursed for therapy at higher rates than appropriate, and Form 1450s

seeking reimbursement for therapy during periods when therapy was no longer reasonable or necessary.

97.     Examples of specific patients with respect to whom false claims were submitted to Medicare include the following:

a.  Patient A[6] was a patient at LICC from December 11, 2017 through March 20, 2018. In Patient A's case, the Facility billed Medicare for the full 100 days of therapy at the Ultra High level.  LICC provided therapy at the Ultra High level throughout Patient A's stay despite the fact that Patient A had difficulty participating in therapy due to significant cognitive deficits and had been hospitalized for multiple rib fractures. Further, the Facility never recorded any decrease in the amount of therapy regularly provided.  Indeed, with the exception of the first assessment after admission, the Facility recorded exactly the minimum number of minutes of therapy needed to qualify for the Ultra High level during each lookback period—720 minutes per week. And, during the first assessment period, the Facility billed for therapy at the Ultra High level despite the fact that the Facility's records reflect that only 660 minutes of therapy—*i.e.*, enough to bill only at the Very High level—were provided.  On February 5, 2018, the treatment notes indicated that Patient A had reached the maximum of his/her potential to benefit from occupational therapy, yet therapy continued to be provided at the same high level until March 20, 2018.  Further, after several weeks of physical therapy, no clinically significant changes in functional mobility were reported.  Accordingly, the level of therapy billed to Medicare was excessive, and Patient A received weeks of excessive therapy after such services were

---

[6]   The United States will provide the names and other identifying information for these patients to Defendants upon their request.

no longer reasonable or necessary.  LICC submitted false claims to Medicare for the unreasonable and unnecessary services rendered to Patient A.  Medicare paid LICC a total of $59,320.38 for these services, when, at most, significantly less than that was clinically justified.

b.  Patient B was a patient at Lynbrook from December 27, 2012 through April 6, 2013. In Patient B's case, the Facility billed Medicare for the full 100 days of therapy, with the first 90 days at the Ultra High level and the last 10 days at the Very High level. Prior to hospitalization, Patient B, who suffered from Parkinson's disease and dementia, was unable to perform activities of daily living independently and received home health aide assistance eight hours per day, seven days a week.  Therapy evaluations at Lynbrook reported that Patient B had poor endurance and a minimal ability to follow commands.  Physical therapy was nonetheless recorded at a rate of 80 minutes per day without variation, despite the therapist noting poor endurance, agitation, and confusion and notations that Patient B's level of function fluctuated significantly from day to day.  Further, Patient B's records show that the number of physical and occupational therapy minutes provided was not reduced or therapy discontinued even after the records show that Patient B had reached his/her prior level of function with respect to physical therapy and was making minimal progress with respect to occupational therapy.  Accordingly, the level of therapy billed to Medicare was excessive, and Patient B received weeks of therapy after such services were no longer reasonable or necessary.  Lynbrook submitted false claims to Medicare for unreasonable and unnecessary services rendered to Patient B.  Medicare paid Lynbrook a total of $54,567.07 for these services, when, at most, significantly less than that was clinically justified.

c.  Patient C was a patient at Sutton Park from June 28, 2016 through October 5, 2016. In Patient C's case, the Facility billed Medicare for a 99-day stay at the Ultra High level, with physical and occupational therapy minutes recorded at exactly 60 minutes per day throughout the stay, with the exception of one day on which 30 minutes of physical therapy and 90 minutes of occupational therapy were recorded without any clinical justification for the change. The medical records do not reflect any attempt to customize the amount of therapy Patient C received, and Patient C's physical therapy minutes were never reduced or therapy discontinued despite the fact that the patient regained function, as would be clinically appropriate. Similarly, Patient C's occupational therapy minutes were never reduced or therapy discontinued despite the fact that, by August 2016, the medical records showed that the patient was able to perform all self-care tasks with only contact guard assistance—*i.e.*, no assistance other than the therapist placing his or her hands on the patient's body. Accordingly, the level of therapy billed to Medicare was excessive, and Patient C received weeks of therapy after such services were no longer reasonable or necessary. Sutton Park submitted false claims to Medicare for the unreasonable and unnecessary services rendered to Patient C. Medicare paid Sutton Park a total of 146,339.12 for these services, when, at most, significantly less than that was clinically justified.

d.  Patient D was a patient at North Westchester from March 9, 2018 through June 15, 2018. In Patient D's case, the Facility billed for a 98-day stay at the Ultra High level. Throughout the entire stay, physical therapy was billed for up to 90 minutes per day and occupational therapy was billed at a rate of 60 minutes per day, despite the fact that Patient D, who had been hospitalized due to an exacerbation of his or her Chronic Obstructive Pulmonary Disease, had difficulty breathing and poor endurance.

Therapy continued at this rate despite the fact that Patient D quickly regained function.  Additionally, Patient D's therapy minutes as recorded did not actually meet the minimum thresholds required for the Ultra High RUG level.  Accordingly, a significant proportion of the therapy services billed to Medicare did not occur as billed or were unreasonable and unnecessary, both with respect to the intensity of the therapy provided and the number of days for which it was provided.  North Westchester submitted false claims to Medicare for the unreasonable and unnecessary services rendered to Patient D.  Medicare paid North Westchester a total of $53,685.87 for these services, when, at most, significantly less than that was clinically justified.

e.  Patient E was a patient at Glen Cove from January 20, 2015 through April 30, 2015. In Patient E's case, the Facility billed for a 100-day stay at the Ultra High level.  Prior to being admitted to Glen Cove, Patient E had been hospitalized for a fractured ankle, and the hospital recommended a 25 to 30-minute physical therapy session two to three times per week.  Once at Glen Cove, however, physical therapy was billed at a rate of 90 minutes per day throughout Patient E's 100-day stay.  Moreover, occupational therapy was recorded at a rate of approximately 45 minutes per day throughout the stay (except when occupational therapy was missed one day, after which 90 minutes were recorded for the following day without any clinical justification).  The therapy records did not identify skilled activities and exercises that would support the number of minutes of therapy recorded, or any evidence that the type, intensity, or frequency of therapy were tailored to Patient D's individual needs. Accordingly, much of the therapy billed to Medicare was unskilled or unreasonable and unnecessary, both with respect to the intensity of the therapy provided and the

number of days for which it was provided.  Glen Cove submitted false claims to Medicare for the unreasonable and unnecessary services rendered to Patient E. Medicare paid Glen Cove a total of $55,964.86 for these services when, at most, significantly less than that was clinically justified.

f.  Patient F was a patient at Momentum from January 17, 2018 through April 26, 2018, following a five-day admission to the hospital for diarrhea.  In Patient F's case, the Facility billed for a 99-day stay at the Ultra High level.  The Facility billed for 60 minutes of physical therapy and 60 minutes of occupational therapy per day throughout Patient F's stay, despite notes in the medical record that the patient was noncompliant with treatment and unable to be redirected the majority of the time. The Facility continued to bill for therapy at the same level even after the medical records indicate that Patient F was able to perform basic mobility tasks with only contact guard assistance and did not have significant self-care deficits requiring the specialized skills of an occupational therapist.  Accordingly, the level of therapy billed to Medicare was excessive, and Patient F received weeks of therapy after such services were no longer reasonable or necessary.  Momentum submitted false claims to Medicare for the unreasonable and unnecessary services rendered to Patient F. Medicare paid Momentum a total of $58,622.23 for these services when, at most, significantly less than that was clinically justified.

g.  Patient G was a patient at Oasis from July 17, 2015 through October 25, 2015, following a hospitalization after falling, likely due to alcohol intoxication.  Patient G's medical records reflect that Patient G came to the Facility seeking alcohol detoxification services.  In Patient G's case, the Facility billed Medicare for a 100-day stay, with 90 days billed at the Ultra High level and 10 days billed at the Very

34

High level.  Patient G's medical records do not justify the amount of therapy for which Oasis billed Medicare.  Specifically, the bi-weekly progress notes do not reflect that Patient G engaged in skilled activities or exercises to support the minutes of therapy recorded, and in some instances the minutes recorded failed to reach the minimum needed to justify the level billed by the Facility, without any adjustments to the amount or type of services offered.  Further, physical and occupational therapy minutes were not reduced or therapy discontinued after Patient G's impairment decreased and his/her goals were met, as would be clinically appropriate, and any care could have been provided by non-skilled providers.  Instead, physical therapy and occupational therapy were generally recorded for 60 minutes a day throughout Patient G's stay, except on a few days when the number of minutes was increased to 90 minutes without clinical justification.  This was the case even after Patient G was able to perform basic mobility tasks and most activities of daily living with little to no assistance and the patient's medical records did not identify complex impairments or deficits that would justify daily therapy services.  Accordingly, much of the therapy billed to Medicare either did not occur as billed, was unskilled, or was unreasonable and unnecessary, both with respect to the intensity of the therapy provided and the number of days for which it was provided.  Oasis submitted false claims to Medicare for the unreasonable and unnecessary services rendered to Patient G.  Medicare paid Oasis a total of $54,639.63 for these services when, at most, significantly less than that was clinically justified.

h.  Patient H was a patient at Excel from May 11, 2015 through June 15, 2015, following inpatient psychiatric care related to bipolar disorder.  In Patient H's case, the Facility billed for physical and occupational therapy at the Ultra High level for the full length

of the patient's stay, despite Patient H's difficulty following commands.  Further, the therapy notes do not identify skilled activities or exercises necessary to support the minutes of therapy recorded.  Accordingly, Patient H's records do not demonstrate that the amount of high-level therapy for which Excel billed Medicare was reasonable and necessary.  Excel submitted false claims to Medicare for the unreasonable and unnecessary services rendered to Patient H.  Medicare paid Excel a total of $18,507.25 for these services, when, at most, significantly less than that was clinically justified.

i.  Patient I was a patient at Marquis from August 21, 2013 through November 28, 2013. In Patient I's case, the Facility billed Medicare for the full 100 days of therapy, all at the Ultra High level.  Patient I's notes did not show a reduction of physical therapy minutes when Patient I improved function and his or her impairment decreased, as would be clinically appropriate.  Instead, Patient I continued therapy at the same level even after the point that Patient I's medical records reflect that he or she needed only contact guard assistance with functional mobility.  With respect to occupational therapy, Patient I's medical records consistently note that the patient was resistant to treatment and lacked motivation to participate; and reflect that Patient I simply engaged in repetitive exercises rather than activities requiring the services of a skilled therapist.  Accordingly, the level of therapy billed to Medicare was excessive, and Patient I received weeks of therapy that were unskilled or unreasonable and unnecessary.  Marquis submitted false claims to Medicare for the unreasonable and unnecessary services rendered to Patient I.  Medicare paid Marquis a total of $55,224.493 for these services when, at most, significantly less than that was clinically appropriate.

98.     For these patients and others, the Facilities submitted to CMS false claims—specifically, Form 1450s containing HIPPS codes that falsely represented the Facilities' entitlement to be reimbursed for therapy at higher rates than appropriate, and Form 1450s seeking reimbursement for therapy during periods when such therapy was not reasonable or necessary.  A list of examples of false claims submitted in connection with the patients described above is attached as Exhibit A.  A blank Form 1450 is attached as Exhibit B.

99.     Additionally, Defendants made false statements material to false claims submitted to Medicare Part A.  Specifically, as discussed above, in order to be paid, the Facilities completed MDS forms for each patient assessing the patient's clinical condition, physical and mental functioning, and actual and expected use of services.  An example of a blank MDS form in use during the Relevant Period is attached as Exhibit C.[7]  In the MDS forms, the Facilities certified that the information contained in the forms met all applicable Medicare requirements. This includes the requirements that services rendered to patients were both reasonable and necessary.  Because the MDS forms submitted by the Facilities reflected services that were not reasonable and necessary, statements made in the MDS forms—including the Facilities' certifications of compliance with the applicable regulations—were false.

## DEFENDANTS' FRAUDULENT CONDUCT WAS MATERIAL TO CMS'S PAYMENT DECISIONS

100.     Whether a SNF has complied with its obligation to submit claims only for those services that are "reasonable and necessary for the diagnosis or treatment of illness or injury," 42 U.S.C. § 1395y(a)(1)(A), is material to CMS's payment decisions.  If CMS had known that the Facilities submitted claims for rehabilitation therapy services that were unreasonable,

---

[7]     The MDS forms were modified slightly over the course of the Relevant Period but all versions included the relevant certification language.

unnecessary, unskilled, or not actually provided as claimed, it would not have paid for those services.

101.     In particular, as reflected in the Medicare Enrollment Applications SNFs must complete in order to submit claims to and receive payment from Medicare, compliance by SNFs with applicable Medicare requirements is a condition of payment under the Medicare program. Further, Defendants' submission of claims for rehabilitation therapy services that were unreasonable, unnecessary, unskilled, or not actually provided as claimed had a direct effect on the payments Defendants received.  Specifically, these false submissions were material to CMS's decision to reimburse Defendants for therapy services at a higher rate, and for a longer period of time, than permissible under the applicable regulations.  As discussed above, the payments SNFs receive are based on HIPPS codes, which in turn incorporate patients' RUG information.  If the Facilities submitted claims with HIPPS codes reflecting RUG levels that were based on the therapy that was actually reasonable and necessary, Medicare would have paid the Facilities at that lower rate.

102.     As set forth above, moreover, the Facilities were required to certify on their MDS forms that the information therein was collected in accordance with applicable Medicare requirements.  As such, Defendants' practice of billing for therapy that was not reasonable or necessary, in violation of Medicare's requirements, was material to CMS's payment decisions. Additionally, the MDS forms themselves are material to any claim being submitted to the Government for payment, because the MDS form dictates the amount that CMS will pay to the entity submitting the form, and because the entity submitting the MDS form must, as a condition of payment by CMS, certify that it has complied with applicable Medicare requirements.

103.     In keeping with CMS's focus on ensuring that SNFs are paid only for those services that are reasonable and necessary, Medicare Administrative Contractors—the entities

that actually process and pay Medicare claims submitted by SNFs—are authorized to audit providers' claims to determine whether the services billed were reasonable and necessary and, if not, prevent payment.  *See* Medicare Program Integrity Manual, Pub. No. 100-08, Chapters 1, 3 & 6, available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Manuals/Internet-Only-Manuals-IOMs-Items/CMS019033.  In addition, Recovery Audit Contractors ("RACs") are authorized to audit SNFs to determine whether claims have been paid appropriately and to recoup inappropriate payments.  *Id.*  This includes auditing SNFs to determine whether they are overbilling for therapy services and, to the extent such overbilling is identified, to prevent or recoup payments.  *See, e.g.*, *id.* § 3.6.2.4.

104.    In addition to these measures designed to prevent or reverse billing for unreasonable and unnecessary therapy services, the Government has aggressively pursued SNFs that have engaged in fraud of the type at issue here.  In 2016, for example, Life Care Centers of America Inc., a company that owns and operates skilled nursing facilities across the country, and its owner, Forrest L. Preston, agreed to pay $145 million to resolve a Government lawsuit alleging that Life Care violated the FCA by causing the skilled nursing facilities to submit false claims to Medicare and TRICARE for rehabilitation therapy services that were not reasonable, necessary, or skilled.  *See* https://www.justice.gov/opa/pr/life-care-centers-america-inc-agrees-pay-145-million-resolve-false-claims-act-allegations.  Similar to the allegations at issue here, that lawsuit alleged, *inter alia*, that Life Care had a practice of placing beneficiaries in the Ultra High reimbursement level irrespective of their clinical needs and sought to keep patients at the facilities longer than necessary to continue billing for therapy.  *Id.*

105.    Similarly, in 2018, two consulting companies—Southern SNF Management, Inc. and Rehab Services in Motion—and nine affiliated skilled nursing facilities settled claims that they violated the FCA by submitting or causing the submission of false claims to Medicare for

unnecessary rehabilitation therapy services.  *See* https://www.justice.gov/opa/pr/ two-consulting-companies-and-nine-affiliated- skilled-nursing-facilities-pay-10-million.  In that case, as here, the Government alleged that the defendants' practices encouraged the provision of therapy without regard for patients' individual clinical needs.  *Id.*  These cases and others reflect the Government's active efforts to enforce the Medicare requirements at issue in this case.

## COUNT I

### Violation of the FCA: Presentation of False Claims for Payment
### (31 U.S.C. § 3729(a)(1)(A))

106.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

107.    The Government seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(A).

108.    Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, presented, either directly or indirectly, false or fraudulent claims for payment to the Government.  Specifically, Defendants knowingly, or acting with deliberate indifference or reckless disregard of the truth, presented false or fraudulent claims for payment to Medicare Part A, specifically, Form 1450s requesting payment for unreasonable, unnecessary, or unskilled therapy services, or for therapy services that did not occur as billed.

109.    The Government made payments to the Defendants because of the false or fraudulent claims.

110.    If the Government had known that the claims presented for payment were for the provision of unreasonable, unnecessary, or unskilled therapy services, or for therapy services that did not occur as billed, the Government would not have paid the claims.

111.    By virtue of these false or fraudulent claims, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## COUNT II

### Violation of the FCA: Use of False Statements
### (31 U.S.C. § 3729(a)(1)(B))

112.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

113.    The Government seeks relief against Defendants under 31 U.S.C. § 3729(a)(1)(B).

114.    Through the acts set forth above, Defendants knowingly, or acting with deliberate ignorance or reckless disregard for the truth, made, used or caused to be made or used false records and statements material to the payment of false or fraudulent claims by the Government. Specifically, Defendants knowingly, or acting with deliberate ignorance or reckless disregard of the truth, made, used, or caused to be made or used false or fraudulent records, including false MDS forms, that were material to false or fraudulent claims for payment for unreasonable, unnecessary, or unskilled therapy, or for therapy that was not provided.

115.    By virtue of these false records or statements, the Government has been damaged in a substantial amount to be determined at trial and is entitled to recover treble damages plus a civil monetary penalty for each false record or statement.

## COUNT III

### Unjust Enrichment

116.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

117.    Through the acts set forth above, Defendants have received payments to which they were not entitled and therefore have been unjustly enriched.  The circumstances of these payments are such that, in equity and good conscience, Defendants should not retain those payments, the amount of which is to be determined at trial.

## COUNT IV

### Payment by Mistake of Fact

118.    The Government incorporates by reference each of the preceding paragraphs as if fully set forth in this paragraph.

119.    The Government seeks relief against Defendants to recover monies paid under mistake of fact.

120.    The Government paid money to Defendants as a result of a mistaken understanding.  Specifically, the Government paid Defendants' claims under the mistaken and erroneous understanding that such claims were for services that were reasonable and necessary and actually occurred as billed.  This erroneous understanding was material to the determination to pay Defendants' claims.  Had the Government known that the claims were for the provision of unreasonable, unnecessary, or unskilled therapy services, or for therapy services that were not in fact rendered as billed, it would not have paid such claims.  Those payments were therefore by mistake.

121.    As result of such mistaken payments, the Government has sustained damages for which Defendants are liable in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff, the Government, requests that judgment be entered in its favor as follows:

(a)     on the First and Second Claims for relief (violation of the FCA, 31 U.S.C. §§ 3729(a)(1)(A) and (a)(1)(B)), a judgment against Defendants for treble damages and civil penalties to the maximum amount allowed by law.

(b)     on the Third and Fourth Claims for relief (unjust enrichment and payment by mistake of fact), a judgment against Defendants for damages to the extent allowed by law.

(d)     An award of costs and such further relief as is proper.

Dated:     New York, New York
           June 2, 2021

                                        Respectfully submitted,

                                        AUDREY STRAUSS
                                        United States Attorney for the
                                        Southern District of New York


                          By:      */s/ Rachael Doud*_____
                                        RACHAEL DOUD
                                        JACOB M. BERGMAN
                                        Assistant United States Attorneys
                                        86 Chambers Street, 3rd Floor
                                        New York, NY 10007
                                        Tel: (212) 637-2776/3274
                                        Email: rachael.doud@usdoj.gov
                                              jacob.bergman@usdoj.gov
                                              *Attorneys for the Government*