**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* INTEGRA MED ANALYTICS LLC,<br><br>        Plaintiff-Relator,<br><br>    v.<br><br>ISAAC LAUFER, *et al.*,<br><br>        Defendants. | No. 17 Civ. 9424 (CS) |
| UNITED STATES OF AMERICA,<br><br>        Plaintiff,<br><br>    v.<br><br>ISSAC LAUFER, *et al.*,<br><br>        Defendants. | |

**THE UNITED STATES OF AMERICA'S OMNIBUS MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS**

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.: (212) 637-2776/2689
E-mail: jacob.bergman@usdoj.gov
       danielle.levine@usdoj.gov

JACOB M. BERGMAN
DANIELLE J. LEVINE
Assistant United States Attorneys
– Of Counsel –

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................... iii

PRELIMINARY STATEMENT ............................................................................ 1

BACKGROUND ................................................................................................. 4

I.    Medicare Part A Reimbursement for Reasonable and Necessary Services ........ 4

    A.    During the Covered Period, the Facilities' Reimbursement Under Medicare Part A Was Based on the Number of Minutes of Skilled Therapy Provided and Limited to 100 Days of Care ............................ 4

    B.    The Facilities Were Required to Report Therapy Times and Certify That the Services Complied with Medicare Rules and Regulations ............................... 7

II.    Defendants Violated the False Claims Act by Submitting, or Causing the Submission of, Claims to Medicare for Medically Unnecessary or Unreasonable Services ..................................................................................... 9

    A.    Laufer and Whitney Caused the Facilities to Keep Patients Longer Than Was Medically Reasonable or Necessary ............................................ 10

    B.    Whitney and Laufer Caused the Facilities to Put Patients on Higher Levels of Skilled Therapy Than Was Justified, to Maximize Medicare Reimbursement ...................................................................................... 11

    C.    Defendants' Scheme Resulted in the Submission of False Claims ........................ 12

ARGUMENT ..................................................................................................... 13

I.    The Complaint Satisfies Federal Rule of Civil Procedure 9(b) ......................... 13

    A.    The Complaint Alleges with Particularity a Centralized Fraudulent Scheme Implemented Across the Facilities by Laufer and Whitney .................... 16

    B.    The Complaint Details Defendants' FCA Violations Through Specific Examples of Misconduct and Representative False Claims ................................ 21

        1.    The Complaint Provides Specific Allegations of Laufer and Whitney's Misconduct and the Pressure They Exerted on the Facilities ...................................................................................... 23

        2.    The Complaint's Representative False Claims Coupled with the Details of the Fraudulent Scheme More Than Satisfy Rule 9(b) .............. 25

(a)     The Complaint Plausibly Alleges That False Claims Were Submitted ....................................................................27

(b)     The Complaint Sufficiently Identifies Sample False Claims from the Covered Period ..................................................28

(c)     The Complaint Plausibly Alleges that False Claims Were Submitted by All Facilities .............................................30

(d)     Defendants' Arguments That the Services Provided Were Reasonable and Medically Necessary Are Improper at This Stage.......................................................................32

C.     The Complaint Specifies the "Who" with Particularity.........................................34

II.     The Government Has Adequately Pleaded That Defendants Acted with Scienter............36

III.     The Government's Claims Are Not Time-Barred ............................................................40

IV.     The Motions to Dismiss the Government's Common Law Claims Should be Denied ....................................................................................43

A.     The Complaint Adequately Pleads Federal Common Law Claims Against the Facilities .....................................................43

B.     The Government Has Properly Alleged Common Law Claims Against Laufer and Whitney ...................................................45

CONCLUSION.......................................................................................................................49

# TABLE OF AUTHORITIES

**Cases**                                                                                          **Page(s)**

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009) ................................................................................. 14, 27, 33

*Bell Atlantic Corp. v. Twombly*,
   550 U.S. 544 (2007) ........................................................................................... 33

*Blobel v. Kopfli*,
   2018 N.Y. Misc. LEXIS 549 (N.Y. Sup. Ct. Feb. 13, 2018) ................................ 48

*Braden v. Wal-Mart Stores, Inc.*,
   588 F.3d 585 (8th Cir. 2009) ....................................................................... 24, 37

*Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*,
   373 F.3d 296 (2d Cir. 2004) ............................................................................... 48

*Clearfield Trust Co. v. United States*,
   318 U.S. 363 (1943) ........................................................................................... 46

*Cox v. Microsoft Corp.*,
   778 N.Y.S.2d 147 (N.Y. App. Div. 1st Dep't 2004) ............................................ 45

*DeMasi v Benefico*,
   567 F. Supp. 2d 449 (S.D.N.Y. 2008) ............................................... 24, 25, 33, 36

*Downey v. State Farm Fire & Cas. Co.*,
   266 F.3d 675 (7th Cir. 2001) ............................................................................. 46

*Employees Retirement Sys. of Government of Virgin Islands v. Blanford*,
   794 F.3d 297 (2d Cir. 2015) ............................................................................... 29

*Georgia Malone & Co. v. Rieder*,
   19 N.Y.3d 511 (N.Y. 2012) ................................................................................ 48

*Global Network Commn'cs, Inc. v. City of New York*,
   458 F.3d 150 (2d Cir. 2006) ............................................................................... 33

*In re Int. Rate Swaps Antitrust Litig.*,
   261 F. Supp. 3d 430 (S.D.N.Y. 2017) ................................................................ 48

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
   797 F.3d 160 (2d Cir. 2015) ............................................................................... 16

*LTV Educ. Sys., Inc. v. Bell*,
   862 F.2d 1168 (5th Cir. 1989) ........................................................................... 46

*M+J Savitt, Inc. v. Savitt*,
   No. 08-cv-8535, 2009 U.S. Dist. LEXIS 21321 (S.D.N.Y. Mar. 17, 2009) ............................ 48

*Matarese v. Moore-McCormack Lines, Inc.*,
   158 F.2d 631 (2d Cir. 1946) ............................................................................................... 48

*Miller v. Holzmann*,
   No. 95-1231 2007 WL 710134 (D.D.C. Mar. 6, 2007) ........................................................ 45

*Myun-Uk Choi v. Tower Research Capital, LLC*,
   890 F.3d 60 (2d Cir. 2018) ................................................................................................. 45

*O'Brien v. Nat'l Prop. Analysts Partners*,
   936 F.2d 674 (2d Cir. 1991) ............................................................................................... 36

*United States ex rel. Academy Health Ctr., Inc. v. Hyperion Foundation, Inc.*,
   No. 10-552, 2014 WL 3385189 (S.D. Miss. July 9, 2014) .................................................. 44

*United States ex rel. Alt v. Anesthesia Services Associates*,
   No. 3:16-cv-0549, 2019 U.S. Dist. LEXIS 223008 (M.D. Tenn. Dec. 31, 2019) .................. 37

*United States ex rel. Banton v UT Med. Grp.*,
   No. 03-CV-2740-JPM-DKV, 2010 WL 11493942 (W.D. Tenn. Jan. 27, 2010) ..................... 44

*United States ex rel. Bibby v. Wells Fargo Bank, N.A.*,
   906 F. Supp. 2d 1288 (N.D. Ga. 2012) .............................................................................. 16

*United States ex rel. Bilotta v. Novartis Pharm. Corp.*,
   50 F. Supp. 3d 497 (S.D.N.Y. 2014) ................................................................. 13, 25, 43, 44

*United States ex rel. Bledsoe v. Cmty. Health Sys.*,
   501 F.3d 493 (6th Cir. 2007) ................................................................................ 13, 15, 35

*United States ex rel. Chorches v. Am. Med. Response, Inc.*,
   865 F.3d 71 (2d Cir. 2017) ............................................................................................ 13, 14

*United States ex rel. Drennen v. Fresenius Medical Care Holdings, Inc.*,
   No. 09-cv-10179, 2012 WL 8667597 .............................................................................. 32, 35

*United States ex rel. Duxbury v. Ortho Biotech Prods.*,
   579 F.3d 13 (1st Cir. 2009) ........................................................................................ *passim*

*United States ex rel. Escobar v. Universal Health Servs.*,
   780 F.3d 504 (1st Cir. 2015) ............................................................................... 30, 37, 42

*United States ex rel. Fox v. Omnicare, Inc.*,
   No. 1:11-cv-962, 2013 WL 2303768 (N.D. Ga. May 17, 2013) .......................................... 35

*United States ex rel. Freedman v. Suarez-Hoyos*,
No. 8:04-cv-933, 2012 WL 4344199 (M.D. Fla. Sep. 21, 2012)............................................. 27

*United States ex rel. Gelbman v. City of New York*,
No. 14-CV-771 (VSB), 2018 WL 4761575 (S.D.N.Y. Sept. 30, 2018) .................................... 34

*United States ex rel. Hayward v. SavaSeniorCare, LLC*,
No. 11-00821, 2016 WL 5395949 (M.D. Tenn. Sept. 27, 2016)........................................ *passim*

*United States ex. rel. Heath v. AT&T, Inc.*,
791 F.3d 112 (D.C. Cir. 2015) ........................................................................................ 14, 35

*United States ex rel. Ibanez v. Bristol-Meyers Squibb Co.*,
874 F.3d 905 (6th Cir. 2017) ..................................................................................................... 38

*United States ex rel. Integra Med Analytics, LLC v. Creative Solutions in Healthcare*,
No. SA-17-CV-1249, 2019 WL 5970283 (W.D. Tex. Nov. 13, 2019) .................................... 40

*United States ex rel. Kester v. Novartis Pha*rm. *Corp.* ("*Kester I*"),
23 F. Supp. 3d 242 (S.D.N.Y. 2014)...................................................................... 13, 14, 15, 44

*United States ex rel. Kester v. Novartis Pharm. Corp.* ("*Kester VII*"),
11 Civ. 8196 (CM), 2015 WL 109934 (S.D.N.Y. Jan. 6, 2015)............................ 28, 31, 32, 42

*United States ex rel. Klump v. Dynamics Corp. of Am.*,
No. 95-1016, 1998 WL 34194886 (S.D. Ohio Nov. 17, 1998) ................................................ 47

*United States ex rel. Ladas v. Hospice Care LLC*,
No. 06-cv-2455, 2010 WL 5067614 (D. Kan. Dec. 7, 2010) ............................................ 27, 29

*United States ex rel. Lawson v. Aegis Therapies, Inc.*,
No. CV 210-72, 2015 WL 1541491 (S.D. Ga. Mar. 31, 2015) ................................................ 25

*United States ex rel. Lawson v. Aegis Therapies, Inc.*,
No. CV 210-72, 2013 WL 5816501 (S.D. Ga. Oct. 29, 2013) ................................................. 25

*United States ex rel. Longo v. Wheeling Hospital, Inc.*,
No. 19-cv-192, 2019 WL 4478843 (N.D. W. Va. Sept. 18, 2019) .............................. 17, 18, 39

*United States ex rel. Manion v. St. Luke's Reg'l Med. Ctr., Ltd.*,
No. CV 06-498, 2008 WL 906022 (D. Idaho Mar. 31, 2008) ............................... 30, 31, 32, 42

*United States ex rel. Martin v. Life Care Centers of America, Inc.*,
No. 08-cv-251, 2014 WL 11429265 (E.D. Tenn. Mar. 26, 2014) .................................... *passim*

*United States ex rel. Ormsby v. Sutter Health*,
444 F. Supp. 3d 1010 (N.D. Cal. 2020) ............................................................................. 35, 43

*United States ex rel. Piacentile v. Wolk*,
  No. 93-5773, 1995 WL 20833 (E.D. Pa. Jan. 17, 1995).........................................47

*United States ex rel. Roberts v. Aging Care Home Health, Inc.*,
  474 F. Supp. 2d 810 (W.D. La. 2007)..............................................................46, 47

*United States v. Rogan*,
  459 F. Supp. 2d 692 (N.D. Ill. 2006) ...............................................................47, 48

*United States ex rel. Sansbury v. LB & B Assocs., Inc.*,
  58 F. Supp. 3d 37 (D.D.C. 2014) ............................................................................41

*United States ex rel. Schmidt v. Zimmer, Inc.*,
  386 F.3d 235 (3d Cir. 2004)....................................................................................27

*United States ex rel. Tahlor v. AHS Hosp. Corp.*,
  No. 08-cv-2042, 2014 WL 4494793 (D.N.J. Sept. 10, 2014)..................................31

*United States ex rel. Vatan v. QTC Med. Servs., Inc.*,
  721 F. App'x 662 (9th Cir. 2018) ...........................................................................17

*United States ex rel. Wood v. Allergan, Inc.*,
  246 F. Supp. 3d 772 (S.D.N.Y. 2017)......................................................................28

*United States v. Erie County Med. Ctr.*,
  No. 02-0305, 2002 WL 31655004 (W.D.N.Y. Oct. 30, 2002) .................................44

*United States v. General Dynamics Corp.*,
  19 F.3d 770 (2d Cir. 1994)......................................................................................43

*United States v. Geri-Care, Inc.*,
  No. 89-5720, 1990 WL 9463 (E.D. Pa. Feb. 1, 1990) .............................................44

*United States v. Halifax Hosp. Med. Ctr.*,
  No. 6:09-cv-1002, 2012 WL 921147 (M.D. Fla. Mar. 19, 2012) ............................45

*United States v. Huron Consulting Grp., Inc.*,
  No. 09 Civ. 1800 (JSR), 2011 WL 253259 & n.3 (S.D.N.Y. Jan. 24, 2011) ..........35

*United States v. Inc. Vil. of Is. Park*,
  888 F. Supp. 419 (E.D.N.Y. 1995) ..........................................................................44

*United States v. Intrados/International Mgmt. Grp.*,
  265 F. Supp. 2d 1 (D.D.C. 2002).............................................................................44

*United States v. Kimbell Foods.*,
  440 U.S. 715 (1979).................................................................................................46

*United States v. Movtady*,
   13 F. Supp. 3d 325 (S.D.N.Y. 2014).................................................. *passim*

*United States v. NHC Healthcare Corp.*,
   115 F. Supp. 2d 1149 (W.D. Mo. 2000) .......................................... 29, 42

*United States v. Omnicare*,
   No. 15-cv-4179 (CM), 2021 WL 1063784 (S.D.N.Y. Mar. 19, 2021) ............ *passim*

*United States v. Park*,
   389 F. Supp. 3d 561 (N.D. Ill. 2019) ............................................... 46

*United States v. Spectrum Painting Corp.*,
   No. 19-cv-2096, 2020 U.S. Dist. LEXIS 154650 (S.D.N.Y. Aug. 25, 2020).......... 48

*United States v. Strock*,
   982 F.3d 51 (2d Cir. 2020)............................................................ 36

*United States v. UBS Sec. LLC*,
   No. 18-CV-6369 (MKB), 2019 WL 6721718 (E.D.N.Y. Dec. 10, 2019) ........... 16

*United States v. Vernon Home Health*,
   21 F.3d 693 (5th Cir. 1994) .......................................................... 46

*United States v. Wells Fargo Bank, N.A.*,
   972 F. Supp. 2d 593 (S.D.N.Y. 2013)........................................... *passim*

*Vila v. Inter-Am. Inv. Corp.*,
   570 F.3d 274 (D.C. Cir. 2009) .................................................... 24, 37

**Statutes**

28 U.S.C. § 2415(a) .......................................................................... 44

31 U.S.C. § 3729(b)(1)(A) .................................................................. 36

31 U.S.C. § 3729(b)(1)(B) .................................................................. 35

31 U.S.C. § 3731(b) .......................................................................... 40

31 U.S.C. § 3731(b)(2) ....................................................................... 41

31 U.S.C. § 3731(c) ........................................................................... 41

31 U.S.C. §§ 3729-33 ......................................................................... 1

42 U.S.C. § 1395d(a)(2)(A) ................................................................... 6

42 U.S.C. § 1395f(a)(2)(B) .................................................................... 4

42 U.S.C. § 1395g(a) ................................................................ 8

42 U.S.C. § 1395y(a)(1)(A) ....................................................... 4

**Rules**

Federal Rule of Civil Procedure 9(b) ................................... *passim*

**Regulations**

42 C.F.R. § 409.32(a) ............................................................... 4

42 C.F.R. § 409.33(c) ............................................................... 5

42 C.F.R. § 409.61(b) ............................................................... 6

42 C.F.R. § 413.343 ................................................................. 7

42 C.F.R. § 483.20(f)(3) ........................................................... 7

42 C.F.R. §§ 409.31(a)-(b) ................................................... 4, 5

**Other Authorities**

63 Fed. Reg. 26,252 (May 12, 1998) ............................ 5, 6, 7, 39

64 Fed. Reg. 41,644 (July 30, 1999) ..................................... 6, 7

83 Fed. Reg. 39,162 (Aug. 8, 2018) ......................................... 6

S. Rep. No. 345, 99th Cong., 2d Sess., 30 (July 28, 1986) .......... 40

The United States of America (the "United States" or the "Government"), by its attorney, Damian Williams, United States Attorney for the Southern District of New York, respectfully submits this memorandum of law in opposition to the motions by Defendants Montclair Care Center, Inc. ("Marquis"), East Rockaway Center LLC ("Lynbrook"), Excel at Woodbury for Rehabilitation and Nursing, LLC ("Excel"), Long Island Care Center Inc. ("LICC"), Treetops Rehabilitation & Care Center LLC ("North Westchester"), Sutton Park Center For Nursing & Rehabilitation, LLC ("Sutton Park"), Suffolk Restorative Therapy & Nursing, LLC ("Momentum"), Oasis Rehabilitation and Nursing, LLC ("Oasis"), Forest Manor Care Center, Inc. ("Glen Cove"), Surge Rehabilitation & Nursing LLC ("Surge"), Quantum Rehabilitation & Nursing LLC ("Quantum," and together with the other facilities, the "Facilities"), Issac Laufer ("Laufer"), Tami Whitney ("Whitney"), and Paragon Management SNF LLC ("Paragon"), to dismiss the United States' Complaint-in-Intervention (the "Complaint").[1]

## PRELIMINARY STATEMENT

From 2010 through 2019 (the "Covered Period"), Defendants Paragon, which manages a group of New York skilled nursing facilities; Issac Laufer, who owns Paragon; the Facilities, ten of which Laufer owns and all of which he controls through Paragon; and Tami Whitney, an employee of Paragon and the Coordinator of Rehabilitation Services for the Facilities, violated the False Claims Act (the "FCA"), 31 U.S.C. §§ 3729-33, by fraudulently billing Medicare for medically unreasonable and unnecessary services.

As the Complaint specifically alleges, Laufer and Whitney caused the Facilities to submit false claims to Medicare through two fraudulent schemes. First, Laufer and Whitney pressured

---

[1] The United States refers to the Facilities' memorandum of law as the "Facilities Mem.," Laufer's memorandum of law as the "Laufer Mem.," Whitney's memorandum of law as the "Whitney Mem.," and Paragon's memorandum of law as the "Paragon Mem."

and directed the Facilities to prevent patients from being discharged until they stayed as close 100 days as possible—the maximum amount compensable by Medicare—without regard to the patients' actual medical needs. Second, Whitney, with Laufer's knowledge, pressured the Facilities to place almost all patients on Ultra High Rehabilitation—the most expensive level of therapy, which is reserved for only the most complex cases—again without regard to whether this treatment was medically necessary.

In support of these allegations, the Complaint includes nine examples of patients who received excessive and unnecessary services and the corresponding false claims submitted to Medicare. The Complaint also identifies specific evidence of Defendants' fraudulent scheme, including text messages between Laufer and Whitney in which they openly discussed putting all patients on Ultra High rehab, and fraudulently keeping patients from being discharged even when further treatment was unnecessary. To cite only one example, Whitney wrote to Laufer that she prohibited patients from using the bathrooms by themselves, in order to keep them from thinking they were ready to go home. The Complaint also alleges that numerous Facility employees witnessed and were pressured to carry out this scheme. For instance, the Complaint describes how patients were not allowed to use walkers or were kept in wheelchairs, all to stunt or mask their progress and keep them from being discharged. As Whitney said, the "goal" of these tactics had nothing to do with the patients' medical needs, but "was to make money." As a result, the Complaint alleges, patients often received unnecessary and even detrimental treatment, for which Defendants then fraudulently billed the Government.

Defendants primarily contend that that the Government's allegations of fraud are insufficient to meet the particularity requirements under Federal Rule of Civil Procedure 9(b). But Defendants ignore and mischaracterize the many detailed allegations in the Complaint as to

each element of the fraudulent scheme implemented across the Facilities, as well as the multiple representative examples of specific false claims. The Complaint explains with particularity how and why Defendants improperly prolonged patient stays and billed for unreasonable, unnecessary, or unskilled therapy sessions, details Defendants' knowledge of the fraud, and sets forth the specific information in each claim that was false. When taken in the light most favorable to the Government—as required when considering a motion to dismiss—the Complaint plainly and plausibly alleges a fraudulent scheme in violation of the FCA, and sets forth specific facts regarding individual false claims that more than sufficiently satisfy the pleading requirements of Rule 9(b).

Defendants also resort to mischaracterizing and speculating about the allegations in the Complaint to argue that the Government cannot establish scienter, casting the alleged fraudulent conduct as "benign business communications" and "naked" allegations of pressure. But Defendants selectively quote the Complaint and ignore the plain and plausible import of its allegations, advancing theoretical alternative interpretations that frame them more favorably to Defendants. Not only are Defendants' arguments premised on an incorrect pleading standard, but they also disregard and misconstrue the Complaint's detailed and specific allegations.

Finally, Defendants' arguments that certain of the Government's claims are time-barred and its common law claims should be dismissed are based on fundamental misunderstandings of law. The Government's FCA claims fall well within the applicable statute of limitations—ten years from the 2017 filing of the relator's *qui tam* complaint. Further, Defendants' common-law arguments disregard established precedent recognizing that federal common law claims exist and upholding the validity of such alternative claims in False Claims Act healthcare cases.

Defendants' motions to dismiss should be denied.

**BACKGROUND**

## I.   Medicare Part A Reimbursement for Reasonable and Necessary Services

The Facilities, like all Medicare providers of inpatient services, can only bill Medicare Part A for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395y(a)(1)(A). Further, the Facilities, like all skilled nursing facilities ("SNFs"), can only bill Medicare for services that are: consistent with the nature and severity of the patient's individual illness, injury, or particular medical needs; consistent with accepted standards of medical practice; and reasonable in terms of duration and quantity. *See* Medicare Benefit Policy Manual, Ch. 8, § 30; *see also* 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. §§ 409.31(a)-(b) (explaining that, to justify SNF care, a medical practitioner must certify on a continuing basis that services are required because the individual needs skilled services daily).

### A.   During the Covered Period, the Facilities' Reimbursement Under Medicare Part A Was Based on the Number of Minutes of Skilled Therapy Provided and Limited to 100 Days of Care

A SNF can only be reimbursed through Medicare Part A for rehabilitation services if the patient needs, among other things: (1) skilled nursing or rehabilitation services that (2) can only be provided in a SNF on an inpatient basis, (3) to address a condition that the patient received treatment for during a qualifying hospital stay, and (4) that require the skills of professional personnel such as licensed therapists. 42 U.S.C. § 1395f(a)(2)(B); 42 C.F.R. §§ 409.31(a)-(b).

Skilled therapy services are specifically defined by regulation and may include the disciplines of physical, occupational, and speech therapy. *See* 42 C.F.R. § 409.32(a). For the services to be considered skilled rehabilitation, they must be "so inherently complex that [they]

can be safely and effectively performed only by, or under the supervision of, professional or technical personnel." [2] *See id*.

By contrast, the "[g]eneral supervision of exercises which have been taught to the patient; including the actual carrying out of maintenance programs, *i.e.*, the performance of the repetitive exercises required to maintain function do not require the skills of a therapist and would not constitute skilled rehabilitation services." *See id.* § 409.33(d). Similarly, "repetitious exercises to improve gait, maintain strength, or endurance; passive exercises to maintain range of motion in paralyzed extremities, which are not related to a specific loss of function; and assistive walking do not constitute skilled rehabilitation services." *See id.* Lastly, if the services can be safely and effectively furnished by non-skilled personnel, then the services are not considered skilled and are no longer reasonable and necessary rehabilitation services and, therefore, are excluded from coverage under Medicare Parts A and B. *See generally id.* § 409.31(a)(2); *see also Physical, Occupational, and Speech Therapy Services*, Centers for Medicare & Medicaid Services (Sept. 5, 2012), *located at* https://www.cms.gov/Research-Statistics-Data-and-Systems/Monitoring-Programs/Medical-Review/Downloads/TherapyCapSlidesv10_09052012.pdf.

Throughout the Covered Period, Medicare Part A paid the Facilities a predetermined daily rate for each day of skilled nursing and rehabilitation services provided to a patient. *See* 63 Fed. Reg. 26,252, 26,259-60 (May 12, 1998) (emphasis added). Subject to certain conditions,

---

[2] Examples of skilled rehabilitation services include: therapeutic exercises which must be performed by or under the supervision of a qualified physical or occupational therapist; gait evaluation and training; range of motion exercises that are part of the active treatment of a specific disease state that resulted in mobility deficits; maintenance therapy when the specialized judgment of a qualified therapist is needed to design and establish a maintenance program; ultrasound, shortwave or microwave therapy; hot pack, hydrocollator, infrared treatments, paraffin baths, and whirlpool; and speech services necessary for the restoration of speech or hearing function. *See* 42 C.F.R. § 409.33(c).

Medicare Part A covered a *maximum* of up to 100 days of care at the Facilities for a benefit period (*i.e.*, spell of illness) following a qualifying hospital stay of at least three consecutive days. 42 U.S.C. § 1395d(a)(2)(A); 42 C.F.R. § 409.61(b), (c).

Further, up until October 1, 2019, the date when Medicare changed the reimbursement structure for SNFs, the Medicare reimbursement rate paid to a SNF for each patient was based, in part, on the patient's anticipated "need for skilled nursing care and therapy." *Final Rule for Medicare Program's Prospective Payment System and Consolidated Billing for Skilled Nursing Facilities*, 64 Fed. Reg. 41,644 (July 30, 1999). Specifically, the daily rate that Medicare paid a SNF depended, in part, on the Resource Utilization Group ("RUG") to which a patient was assigned, and each distinct RUG was intended to reflect the anticipated costs associated with providing skilled nursing and rehabilitation services to beneficiaries with similar characteristics or resource needs.

Under this system, there were five general rehabilitation RUG levels for those beneficiaries that required skilled rehabilitation therapy: Rehab Ultra High (known as "RU"), Rehab Very High ("RV"), Rehab High ("RH"), Rehab Medium ("RM"), and Rehab Low ("RL"). The RUG level to which a patient was assigned depended on the number of skilled therapy minutes and the number of therapy disciplines the patient received during a seven-day assessment reference period (also known as the "look back period").

For a patient to be placed on Ultra High, a patient needed to receive a minimum of 720 minutes of skilled therapy per week from at least two disciplines, such as physical and occupational therapy. *See* 63 Fed. Reg. 26,252, 26,262 (May 12, 1998); 83 Fed. Reg. 39,162, 39,175 (Aug. 8, 2018) (emphasis added). Critically, the Ultra High RUG level, which carried the highest reimbursement rate, was "intended to apply only to the most complex cases requiring

rehabilitative therapy well above the average amount of service time." *See* 63 Fed. Reg. 26,252, 26,258 (May 12, 1998).[3]

### B. The Facilities Were Required to Report Therapy Times and Certify That the Services Complied with Medicare Rules and Regulations

As described in the Complaint, *see* Compl. ¶¶ 45-46, 99, the Facilities were required to report therapy treatment times on a Minimum Data Set ("MDS") form that was completed at regular intervals during a patient's stay. *See* 64 Fed. Reg. at 41,661; 42 C.F.R. § 413.343. The Facilities then transmitted the information in these forms to the Centers for Medicare & Medicaid Services ("CMS").[4] *See* 42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(1)(v) (2008); 42 C.F.R. § 483.20(f)(3) (2012). Further, the Facilities were required to complete the MDS forms as a prerequisite to payment under Medicare, *see* 63 Fed. Reg. at 26,265, and were required to certify:

> "To the best of my knowledge, this information was collected in accordance with applicable Medicare and Medicaid requirements. I understand that this information is used as a basis for ensuring that residents receive appropriate and quality care, and as a basis for payment from federal funds."

*See* MDS Versions 2.0 and 3.0 for Nursing Home Resident Assessment and Care Screening

*located at* https://www.cms.gov/Medicare/Quality-Initiatives-Patient-Assessment-

---

[3] In announcing the final PPS rule, CMS also made clear that SNFs should tailor the number of therapy minutes to patients' clinical needs rather than providing exactly the minimum needed to trigger a specific RUG level, explaining that the RUG system "uses minimum levels of minutes per week as qualifiers . . . . These minutes are minimums and are not to be used as upper limits for service provision . . . . Any policy of holding therapy to the bare minimum, regardless of beneficiary need, is inconsistent with the statutory requirements . . . and will result in poor outcomes, longer lengths of stay, and a degradation in the facility's quality of care." 64 Fed. Reg. 41,644, 41,662 (July 30, 1999).

[4] Prior to October 1, 2010, a SNF would electronically transmit the MDS form to a state's health department or other appropriate agency, which in turn would transmit the data to CMS. 42 C.F.R. § 483.20(f)(3) (2008); 42 C.F.R. § 483.315(h)(1)(v) (2008). From October 1, 2009, through September 30, 2019, SNFs submitted the MDS form directly to CMS. 42 C.F.R. § 483.20(f)(3) (2012).

Instruments/NursingHomeQualityInits/downloads/MDS20MDSAllForms.pdf.

In addition, prior to October 1, 2019, each patient's RUG information was incorporated into a Health Insurance Prospective Payment System ("HIPPS") code, which Medicare used to determine the payment amount owed to each Facility. This HIPPS code was required to be included on the CMS-1450 form (the claim form used to bill Medicare), which the Facilities submitted monthly to Medicare via intermediaries known as Medicare Administrative Contractors that process and pay Medicare claims on behalf of CMS. Medicare Claims Processing Manual, Ch. 25, § 75.5.

When submitting claims to Medicare, the Facilities were required to include a Medicare Enrollment Application in which each SNF certified, among other things:

> I agree to abide by the Medicare laws, regulations and program instructions that apply to this provider. . . . I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

CMS Form 855A.

Further, the Facilities were required to complete documentation of the services rendered to beneficiaries and certify that services rendered were reasonable and necessary, and therefore eligible for reimbursement. In particular, the Medicare statute provides:

> no such payments shall be made to any provider unless it has furnished such information as the Secretary may request in order to determine the amounts due such provider under this part for the period with respect to which the amounts are being paid or any prior period.

42 U.S.C. § 1395g(a).

## II. Defendants Violated the False Claims Act by Submitting, or Causing the Submission of, Claims to Medicare for Medically Unnecessary or Unreasonable Services

The Government's Complaint alleges that Defendants caused Medicare to pay for medically unreasonable and unnecessary therapy services in violation of the FCA and common law theories of fraud. This scheme was carried out by Paragon, which manages the Facilities; Laufer, who owns Paragon; the Facilities, ten of which Laufer owns and all of which he controls through Paragon; and Whitney, an employee of Paragon and the Coordinator of Rehabilitation Services for the Facilities. *See* Compl. ¶¶ 1-6, 12-14, 106-121.

As demonstrated by the numerous text messages, witness statements, and specific patient examples discussed in the Complaint, Laufer and Whitney caused the Facilities to submit false claims on Form 1450s to Medicare Part A. Defendants also made (or caused to be made) false statements on MDS forms in connection with those false claims, including statements erroneously certifying that the Facilities complied with applicable Medicare requirements.

Defendants carried out this fraudulent billing scheme in two principal ways. First, Defendants systematically and deliberately endeavored to keep patients at the Facilities and on skilled therapy longer than necessary or reasonable, for the purpose of maximizing the amount billed to Medicare. *See e.g.*, Compl. ¶¶ 60-84. Second, while the patients were at the Facilities, Defendants routinely put patients on higher levels of rehabilitation therapy than was reasonable or necessary, again in order to bill Medicare at a higher rate. *See e.g.*, *id.* ¶¶ 85-93. Moreover, Laufer and Whitney instructed and pressured Facility employees to engage in these practices, in order to maximize profits and in contravention of the law. *See e.g.*, *id.* ¶¶ 60-71, 77, 79, 89-92.

### A. Laufer and Whitney Caused the Facilities to Keep Patients Longer Than Was Medically Reasonable or Necessary

Laufer and Whitney directed the scheme to keep patients longer than medically reasonable or necessary, which Facility employees carried out across the Facilities. To come as close as possible to hitting Medicare Part A's 100-day maximum reimbursement period, Whitney deliberately tracked the number of Medicare days used by each patient at the Facilities and expected Facility staff to justify discharges that were substantially short of 100 days—not for any medical reason, but because 100 days was the maximum stay compensable by Medicare. *See id.* ¶¶ 65, 70, 71, 75. According to employees of several of the Facilities and as alleged in the Complaint, Whitney frequently challenged discharge determinations when a Medicare patient was set to be released before being at the Facility for at least 85 or 90 days, and would at times overrule employees who believed patients were ready to be discharged earlier. *See id.* ¶ 70.

Laufer received daily updates from the Facilities reporting the number of Medicare patients that had been discharged and, when he believed the Facilities were not making enough money, instructed Whitney to curb discharges in order to maximize Medicare reimbursement. *See, e.g.*, *id.* ¶¶ 63, 66, 68, 76. Laufer's directives were not based on any information about patients' clinical needs or about improving conditions at the Facilities; on the contrary, Laufer was explicit that his goal was simply about increasing revenue. *See id.* ¶¶ 67, 68. At times, Laufer went so far as to tell Whitney to prevent people from leaving until they could find new patients to fill the empty slots. *See id.*

To carry out Laufer's directives and maximize each patients' Medicare days, Whitney and the Facilities devised various strategies to prolong patient stays. *See id.* ¶¶ 67, 72, 73. One such strategy was the use of challenging balance tests as a pretext to keep Medicare patients at the Facilities even after they were ready to be discharged. *See id.* ¶ 79. Whitney was clear about

the purpose of these balance tests, telling Laufer that she needed a balance testing machine "hooked up" because it "prolong[s] high level discharges." *Id.* ¶ 83.

The Facilities went so far as to intentionally stunt or mask patients' progress, by, for example, not permitting the residents to use walkers or requiring them to remain in a wheelchair, in order to create the appearance of a continued need for services and residential care. *See id.* ¶ 74. Whitney reported to Laufer directly about these strategies. For instance, in a voice message, she told Laufer that they were preventing patients from using the bathroom on their own, because "[i]f we allow them to take themselves they will think they are ready to go home." *Id.* ¶ 77.

### B. Whitney and Laufer Caused the Facilities to Put Patients on Higher Levels of Skilled Therapy Than Was Justified, to Maximize Medicare Reimbursement

Whitney also endeavored to maximize the amount of skilled therapy provided to patients, again without regard to their clinical needs, and reported to Laufer on this practice. *See id.* ¶¶ 91, 92. Whitney directed the Facilities to put virtually all Medicare patients on the highest, and thus most expensive, level of therapy, with little to no consideration of their actual medical needs, and chastised or overrode employees who failed to do so. *See id.* ¶¶ 89, 90. This scheme led to the provision of, and billing for, therapy with little or no benefit to patients, and even therapy that did not involve the provision of skilled services—just to fill minutes. *See id.* ¶ 85.

As described in the Complaint, employees at the Facilities felt that they had "no wiggle room" when it came to how much rehabilitation therapy patients would receive. *See id.* ¶ 86. In order to place patients in the Ultra High Rehab category, Whitney expected therapists to provide at least sixty minutes of occupational and physical therapy per day, six times per week, regardless of whether the patient needed it or could tolerate it. *See id.*

Whitney's edict to put all patients on Ultra High Rehab led to patients, *inter alia,* receiving treatment that they could not reasonably be expected to benefit from and patients

receiving services that did not rise to the level of skilled services, but were nevertheless billed as such. *See id.* ¶ 87. For instance, as outlined in the Complaint, therapists reported simply moving the arms and legs of patients who were not cognitively present, playing checkers with patients and reporting it as skilled therapy, or being told by supervisors to "just write something" in the patient's chart when the patient could not engage in therapy. *See id.* ¶ 88.

### C. Defendants' Scheme Resulted in the Submission of False Claims

Laufer's and Whitney's efforts to prolong patient stays and maximize rehabilitation levels, all in order to inflate Medicare billing, were successful. During the Covered Period, the Facilities kept Medicare Part A patients at the Facilities longer, and provided more Ultra High rehabilitation to their patients, than the vast majority of skilled nursing facilities in the nation. *See id.* ¶¶ 84, 93.

Moreover, the Complaint provides nine examples of patients who received services that were not reasonable, necessary, or skilled. *See id.* ¶ 97. These examples provide the name of the patient,[5] the Facility at which they were treated, the dates of their treatment, the amount paid by Medicare for their services, details about the claims themselves (including the Medicare Claim Number associated with each example), and a description of why the services were unreasonable, unnecessary, or unskilled. *See id.*, Exh. A. The Complaint also provides examples of the Facilities billing Medicare for Ultra High Rehab despite not meeting the minimum minute threshold for that rate. *See id.* ¶¶ 97(a), (d).

---

[5] While the Complaint itself does not contain the patients' names, in order to protect their privacy, that information was provided separately to Defendants. *See id.* ¶ 97(a) n.6.

**ARGUMENT**

## I. The Complaint Satisfies Federal Rule of Civil Procedure 9(b)

Defendants wrongly assert that the Complaint fails to satisfy the pleading requirements of Federal Rule of Civil Procedure 9(b). *See* Facilities Mem. 5-28; Laufer Mem. 14-21; Whitney Mem. 11-17. The allegations in the Complaint more than satisfy Rule 9(b). A plaintiff satisfies the elements of Rule 9(b) by "(1) specify[ing] the statements that the plaintiff contends were fraudulent, (2) identify[ing] the speaker, (3) stat[ing] where and when the statements were made, and (4) explain[ing] why the statements were fraudulent." *United States ex rel. Chorches v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017). Although Rule 9(b) typically requires that a plaintiff set forth details of the fraudulent scheme and information identifying particular false claims submitted to the Government, *see United States ex rel. Kester v. Novartis Pharm. Corp.* ("*Kester I*"), 23 F. Supp. 3d 242, 255, 257-58 (S.D.N.Y. 2014), "[i]n cases where the alleged fraudulent scheme is extensive and involves numerous transactions that occurred over a long period of time, courts have found it impractical to require the plaintiff to plead the specifics with respect to each and every instance of fraudulent conduct." *Id.* at 258 (internal quotation marks and citation omitted). Rather, "plaintiffs can plead the submission of thousands of claims with particularity by providing example claims which are representative of those arising from the fraudulent scheme." *United States ex rel. Bilotta v. Novartis Pharm. Corp.*, 50 F. Supp. 3d 497, 526 (S.D.N.Y. 2014) (quoting *Kester I*, 23 F. Supp. 3d at 259) (internal quotation marks omitted); *see also United States ex rel. Bledsoe v. Cmty. Health Sys.*, 501 F.3d 493, 510 (6th Cir. 2007) ("*Bledsoe II*") ("[W]here the fraud allegedly was complex and occurred over a period of time, the requirements of Rule 9(b) are less stringently applied." (internal quotations and citations omitted)); *United States v. Movtady*, 13 F. Supp. 3d 325, 333 (S.D.N.Y. 2014) ("[I]t is permissible in this type of case to plead each scheme with particularity, and provide examples of

specific false claims submitted to the government pursuant to that scheme." (quotation marks and citations omitted)).

"The point of Rule 9(b) is to ensure that there is sufficient substance to the allegations to both afford the defendant the opportunity to prepare a response and to warrant further judicial process." *United States ex rel. Chorches*, 865 F.3d at 87 (quoting *United States ex. rel. Heath v. AT&T, Inc.*, 791 F.3d 112, 125 (D.C. Cir. 2015)). A complaint is sufficient if it "provide[s] the defendant with enough details to be able to reasonably discern which of the claims it submitted are at issue." *United States v. Omnicare*, No. 15-cv-4179 (CM), 2021 WL 1063784, at *10 (S.D.N.Y. Mar. 19, 2021) (quoting *Kester I*, 23 F. Supp. 3d. at 258); *see also United States v. Wells Fargo Bank, N.A*., 972 F. Supp. 2d 593, 616-17 (S.D.N.Y. 2013) (finding that the Government satisfied Rule 9(b) by pleading "ten examples of insurance claims identified by . . . case number," which gave the defendant sufficient notice by enabling it "to infer with reasonable accuracy the precise claims at issue by examining the representative samples" of the broader class of claims (citation and alterations omitted)); *Movtady*, 13 F. Supp. 3d at 332 ("The purpose of Rule 9(b)'s specificity requirement is to provide the defendant with fair notice of a plaintiff's claim and adequate information to frame a response." (quotation marks, citation, and alteration omitted)).

The Complaint provides all Defendants with fair notice of the fraudulent scheme and false claims at issue in this case, thereby "allow[ing] the court to draw the reasonable inference that the defendant is liable[,]" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), under the FCA. Moreover, the Complaint's allegations are plainly sufficient to allow Defendants to reasonably infer which other false claims are at issue in this case, and that is all that Rule 9(b) requires. *See*

*Kester I*, 23 F. Supp. 3d at 258; *Wells Fargo*, 972 F. Supp. 2d at 616; *see also Bledsoe II*, 501 F.3d at 511.

Defendants do not contend that they lack sufficient information to respond to the Complaint, because they cannot. The Complaint lays out, in ample detail, Laufer and Whitney's scheme carried out across all eleven Facilities to improperly inflate Medicare reimbursement to each of the eleven Facility Defendants by billing for therapy services that were unreasonable, unnecessary, or unskilled. *See* Compl. ¶¶ 57-93. The Complaint explains with particularity how and why Defendants improperly billed for unreasonable, unnecessary, or unskilled therapy sessions (*id.* ¶¶ 70-83, 86-90), details Defendants' knowledge of the fraud (*id.* ¶¶ 64-69, 75-78, 82, 90-92), sets forth the specific information in each claim that is false (*id.* ¶¶ 94-99), and explains how Defendants' conduct led to the submission of false claims and false statements to Medicare (*id.* ¶¶ 57-93). Further, the Complaint contains detailed information concerning representative false claims from nine patients from nine of the eleven Facility Defendants (*id.* ¶ 97(a)-(i)).

Defendants' attacks on the sufficiency of the Complaint are premised on a pleading standard that is inconsistent with the law and would be impossible to meet. First, the Facility Defendants attempt to analyze the sufficiency of the allegations concerning each Facility independently, rather than in the context of the overall fraudulent scheme. Second, Defendants sidestep the fraudulent nature of the alleged conduct by asking the Court to speculate about alternative interpretations of their cherry-picked allegations and the representative examples. Third, Defendants erroneously argue that the Complaint's nine patient examples of representative false claims are insufficient (although Defendants fail to identify the number of claims they would deem sufficient) and that the Government is required to link these

representative examples to other specific allegations in the Complaint (*i.e.*, the specific text and voice messages between Laufer and Whitney that are quoted in the Complaint). Defendants are wrong on all counts.

### A. The Complaint Alleges with Particularity a Centralized Fraudulent Scheme Implemented Across the Facilities by Laufer and Whitney

The Facilities' primary strategy to evade the well-pleaded allegations in the Complaint is to suggest that each Facility operates independently, then narrowly construe the Government's specific, particularized allegations regarding the fraudulent scheme in isolation as to each Facility. *See* Facilities Mem. 6-17. But the Facilities misstate the law and mischaracterize the Complaint's allegations. As the Complaint makes clear, the Facilities were all managed by Paragon and overseen by Laufer and Whitney, who orchestrated the same scheme at each Facility. *See* Compl. ¶¶ 50-59.

Defendants criticize the Complaint for pleading the Facilities as "a fictional group." This is simply not so. During the Covered Period, Laufer owned 10 of the 11 Facilities. *Id.* ¶ 12. Further, Laufer managed all of the Facilities through Paragon and Whitney oversaw rehabilitation at all of the Facilities through her position at Paragon. *Id.* ¶¶ 13-14. In these positions, Laufer and Whitney could and did orchestrate the same scheme to inflate Medicare billings at each Facility. *Id.* ¶¶ 50–59. The Complaint's detailed description of the alleged scheme is more than sufficient to "inform each defendant of the nature of [its] alleged participation in the fraud," thus satisfying Rule 9(b). *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 172 (2d Cir. 2015) (quotation marks and citation omitted); *see also United States v. UBS Sec. LLC*, No. 18-CV-6369 (MKB), 2019 WL 6721718, at *13 (E.D.N.Y. Dec. 10, 2019) (applying *Loreley* in finding that group allegations regarding entities that played the same role in a fraudulent scheme are sufficient); *United States ex rel. Bibby v.*

*Wells Fargo Bank, N.A.*, 906 F. Supp. 2d 1288, 1297-98 (N.D. Ga. 2012) (a motion to dismiss on the basis of supposed "collective pleading" should be granted only where there is "a lack of clarity as to what conduct is alleged against each individual defendant"); *United States ex rel. Vatan v. QTC Med. Servs., Inc.*, 721 F. App'x 662, 664 (9th Cir. 2018) (complaints are sufficiently pleaded when they "proffer[] the names of individuals allegedly involved in perpetuating the purported fraud" and allege "with specificity how [a defendant] company itself institutionalized and enforced its fraudulent scheme" (citation and internal quotation marks omitted)).

Further, Defendants cannot and do not argue against the basic agency principle that Laufer's and Whitney's culpable conduct is imputed to the corporate entities that they controlled and on behalf of which they acted—namely, Paragon (Laufer's management company and Whitney's employer) and the eleven Facility Defendants, ten of which Laufer owned and all of which he ran through Paragon. *See* Compl. ¶¶ 12-14. Imputing the conduct of Laufer and Whitney to Paragon and the Facilities is appropriate given Laufer and Whitney's central role in the operations of the Facilities. *See, e.g.*, *United States ex rel. Longo v. Wheeling Hospital, Inc.*, No. 19-cv-192, 2019 WL 4478843, at *10 (N.D. W. Va. Sept. 18, 2019) (holding that the individual defendant was indisputably an agent of both the hospital and the management company, and consequently "any misdeeds committed by or at the direction of [that individual] are imputed to both [the management company] and [the hospital]").

Courts have rejected similar arguments by SNF defendants in cases comparable to this one. For instance, in *United States v. Paksn, Inc.*, No. 15-cv-9064, Dkt. No. 112 (C.D. Cal. Nov. 15, 2021), slip op. at 7 (attached as Exh. 1), the United States sued a management company of a chain of SNFs, the seven SNFs themselves, and the owner of six of the seven SNF defendants

and the management company, alleging a kickback scheme at each of the SNFs. Like here, the defendants argued that the Government's allegations were insufficient by themselves to group all nine defendants together and hold them liable for an overall scheme. *Id.* The Court, however, disposed of defendants' arguments, finding that the Government "plausibly alleged specific facts showing that [the SNF owner], through [the SNF management company], was personally involved in the operation of the SNFs and operated them as part of a unified scheme involving the same methods and many of the same doctors." *Id.* Accordingly, the Court imputed the SNF owner's knowledge to each of the SNF defendants. *Id.*

Similarly, in *United States ex rel. Martin v. Life Care Centers of America, Inc.*, No. 08-cv-251, 2014 WL 11429265 (E.D. Tenn. Mar. 26, 2014), Life Care argued that the complaint failed to allege a nationwide scheme because it referenced only a handful of facilities where misconduct occurred and contained representative examples of false claims from only nine of Life Care's 200 facilities. The Court rejected Life Care's argument, finding that "[t]he crux of the Government's Complaint concerns general allegations that Life Care engaged in a nationwide scheme to pressure therapists into submitting claims for rehab therapy that included medically unnecessary and unskilled minutes." *Id.* at *11 (internal quotations omitted). The Court found that the Government pleaded its complaint with specificity because it explained "the billing structure for Medicare and the corporate structure for Life Care, alleging how Life Care was submitting false or fraudulent claims based on false statements or records, and listing specific locations, managerial employees, and representative patients involved in the false or fraudulent claims." *Id.*

In *United States ex rel. Hayward v. SavaSeniorCare, LLC*, No. 11-00821, 2016 WL 5395949 (M.D. Tenn. Sept. 27, 2016), the Government alleged that the defendants engaged in a

nationwide scheme across their 185 SNFs to increase their Medicare revenue by maximizing the number of days billed at the highest level of reimbursement for rehabilitation therapy services. The defendants moved to dismiss, arguing that "the Government's Complaint fails to satisfy Rule 9(b)'s heightened pleading requirements because it indiscriminately groups all of the individual defendants into one wrongdoing monolith." *Id.* at 14 (internal quotations omitted). The Court disposed of the defendants' argument, holding that "[a] fair reading of the Consolidated Complaint suggests that the Defendants, acting in concert, created and implemented policies in an effort to wrongfully enlarge Medicare billing." *Id.*

The same is true here. As alleged, Paragon, as ultimately directed by Laufer, exercised authority over hiring and firing decisions with respect to the administrators that managed the day-to-day operations of the Facilities. Compl. ¶ 13. Whitney, an employee of Paragon and the Coordinator of Rehabilitation Services for all the Facilities, had responsibility for coordinating the provision of, and billing for, rehabilitation services at the Facilities. *Id.* ¶ 14. Therefore, Laufer's and Whitney's conduct in devising and implementing a unified fraudulent scheme across the Facilities can be imputed to the Facilities themselves.

Contrary to the Facilities' ill-founded arguments, the Complaint alleges in detail that the Facilities, under the direction and control of Laufer and Whitney, knowingly submitted, or caused to be submitted, false claims to Medicare Part A for unreasonable, unnecessary, or unskilled therapy services that the Facilities provided to residents. The Complaint makes detailed allegations that Defendants Laufer and Whitney, in their positions at Paragon, directed this scheme, exerted pressure on employees to provide excessive amounts of therapy, and directed the Facilities to put in place tools to prolong patient stays and maximize the amount of therapy provided to patients, without regard to their clinical needs. *Id.* ¶¶ 57-93.

The Complaint sets forth instance after instance of Laufer instructing Whitney to find ways for the Facilities to "curb" patient discharges—without any regard to the patients' medical condition or need—because prolonging discharges was the "#1 place to make more profit." Compl. ¶ 68; *see, e.g.*, *id.* ¶ 64 (Laufer pressuring Whitney to slow the discharges at Lynbrook and to "[m]ake sure [the Administrator] knows she has a problem."); *id.* ¶¶ 65-66 (Laufer instructing Whitney that she must "jump on" the discharges at Lynbrook and Quantum, making it known to Whitney that the two early discharges cost the facility $42,000); *id.* ¶ 67 (Laufer telling Whitney that the Emerge facility was "hurting" so she must "curb" the discharge "pace"). Laufer's message to Whitney was loud and clear: as Whitney stated, Laufer's "goal was to make money, and he wants people to stay as long as they can so we can make lots of money." *Id.* ¶ 67.

The Complaint further details how Laufer and Whitney, through their control of the Facilities, ensured that the discharge pace was curbed. Whitney kept close track of each Facility's discharge pace, and if a patient's scheduled discharge fell well short of the maximum Medicare-reimbursable 100 days, Whitney, in her role as the Coordinator of Rehabilitation Services for the Facilities, required Facility employees to justify why the patients were not staying longer. *Id.* ¶ 71. Whitney frequently challenged and had the authority to overrule discharge determinations when a Medicare patient was set to be released before being at the Facility for at least 85 or 90 days. *Id.* ¶ 70. As one employee stated, the goal was not to keep patients for exactly 100 days but for slightly less than that, to deliberately avoid creating "a red flag," *i.e.*, trigger an alert to Medicare of an above-average number of 100-day stays. *See id.*

The Complaint also details how Laufer and Whitney worked to ensure that as many patients as possible across the Facilities were put on the most expensive level of therapy— irrespective of clinical need. *See, e.g.*, *id.* ¶ 90 (if the RUG levels were not sufficiently high,

Whitney would intervene and determine the RUG levels for individual patients); *id.* (Whitney instructing a Director of Rehabilitation to examine her RUG billings because there were an insufficient number of patients on Ultra High); *id.* ¶ 91 (Whitney assuring Laufer that she would "stay on top" of two Facilities whose RUG billings were not sufficiently high); *id.* ¶ 92 (Whitney informing Laufer that one Director of Rehabilitation was not performing well because she was "discharging people too soon" and she was no longer putting "everyone on ultra appropriately").

For these reasons, Laufer and Whitney's conduct in implementing the unified fraudulent scheme was imputable to Paragon and to the eleven Facility Defendants. The Complaint details a widespread scheme of corporate pressure by Laufer and Whitney to maximize revenue across the Facilities by prolonging patient stays and billing federal healthcare programs at the Ultra High level without regard for patients' needs. As such, the Complaint satisfies the requirements of Rule 9(b).

## B. The Complaint Details Defendants' FCA Violations Through Specific Examples of Misconduct and Representative False Claims

Defendants wrongly contend that the Complaint does not satisfy Rule 9(b) because it does not plead the "what" and the "how" of the fraud with sufficient particularly across all Facilities for the entire relevant time period. Facilities Mem. 6-17; Whitney Mem. 15-17. But the Complaint describes numerous examples of misconduct arising from Defendants' fraudulent scheme and exemplar false claims that resulted from the misconduct. *See Life Care*, 2014 WL 11429265, at *12 ("[T]he Government has sufficiently supported its claims that Defendant violated the FCA by submitting false or fraudulent claims with factual allegations which make reference to representative patients."). As discussed in Section II (Background) above, the Complaint details the "what": Whitney, at Laufer's direction, pressured Facility employees to prolong patient stays and maximize therapy as means to enhance profits without consideration of

medical necessity, causing the Facilities to certify that the therapy was medically necessary or skilled when it was not and resulting in the submission of false claims and statements to the Medicare program. *See also* Compl. ¶¶ 57-93. The Complaint also provides examples of the "how": detailing (including though Laufer's and Whitney's own communications) the specific tactics used to implement the scheme of prolonging patient stays and putting patients on Ultra High rehab—again, irrespective of medical necessity. *See, e.g., id.* ¶ 73 ("if the original goal was to have a patient walk 20 feet, the therapist might extend the goal to 25 feet, in order to try to prolong the patient's stay"); *id.* (when completing therapy notes, the therapist would exaggerate the amount of assistance patients required); *id.* ¶ 74 (Lynbrook did not permit rooms to have walkers so the patients could not improve and the families of the patients would not see their loved ones walking); *id.* (at Momentum, patients were kept in wheelchairs so they would not progress); *id.* ¶ 77 (Whitney explaining to Laufer that "[i]f we allow [patients] to take themselves [to the bathroom] they will think they are ready to go home. So we tell them they have to use call bell and wait for aide to take them."); *id.* ¶¶ 79-83 (testing patients on the Balance Master at the point that they were arguably ready to be discharged to convince them (or their families) that the patients had balance deficiencies and should stay longer); *id.* ¶ 88 (therapists simply moving the arms and legs of patients who were not cognitively present as a means to reach the Ultra High level of therapy minutes); *id.* (therapist reported playing checkers with a patient because she had to fill up time to reach the maximum number of minutes).

The Complaint further alleges that Defendants submitted claims falsely representing that they should be reimbursed for higher levels of therapy and for more therapy minutes (false HIPPS codes on Form 1450s) and falsely certifying that the services rendered to patients were reasonable and necessary (false statements on MDS forms). *See id.* ¶¶ 97-99. The Complaint also

explains *why* the Facilities' false certifications statements in the Form 1450s and MDS forms were false. *Id.* ¶ 97(a)-(i) (explaining the allegations of medically unnecessary and/or unskilled therapy provided to nine sample patients). More specifically, through nine patient examples, the Government describes services billed to Medicare that were: unskilled, *id.* ¶¶ 97(e), (g), (h), (i), provided to individuals who could not meaningfully participate in the therapy, *id.* ¶¶ 97(a), (b), (h), and provided to individuals after they ceased to benefit from treatment, *id.* ¶¶ 97(a), (b), (c), (d), (f), (g), (i). In addition, the Government provided specific examples of claims submitted to Medicare for patients who were billed for Ultra High rehab despite not receiving the requisite number of skilled therapy minutes to qualify for that reimbursement rate. *See id.* ¶¶ 97(a), (d), (g).

### 1. The Complaint Provides Specific Allegations of Laufer and Whitney's Misconduct and the Pressure They Exerted on the Facilities

Defendants erroneously argue that the Complaint offers only generalized allegations of "pressure," and that the Court should consider potentially benign explanations for the specific allegations of Laufer's and Whitney's misconduct. Facilities Mem. 15-17; Laufer Mem. 18-21; Whitney Mem. 15-17; Paragon Mem. 3, 6-8. Defendants are wrong on both fronts. As set forth above, the Complaint provides numerous details regarding Laufer's and Whitney's plans to prolong patient stays and maximize therapy without any consideration of medical need or the patient's clinical condition. *See, e.g.*, Compl. ¶¶ 60-71, 75, 76, 78, 90, 91, 92. The Complaint also describes, in detail, methods that the Facilities employed to satisfy Whitney's directives of curbing patient discharges and providing the highest level of therapy. *See, e.g.*, *id.* ¶¶ 73, 74, 77, 79-83, 88. Far from generalized allegations of pressure, the Complaint provides specific details of the precise pressure Laufer, through Whitney, applied.

Further, Defendants selectively edit the quotations contained in the Complaint to create an appearance of ambiguity when there is none, and further ignore that, when considering alternative explanations under Rule 8, "the complaint should be read as a whole, not parsed piece-by-piece to determine whether each allegation, in isolation, is plausible." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 594 (8th Cir. 2009) (citing *Vila v. Inter-Am. Inv. Corp.*, 570 F.3d 274, 285 (D.C. Cir. 2009) (factual allegations should be "viewed in their totality")). When reviewing the actual, complete content of the messages or viewing them holistically and within context, they are unambiguously indicative of a fraudulent scheme to provide unreasonable and unnecessary medical care. In any event, "[o]n a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all of the well-pleaded facts and consider those facts in the light most favorable to the plaintiff." *DeMasi v Benefico*, 567 F. Supp. 2d 449, 452-53 (S.D.N.Y. 2008).

For example, the Facilities selectively edit the allegation that the Lynbrook Director of Rehabilitation did not allow walkers in patients' rooms "despite the fact that the walkers would increase the patient's ability to ambulate . . . ." Facilities Mem. 14. The Facilities assert that there could be an innocent explanation for this practice, such as a determination that the walkers were a tripping hazard. *See id.* However, the ellipsis edits out the *precise explanation for the policy*, namely that, "[a]ccording to the employee, the Director implemented this practice so the patients could not improve and the families of the patients would not see their loved ones walking, thereby reducing pressure from the patients and their families to discharge Facility residents." Compl. ¶ 74.

Similarly, the Facilities claim that a statement by an employee at Momentum that patients "were kept in wheelchairs so they would not progress" is "fraught with ambiguity" because the Complaint lacks sufficient information about the employee who made this statement or the

patient whose progress was deliberately stunted. Facilities Mem. 12 (referring to Compl. ¶ 74).

But the allegation and its import are clear—no matter the employee involved or the patients who

were harmed. This allegation shows the Facilities putting profits ahead of patients' well-being

and taking steps to deliberately impede patients' treatment to maximize profits.

Defendants' reliance on *United States ex rel. Lawson v. Aegis Therapies, Inc.*, No. CV

210-72, 2015 WL 1541491 (S.D. Ga. Mar. 31, 2015), in support of their argument that there are

non-fraudulent possible explanations for the statements and conduct, is misplaced. *See* Facilities

Mem. 8, 11, 18 n.5; Laufer Mem. 15-16; Whitney Mem. 16. First, the court in *Aegis* was

deciding a motion for summary judgment, not a motion to dismiss. The court did not find that

pressure from management to increase Medicare revenue regardless of need was insufficient to

state a claim, but that the allegations related to pressure were "not supported by any evidence in

the record." *Id.* at *13. That of course is not the standard on a motion to dismiss, where the Court

must credit the Government's well-pleaded allegations. *See DeMasi*, 567 F. Supp. 2d at 452-53.

In fact, in denying Aegis's prior motion to dismiss, the *Aegis* court concluded that "the

Government's Complaint states a plausible claim for relief against the Facility." *United States ex

rel. Lawson v. Aegis Therapies, Inc.*, No. CV 210-72, 2013 WL 5816501, at *7 (S.D. Ga. Oct.

29, 2013). And here, the Complaint also alleges specific details of Defendants' scheme to

increase Medicare billings regardless of medical necessity or patient need.

> **2.      The Complaint's Representative False Claims Coupled with the Details of
> the Fraudulent Scheme More Than Satisfy Rule 9(b)**

The Complaint's detailed examples of false claims resulting from Defendants'

misconduct satisfy Rule 9(b)'s particularity requirement because they "are representative of

those arising from the fraudulent scheme." *Bilotta*, 50 F. Supp. 3d at 526; *Movtady*, 13 F. Supp.

3d at 333 (holding Government satisfied Rule 9(b) standard because it pleaded the "scheme with

particularity, and provide[d] [ten] examples of specific false claims submitted to the government pursuant to that scheme" (internal quotation marks and citation omitted)). The Complaint includes nine different patients across nine of the Facilities, comprising a total of thirty-six claims to Medicare. Compl., Exh. A. The Complaint includes the claim number, the date of the claim, the Facility, the number of rehab days, the RUG level, and the amount paid. *Id.* For each of these patients, the Complaint describes the forms (the CMS Form 1450s) used by the Facilities when submitting false claims to Medicare, and the forms used to transmit false statements in connection with those claims (the MDS forms). *See id.* ¶¶ 98, 99. Moreover, each of the representative false claims are within the time period covered by the Complaint.

Defendants offer four arguments to discredit the patient examples, all of which are baseless. First, Defendants argue that the Complaint does not specifically link each practice to specific false claims. *See* Facilities Mem. 7-17; Laufer Mem. 18-20; Whitney Mem. 11-15; Paragon Mem. 3. Second, Defendants argue that the Government has not provided sufficient examples to cover the relevant time period. Facilities Mem. 19-20; Paragon Mem. 3. Third, Defendants contend that the Complaint's specific examples do not satisfy Rule 9(b) because they do not include all Facilities and are insufficient in number as to the remainder. Facilities Mem. 19-20; Paragon Mem. 3. And fourth, Defendants press the Court to engage in fact-finding as to whether the representative false claims were actually "false." Facilities Mem. 21. Each of Defendants' arguments should be rejected because the Complaint plausibly alleges that false claims were submitted for payment and provides Defendants with fair notice of the fraudulent scheme and false claims at issue in this case, by pleading with particularity a fraudulent scheme coupled with more than sufficient representative examples.

**(a) The Complaint Plausibly Alleges That False Claims Were Submitted**

The Government "has sufficiently supported its claims that Defendant[s] violated the FCA by submitting false or fraudulent claims with factual allegations which make reference to representative patients." *Life Care*, 2014 WL 11429265, at *12. Contrary to Defendants' arguments, however, *see* Facilities Mem. 7-17; Laufer Mem. 18-20; Whitney Mem. 11-15, the Government is not required to link an individual action, such as a particular communication from Whitney or Laufer, to a specific claim, *see Life Care*, 2014 WL 11429265, at *12 (rejecting the defendant's argument that the Government was required to "provide factual support linking the allegedly improper schemes to the submission of an actual false claim"). Here, as in *Life Care*, "[t]he factual allegations provided in the Government's Complaint permit the Court to draw a reasonable inference that Defendant's billing practices resulted in fraudulent or false claims being submitted to the Government." *Id.* (citing *Iqbal*, 556 U.S. at 679); *see also United States ex rel. Schmidt v. Zimmer, Inc.*, 386 F.3d 235, 244 (3d Cir. 2004) ("[A]ssuming that a jury were to conclude that [defendant's] marketing scheme was a substantial factor in bringing about . . . [false statements] and the [false claims were] a normal consequence of the situation created by that scheme," the defendant could be found liable under the FCA); *United States ex rel. Freedman v. Suarez-Hoyos*, No. 8:04-cv-933, 2012 WL 4344199, at *8 (M.D. Fla. Sep. 21, 2012) (discussing the use of the "substantial factor" test in FCA cases); *United States ex rel. Ladas v. Hospice Care LLC*, No. 06-cv-2455, 2010 WL 5067614, at *5 (D. Kan. Dec. 7, 2010) (holding that complaint satisfied Rule 9(b) where business practices caused false claims, even though specific claims were not linked to specific practices).

Similarly, courts within this District have not required linkage between the alleged wrongful practices and the submission of a specific false claim; rather they have held that allegations of a fraudulent scheme coupled with representative false claims are sufficient to

satisfy Rule 9(b). *See, e.g.*, *United States ex rel. Wood v. Allergan, Inc.*, 246 F. Supp. 3d 772, 824 (S.D.N.Y. 2017) (Relator was not required to allege specific kickbacks that caused specific false claims because the complaint "establishes a relationship between" the kickbacks and the allegedly false claims by naming physicians that received kickbacks and alleging that defendants maintained a spreadsheet that was used to track the efficacy of their kickback program), *rev'd and remanded on other grounds*, 899 F.3d 163 (2d Cir. 2018); *Wells Fargo Bank, N.A.*, 972 F. Supp. 2d at 618-19 ("In other words, the United States alleges that Wells Fargo *knew*, through monthly reports, that it was originating loans that materially violated HUD requirements and intentionally disregarded these reports, continuing to emphasize loan volume over quality and to submit to HUD claims for reimbursement on loans it knew or should have known were ineligible for FHA insurance."). Likewise here, the Complaint's detailed allegations concerning the pressure placed upon therapists, coupled with the representative examples of false claims, plausibly demonstrate that Defendants' fraudulent scheme caused false claims to be submitted to Medicare. *See* Compl. ¶¶ 57-93 (allegations describing fraudulent conduct with specificity); *id.* ¶ 97(a)-(i) (representative examples of false claims caused by fraudulent conduct). That is all that Rule 9(b) requires.

### (b) The Complaint Sufficiently Identifies Sample False Claims from the Covered Period

Nor must the Complaint identify false claims from every year of the time period alleged in the Complaint, as the Facilities contend. *See* Facilities Mem. 20. While sample false claims must be within the overall period of the fraudulent scheme, there is no requirement that they cover the entire period from end-to-end. *See United States ex rel. Kester v. Novartis Pharm. Corp.* ("*Kester VII*"), No. 11 Civ. 8196 (CM), 2015 WL 109934, at *23 (S.D.N.Y. Jan. 6, 2015). Defendants cite no cases supporting a contrary proposition. Rather, the Complaint need only

allege the "rough" time period of the conduct. *United States ex rel. Duxbury v. Ortho Biotech Prods.*, 579 F.3d 13, 30 (1st Cir. 2009). "When an underlying fraudulent activity is alleged to have occurred systematically and continuously over a period of time it is sufficient to allege a general time frame of the fraud in question." *United States v. NHC Healthcare Corp.*, 115 F. Supp. 2d 1149, 1151 (W.D. Mo. 2000); *see also Employees Retirement Sys. of Government of Virgin Islands v. Blanford*, 794 F.3d 297, 307 (2d Cir. 2015) ("[T]he Second Circuit has held that allegations concerning activity in one period can support an inference of similar circumstances in a subsequent period."). As the court in *Hospice Care* explained, a complaint is sufficiently particular as to time where it "allege[s] the date, or series of dates, when specific business practices [were] in use; when communications took place; when claims were submitted; and when the alleged violations occurred." *Hospice Care*, 2010 WL 5067614, at *6; *see also Life Care*, 2014 WL 11429265, at *13 (rejecting defendant's argument that the Government failed to plead the time period with particularity because, while the Government alleged "false or fraudulent claims for a significant period, [] it also detail[ed] specific dates, locations, and persons supporting its claims.").

Here, the Government has pleaded the time period of the misconduct with particularity. The Complaint alleges that the conduct in question occurred from 2010 through September 2019. Compl. ¶¶ 1, 57; *see also id.* ¶¶ 41-49, 55. The Complaint includes numerous examples of communications and specific business practices connected to the fraudulent scheme, and the date or time period of these actions. *See, e.g.*, *id.* ¶ 91 (2013 message from Whitney to Laufer); ¶ 53 (Laufer authorized Paragon marketing employees to be embedded in hospitals in 2014); ¶ 92 (2015 message from Whitney to Laufer); ¶¶ 75, 77 (2016 communications between Laufer and Whitney); ¶¶ 65-66, 68, 76 (2017 communications between Laufer and Whitney); ¶ 63-64, 67,

78, 90 (2018 communications between Laufer and Whitney); ¶ 71 (2019 communications between Laufer and Whitney). Finally, the Complaint lists the dates for thirty-six representative claims from multiple years within the alleged timeframe, *see* Compl. Exh. A; *id.* ¶ 97(a)-(i).

Accordingly, the Complaint provides Defendants with fair notice of the Government's case against them with respect to the entire time period at issue. *See United States ex rel. Escobar v. Universal Health Servs.*, 780 F.3d 504, 509, 515 (1st Cir. 2015), *vacated on other grounds*, 579 U.S. 176 (2016) (identification of false claims over two-year period as to one patient sufficient to satisfy Rule 9(b) as to claims submitted for other patients for fraudulent scheme over six-year period); *Life Care*, 2014 WL 11429265, at *13 (finding defendant's Rule 9(b) time period arguments to be "unpersuasive" because the Government "details specific dates . . . supporting its claims[,]" including "a list of representative patients" with "the date the Government received their claims"); *United States ex rel. Manion v. St. Luke's Reg'l Med. Ctr., Ltd.*, No. CV 06-498, 2008 WL 906022, at *3 (D. Idaho Mar. 31, 2008) ("To require Plaintiffs to provide specific information as to exactly when alleged violations took place over a multi-year time frame such as this would make Rule 9(b) carry more weight than it was meant to bear.").

### (c) The Complaint Plausibly Alleges that False Claims Were Submitted by All Facilities

The Facilities next erroneously argue that the Government does not satisfy the "where" requirement of Rule 9(b) because the Complaint does not contain representative examples concerning Quantum and Surge and does not contain enough examples of misconduct from the remaining Facilities. *See* Facilities Mem. 7-8, 19-21. Again, such formalism is not required where the Complaint provides detailed allegations concerning the fraudulent scheme, directed by Laufer and Whitney and implemented across the Facilities, and examples of claims from nine patients from nine different Facilities. *See, e.g.*, Compl. ¶¶ 63-93 (detailing communications and

practices relating to specific Facilities); *id.* Exh. A; *id.* ¶ 97(a)-(i) (detailing nine patient examples that resulted in false claims). Indeed, in two recent cases involving allegations of fraud committed by SNFs, those courts found far fewer representative examples as a proportion of claims to be sufficient to satisfy Rule 9(b), and did not require the Government to identify a representative claim for each SNF. *See SavaSeniorCare*, 2016 WL 5395949, at *11 (holding that five patient examples drawn from five SNFs, even though defendants owned 185 SNFs, was sufficient); *Life Care*, 2014 WL 11429265, at *13 (ten patient examples from ten SNFs, even though defendants owned 200 SNFs, were sufficient because it is "clear that representative patients can support more general allegations"). Indeed, in *Kester VII*, Judge McMahon rejected an analogous argument that the Relator had to provide sample claims to each government program affected by the relevant fraud, noting that "[t]here is no logical stopping point for such an argument. The [d]efendants could just as easily demand that the Relator provide sample claims for each drug with respect to each program during each year of the kickback scheme. Rule 9(b) is simply not that rigid in False Claims Act cases." *Kester VII*, 2015 WL 109934, at *23.

At bottom, the Facilities "are effectively asking the Court to accept, for purposes of a motion to dismiss, that while they were improperly billing Medicare at one [Facility] they were not doing the exact same thing at another [Facility]." *United States ex rel. Tahlor v. AHS Hosp. Corp.*, No. 08-cv-2042, 2014 WL 4494793, at *4 (D.N.J. Sept. 10, 2014) (refusing to make this inference in adjudicating a Rule 12 motion because "[c]ourts have accepted, for purposes of a motion to dismiss, that a defendant violating the FCA in one location was engaging in the same conduct in another location"); *see also Duxbury*, 579 F.3d at 31 (where plaintiff "has alleged facts that false claims were in fact filed by the medical providers [plaintiff] identified, [these

allegations] further support[] a strong inference that such claims were also filed nationwide"); *United States ex rel. Drennen v. Fresenius Medical Care Holdings, Inc.*, No. 09-cv-10179, 2012 WL 8667597, at *2 (D. Mass. Mar. 6, 2012) (where plaintiff identified the locations of the claims submission, and alleged that "by reason of [defendant's] national billing practices, this billing likely occurred at [defendant's] other facilities throughout the country[,]" the plaintiff satisfied Rule 9(b)).

Here, the Complaint contains specific allegations that Laufer and Whitney directed a centralized scheme across all eleven Facilities, providing detailed examples of pressure and misconduct at ten of the Facilities and representative examples of false claims submitted by nine of them. In sum, "there is no mandatory 'checklist' of information a plaintiff must provide to satisfy Rule 9(b)." *Kester VII*, 2015 WL 109934, at *23. Because the Complaint affords Defendants fair notice of the actions that the Government alleges caused false claims to be submitted for payment, the Government has met its burden to plead with particularity the fraudulent scheme and the false claims at issue. *Movtady*, 13 F. Supp. 3d at 332-33.

### (d) Defendants' Arguments That the Services Provided Were Reasonable and Medically Necessary Are Improper at This Stage

Lastly, Defendants contend that the representative examples do not satisfy Rule 9(b) because, they claim, there is a question as to whether the examples represent truly false claims. *See* Facilities Mem. 21. Defendants urge the Court to engage in fact-finding as to whether the therapy provided in those examples was reasonable and necessary and/or skilled in nature. *See, e.g.*, *id.* at 26 ("Much of the government's grievance regarding [a Facility's] treatment of the patient revolves around alleged discrepancies in the bookkeeping relating to the therapy provided."); *id.* (disputing whether "therapy should have been discontinued once 'Patient B' reached 'his/her prior level of function'"); *id.* at 25 (disputing whether Ultra High therapy was

necessary, arguing the Government needed to explain why Ultra High therapy was not necessary); *id.* at 24 (arguing the Government needed to explain why patient's "difficulty following commands made the therapy unnecessary or inappropriate").

Such factual arguments, however, are not properly resolved on a motion to dismiss. *See, e.g.*, *Global Network Commn'cs, Inc. v. City of New York*, 458 F.3d 150, 155 (2d Cir. 2006) ("The purpose of Rule 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief *without* resolving a contest regarding its substantive merits. The Rule thus assesses the legal feasibility of the complaint, but does not weigh the evidence that might be offered to support it."); *DeMasi*, 567 F. Supp. 2d at 452-53 ("On a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all of the well-pleaded facts and consider those facts in the light most favorable to the plaintiff."); *SavaSeniorCare*, 2016 WL 5395949, at *12 (rejecting similar arguments by SNF defendants because "the question now is not whether the Government is ultimately correct in its assertions"); *Life Care*, 2014 WL 11429265, at *11 ("the Court is not to weigh evidence or make credibility determinations when considering a Motion to Dismiss, but rather evaluate the sufficiency of the pleadings.") (citing *Iqbal*, 556 U.S. at 679, and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007))).

Defendants' selective reading of the Complaint ignores that Rule 9(b) does not require the Government to plead its allegations with the level of detail required to ultimately prove its case, as Defendants seem to assert. Rather, the nine patient examples across nine Facilities coupled with the detailed allegations of misconduct across the Facilities satisfy Rule 9(b) because the examples provide "the defendant[s] with enough details to be able to reasonably discern which of the claims it submitted are at issue," *Omnicare*, 2021 WL 1063784, at *10, and

sufficient notice of the precise misconduct alleged by the United States, *see, e.g.*,

*SavaSeniorCare*, 2016 WL 5395949, at *12.[6]

### C.    The Complaint Specifies the "Who" with Particularity

As described above, the Complaint plausibly alleges that the Defendants submitted and/or

caused the submission of false claims and false statements to the Government. However, the

Facilities claim that the Complaint must be dismissed because the Government has inadequately

pleaded who at the Facilities submitted these claims and statements.[7] Facilities Mem. 18.

Defendants misunderstand the law and misrepresent the facts. As a factual matter, Whitney and

Laufer controlled the Facilities, and the Complaint contains numerous details about how their

---

[6] The Facilities' reliance on the settlement reached in *Jimmo v. Sebelius*, No. 5:11-CV-17
(D. Vt.), *see* Facilities Mem. 23, 25, is misplaced. In *Jimmo*, the plaintiffs alleged that Medicare
contractors improperly applied an "improvement standard" to claims for skilled rehab therapy.
*See Jimmo* Am. Compl., Dkt. No. 13. With respect to two of the Government's representative
examples, the Facilities argue the Complaint here applies the same alleged "improvement
standard" to measure falsity. *See* Facilities Mem. 23, 25. As the court in *Life Care* stated in
response to similar arguments that the Facilities make here, "[w]ithout going into a detailed
history of the *Jimmo* litigation, a settlement agreement entered into in another case in another
district need not affect the way the Government has pled the claims in this action and cannot be
determinative of the way the Court decides Defendant's instant Motion." *Life Care*, 2014 WL
11429265, at *9. Further, and different than *Jimmo*, the Complaint does not challenge the
medical judgment of therapists but rather the practices of Defendants in preventing medical
judgment from being exercised. But "[e]ven if . . . the factual and legal circumstances of this
case and the *Jimmo* case [were] similar, those arguments would be cognizable by this Court only
if and when Defendant files a motion for summary judgment, not on this motion to dismiss." *Id.*

[7] In making this argument the Facilities also seem to contend, in a footnote, that the Complaint
should be dismissed because it fails to explicitly state whether it is alleging that Defendants
violated the FCA under an express or implied certification theory. Facilities Mem. 18 n.5.
However, this is simply not what is required to be pleaded under Rule 9(b). The lone case
Defendants cite for this proposition involved a relator who failed to identify any legal or
contractual requirement that had either been expressly or impliedly violated. *See United States ex
rel. Gelbman v. City of New York*, No. 14-CV-771 (VSB), 2018 WL 4761575, at *8 (S.D.N.Y.
Sept. 30, 2018). By contrast, here the Government has detailed precisely how the Defendants'
Form 1450s were false and why this was material to Government's payment decisions. *See*
Compl. ¶¶ 98, 100-101, 103-105. The Government has also explained how the Defendants' MDS
forms contained false statements and why this was also material to the Government's payment
decisions. *See id.* ¶¶ 99, 102-105.

actions caused the submission of false claims. *See supra* Section II (Background). Further, the Complaint illustrates numerous ways in which employees of the individual Facilities provided medically unreasonable or unnecessary treatment. *See, e.g.*, Compl. ¶¶ 73, 74, 77, 79-83, 88.

The Government does not need to identify any specific person who actually submitted the false claims because where, as here, "a plaintiff 'has alleged that a corporation has committed fraudulent acts, it is the identity of the corporation, not the identity of the natural person, that the plaintiff must necessarily plead with particularity.'" *Wells Fargo*, 972 F. Supp. 2d at 618 (quoting *Bledsoe II*, 501 F.3d at 506); *see also Heath*, 791 F.3d at 125 ("The complaint makes clear, in other words, that corporate levers were pulled; identifying precisely who pulled them is not an inexorable requirement of Rule 9(b) in all cases."); *United States v. Huron Consulting Grp., Inc.*, No. 09 Civ. 1800 (JSR), 2011 WL 253259, at *2 & n.3 (S.D.N.Y. Jan. 24, 2011); *United States ex rel. Fox v. Omnicare, Inc.*, No. 1:11-cv-962, 2013 WL 2303768, at *6 (N.D. Ga. May 17, 2013); *Fresenius Med. Care Holdings, Inc.*, 2012 WL 8667597, at *2 (holding that complaint satisfied Rule 9(b) even though it did not list the names of the employees who actually submitted the claims); *Paskn*, slip op. at 8 (attached as Exh. 1) (the Government is not required to identify the specific individual employees of each Defendant who signed the attestations and claim forms or to demonstrate those employees' knowledge that the claims were false) (citations omitted); *United States ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1084 n.499 (N.D. Cal. 2020) (Defendants "suggest that the government must (1) identify specific individuals at [defendants] who submitted claims or signed certifications to CMS and (2) allege that those individuals had knowledge that the claims or certificates were false. This is not required.") (citation omitted).

## II.     The Government Has Adequately Pleaded That Defendants Acted with Scienter

The Government has more than sufficiently pleaded scienter. The text of the FCA expressly provides that it does not require "proof of specific intent to defraud." 31 U.S.C. § 3729(b)(1)(B). Rather, the FCA imposes liability for, among other things, "knowingly" submitting a false claim. 31 U.S.C. § 3729(a)(1)(A)-(B). "[K]nowing" means "actual knowledge of the information," "act[ing] in deliberate ignorance of the truth or falsity of the information," or "act[ing] in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A).

Rule 9(b) permits scienter to be alleged "generally," *see* Fed. R. Civ. P. 9(b), and the Government need only "plead the factual basis which gives rise to a strong inference of fraudulent intent." *United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020) (quoting *O'Brien v. Nat'l Prop. Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991)). Moreover, the Government can meet its burden "either (a) by alleging facts to show that defendants had both motive and opportunity to commit fraud, or (b) by alleging facts that constitute strong *circumstantial evidence* of conscious misbehavior or recklessness." *Id.* (emphasis added).

Interpreting the allegations in the light most favorable to the Government, which the Court must do, *see DeMasi*, 567 F. Supp. 2d at 452-53, the Government has clearly alleged scienter. Nevertheless, Defendants claim that the Government has failed to meet this burden.

Laufer and Whitney both contend that there is no evidence indicating that they recklessly caused the provision of unnecessary and unreasonable treatment, resulting in false claims, despite the numerous text messages and witness statements to contrary. *See* Laufer Mem. 15-16, 18; Whitney Mem. 18-19. Curiously, Laufer argues that the communications cited in the Complaint reflect "benign business communications," Laufer Mem. 15, and Whitney contends that they are evidence of her ensuring that care was "appropriate," Whitney Mem. 18.

Meanwhile, the Facilities and Paragon simply state that the Government has failed to adequately plead scienter. *See* Facilities Mem. 28. Paragon Mem. 4-5. Paragon also attempts to create novel requirements for pleading scienter, such as requiring that illegal conduct be part of the company's policies or an employee's official job responsibilities. *See* Paragon Mem. 4.

With respect to Laufer, the Government alleges, with ample detail, that he pressured Whitney to take steps to increase Medicare revenue without any regard for the medical needs of the patients at the Facilities. For example, the Complaint describes how Laufer told Whitney to stop discharging patients (without any knowledge about their medical condition) from Emerge until it could bring its census numbers up because the Facility was losing too much money. *See* Compl. ¶ 67. Similarly, Laufer instructed Whitney to "jump on" Facilities that discharged patients at a rate that he deemed unacceptable, *see id.* ¶ 65, and to "[m]ake sure" that an administrator "knows she has a problem" because she was not preventing discharges to his liking. *Id.* at ¶ 64.

These are not, as Laufer contends, "benign business communications" or "naked allegations" about pressuring employees.[8] Laufer Mem. 15. These are examples of Laufer plainly telling Whitney to find ways to keep patients from being discharged, without any regard to their medical needs, and to exert pressure on employees to stop discharging patients. Laufer urges the Court to indulge in an alternate interpretation of his statements. However, as discussed in Section II(B)(1), when considering alternative explanations under Rule 8, "the complaint

---

[8] Laufer, like the Facilities, relies on *United States ex rel. Lawson v. Aegis Therapies, Inc.*, *see* Laufer Mem. 16, but as described in Section I(B)(1), this case is not applicable to the motion to dismiss stage. Laufer also cites *United States ex rel. Alt v. Anesthesia Services Associates*, No. 3:16-cv-0549, 2019 U.S. Dist. LEXIS 223008, at *18-25 (M.D. Tenn. Dec. 31, 2019), in support of his argument that the Court should dismiss the Complaint because conclusory allegations of pressure are insufficient to survive a motion to dismiss. *See* Laufer Mem. 17. But, as discussed in Section I(B)(1), the Complaint does not rely on mere conclusory allegations of pressure.

should be read as a whole, not parsed piece-by-piece to determine whether each allegation, in isolation, is plausible." *Braden*, 588 F.3d at 594 (citing *Vila*, 570 F.3d at 285) (factual allegations should be "viewed in their totality"). When viewed as the whole, the Complaint more than sufficiently alleges that Laufer acted with the necessary scienter.[9]

Whitney's arguments are also without merit. She contends that none of the Government's allegations or quoted text messages or witness statements suggest that she recklessly caused the submission of false claims. Whitney Mem. 18. She goes so far as to claim that her text messages are consistent with her providing medically reasonable care. *See id.* This argument is baseless, particularly at the motion to dismiss stage.

For example, Whitney explicitly told Laufer that she needed a Balance Master machine not for any purpose related to patient care, but to prevent high functioning patients from being discharged. Compl. ¶ 83. Similarly, she told Laufer that she forbade the Facilities from allowing patients to take themselves to the bathroom because "then they will think they are ready to go home." *Id.* ¶ 77. Moreover, Whitney directed that all patients be placed on Ultra High Rehab and, in fact, the Complaint includes an excerpted message from Whitney to Laufer in which she notes with a disapproval that a facility director has stopped putting "everyone on ultra

---

[9] As discussed in Section I(B)(2)(a), the Government does not need to link, as Laufer suggests, a particular conversation or text message between Laufer and Whitney, to a conversation between Whitney and a Facility employee, and then to a particular false claim. *See* Laufer Mem. 18. The case Laufer cites for this proposition, *United States ex rel. Ibanez v. Bristol-Meyers Squibb Co.*, involved allegations that a pharmaceutical company allegedly marketed a drug for unapproved uses thereby causing doctors to prescribe the drug for such purposes and, in turn, the Government to pay for these prescriptions. 874 F.3d 905, 912 (6th Cir. 2017). The Court dismissed relators' complaint because they failed to "adequately identify a representative false claim" and noted that relators' complaint would have succeeded if they provided an example of a "prescription reimbursement submitted to the government for a tainted prescription of [the drug]." *Id.* at 915. Here, the Government has provided nine such examples of patients at the Facilities who received treatment that was neither reasonable nor necessary. *See* Compl. ¶ 97.

appropriately." *See id.* ¶ 92. As discussed in Section I(B) (Background), it is not appropriate to put everyone, by default, on Ultra High Rehab, which is reserved for "only . . . the most complex cases." *See* 63 Fed. Reg. 26,252, 26,258 (May 12, 1998). Whitney's text messages are not only compelling evidence of her scienter, but also of Laufer's scienter, because Whitney was communicating directly with him. Moreover, because the allegations against Whitney concern her acts as a Paragon employee overseeing rehabilitation at all of the Facilities, the Government has adequately pleaded scienter with respect to Paragon as well. *See supra* Section I(a)(A) citing *Paksn*, slip op. at 7 (attached as Exh. 1); *Wheeling Hospital, Inc.*, 2019 WL 4478843, at *10.

Last, the Facilities contend that the Government has failed to plead that the Facilities acted with scienter because it has failed to allege that individuals at the Facilities (as opposed to Laufer or Whitney, presumably) acted with the requisite intent. *See* Facilities Mem. 28. As an initial matter, the Facilities ignore that the scienter of Laufer and Whitney is attributable to the Facilities. *See, e.g.*, *Paksn*, slip op. at 7-8 (attached as Exh. 1) (because the owner of SNFs had scienter it was unnecessary to prove that specific employees at each SNF had scienter). As discussed in Section II (Background), the Complaint alleges a scheme that was directed by Laufer and Whitney, then executed at the Facilities, which were under their control.

The Facilities' argument also disregards that the Complaint contains numerous allegations of individual Facility employees knowingly taking steps to improperly prolong patient stays and provide unnecessary rehabilitation services. *See e.g.*, Compl. ¶ 73 (a "therapist was instructed by Facility management, when completing therapy notes, to exaggerate the amount of assistance patients required in order to ensure that they remained eligible for therapy and would stay in the Facility"); *id.* ¶ 74 (a Facility's director of rehab deliberately kept patients from using walkers in order to stunt their progress and prolong their stays); *id.* ¶ 86 (a therapist

knowingly provided unskilled therapy to patients just to meet Ultra High Rehab minute thresholds).

Similar allegations have been determined to be sufficient to state a claim in other cases. *See, e.g.*, *United States ex rel. Integra Med Analytics, LLC v. Creative Solutions in Healthcare*, No. SA-17-CV-1249, 2019 WL 5970283, at *4 (W.D. Tex. Nov. 13, 2019) (crediting an allegation on a motion to dismiss that therapists "received pressure from management 'to provide Ultra High Rehab without any attention to the patients' plan of care.'"); *Life Care*, 2014 WL 11429265, at *11 ("The crux of the Government's Complaint concerns general allegations that Life Care engaged in a nationwide scheme to pressure therapists into submitting claims for rehab therapy that included medically unnecessary and unskilled minutes."). Accordingly, the Government has adequately pleaded scienter.

## III.    The Government's Claims Are Not Time-Barred[10]

The Government's FCA claims in this case are not time-barred. An FCA action must be brought (1) within "6 years after the date on which the violation . . . is committed"; or (2) within "3 years after the date when facts material to the right of action are known or reasonably should have been known" by the United States, "but in no event more than 10 years after the date on which the violation is committed"—whichever occurs last. 31 U.S.C. § 3731(b). As the Senate report on the 1986 amendments to the FCA states, section 3731(b)(2)'s tolling provision means that the "statute of limitations does not begin to run until the material facts are known by an *official within the Department of Justice* with the authority to act in the circumstances." S. Rep. No. 345, 99th Cong., 2d Sess., 30 (July 28, 1986), *reprinted in* 1986 U.S.C.C.A.N. 5266 (emphasis added); *see also Wells Fargo Bank, N.A.*, 972 F. Supp. 2d at 608 ("[B]oth the statutory

---

[10] The Facilities are the only defendants to raise a statute of limitations argument.

text and the weight of authority support the conclusion that the only government 'official ... charged with responsibility to act' under the FCA is the Attorney General (or his designee within DOJ)"). Moreover, where the Government elects to intervene in a *qui tam*, the Government's pleading relates back to the filing of the *qui tam* action regarding the same conduct. 31 U.S.C. § 3731(c).

It is undisputed that the Government's Complaint relates back to Relator's *qui tam* complaint, which was filed on December 1, 2017. Here, the 10-year statute of limitations set forth in 31 U.S.C. § 3731(b)(2) is operable and runs from the date the Relator filed its complaint because no official within the Department of Justice with authority to act was (or reasonably should have been) aware of the alleged fraud prior to the filing of the Relator's complaint. The Facilities argue, in a footnote, that that the 10-year period is not applicable because the Relator's complaint includes "publicly available claims information, which was available to the government even before Relator brought its case." Facilities Mem. 29 n.7. As a threshold matter, the Medicare claims data referred to by the Facilities is submitted to CMS, not to the Department of Justice. Moreover, the data alone did not reveal the fraud. The U.S. Attorney's Office only became aware of the facts that gave rise to this FCA action after it reviewed the relator's analyses of the data and conducted a lengthy and rigorous investigation. Further, the FCA requires a defendant to act with scienter and data analysis alone, even it reflects aberrant behavior, is simply not enough to put the Government on notice of fraud. Accordingly, the Government did not know (and could not reasonably have been expected to know) of the alleged fraud more than three years before the filing of the *qui tam* complaint, and thus can assert claims as far back as December 2007. *See United States ex rel. Sansbury v. LB & B Assocs., Inc.*, 58 F. Supp. 3d 37, 52 (D.D.C. 2014) (permitting the Government to assert claims dating back 10

years before the filing of the relator's complaint because the Government's complaint-in-intervention related back to the filing of the relators' complaint and that complaint was filed within 3 years of any relevant governmental official learning of the fraud).

The Facilities also argue that the Government's claims pre-dating December 2012 should be dismissed because the Government has failed to provide examples of misconduct from that time period. *See* Facilities Mem. 29. However, this is simply a Rule 9(b) argument disguised as statute of limitations argument. As discussed in Section I(b)(2)(B), the Government does not need to plead conduct from each and every year of a multi-year scheme. Instead, in order to meet Rule 9(b)'s timeframe requirement, the Complaint need only allege the rough time period of the conduct. *See Kester VII*, 2015 WL 109934, at *23 (noting that a complaint does not need to identify false claims from every year of the time period alleged); *United States ex rel. Escobar*, 780 F.3d at 509, 515, *vacated on other grounds*, 579 U.S. 176 (2016) (identification of false claims over two-year period as to one patient sufficient to satisfy Rule 9(b) as to claims submitted for other patients for fraudulent scheme over six-year period); *Duxbury*, 579 F.3d at 30; *Manion*, 2008 WL 906022, at *3 ("To require Plaintiffs to provide specific information as to exactly when alleged violations took place over a multi-year time frame such as this would make Rule 9(b) carry more weight than it was meant to bear."); *United States v. NHC Healthcare Corp.*, 115 F. Supp. 2d 1149, 1151 (W.D. Mo. 2000) ("When an underlying fraudulent activity is alleged to have occurred systematically and continuously over a period of time it is sufficient to allege a general time frame of the fraud in question"). Accordingly, the Government is not barred from seeking to recover for false claims that pre-date December 2012.

**IV. The Motions to Dismiss the Government's Common Law Claims Should be Denied[11]**

**A. The Complaint Adequately Pleads Federal Common Law Claims Against the Facilities**

The Facilities contend that the Government's claims for unjust enrichment and payment by mistake should be dismissed because: the Government has failed to plead these claims with particularity; the claims are barred because the FCA already provides an adequate legal remedy; and the Government's claims "sound in quasi-contract." *See* Facilities Mem. 30-31. The Facilities also argue that the Government's common law claims are subject to a three-year statute of limitations and, therefore, the Government's claims pre-dating December 1, 2014, are time-barred. *See id.* at 32. These arguments are without merit.

As an initial matter, for the reasons stated in Section I, the Government has more than adequately pleaded fraud with particularity. Further, the Facilities are incorrect that common law fraud claims cannot be alleged concurrently with FCA claims alleging Medicare fraud. As a Court in this district recently made clear, "[c]ourts have consistently held that federal common law claims are available to the government and can coexist with FCA claims." *Omnicare*, 2021 WL 1063784, at *13 (citing *United States v. General Dynamics Corp.*, 19 F.3d 770, 773 (2d Cir. 1994)); *see also Bilotta*, 50 F. Supp. 3d at 539; *Ormsby*, 444 F. Supp. 3d at 1086.

The Facilities are also incorrect that the Government's federal common law claims are barred because the parties' relationship is governed by the Medicare Provider Agreement and, accordingly, they "sound in quasi-contract." Facilities Mem. 31.[12] Courts in this district have

---

[11] Paragon has not provided any independent reasons why the common law claims should be dismissed against it.

[12] None of the cases cited by the Facilities actually stands for the proposition that the Government is prohibited from bringing common law causes of action to recover Medicare funds because of a contractual relationship between the parties. *See* Facilities Mem. 31.

regularly allowed the Government to pursue common law fraud claims seeking to recover Medicare funds. *See, e.g.*, *Omnicare*, 2021 WL 1063784, at *13; *Bilotta*, 50 F. Supp. 3d at 539; *Kester I*, 23 F. Supp. 3d at 269. Further, this argument has been explicitly rejected by courts in other districts. *See, e.g.*, *United States ex rel. Academy Health Ctr., Inc. v. Hyperion Foundation, Inc.*, No. 10-552, 2014 WL 3385189, at *45 (S.D. Miss. July 9, 2014) (Government can bring actions for payment by mistake and unjust enrichment in a Medicare overpayment case as the claims are not based on a contract); *United States v. Geri-Care, Inc.*, No. 89-5720, 1990 WL 9463, at *3 (E.D. Pa. Feb. 1, 1990) (rejecting argument that unjust enrichment claim is barred because of a contractual relationship between defendant and Medicare.).

Lastly, the Facilities argue that the statute of limitations for unjust enrichment and payment by mistake is three years and, accordingly, the Government cannot recover for claims that pre-date December 2014—three years before relator's complaint was filed. This argument is also wrong. The statute of limitations for unjust enrichment and payment by mistake is six years, as prescribed by 28 U.S.C. § 2415(a). *See, e.g.*, *United States v. Erie County Med. Ctr.*, No. 02-0305, 2002 WL 31655004, at *6 (W.D.N.Y. Oct. 30, 2002) (the Government's "unjust enrichment claims are governed by the six-year statute of limitations in 28 U.S.C. § 2415(a)"); *United States v. Inc. Vil. of Is. Park*, 888 F. Supp. 419, 455 (E.D.N.Y. 1995) ("This court has held that the six year statute of limitation set forth in 28 U.S.C. § 2415(a) is applicable to a claim for unjust enrichment."); *United States ex rel. Banton v UT Med. Grp., Inc.*, No. 03-CV-2740-JPM-DKV, 2010 WL 11493942, at *9 (W.D. Tenn. Jan. 27, 2010) (the statute of limitations for unjust enrichment and payment by mistake is six years and those claims relate back to the relator's complaint if they arise from the same conduct); *United States v. Intrados/International Mgmt. Grp.*, 265 F. Supp. 2d 1, 12-13 (D.D.C. 2002) (statute of limitations for federal claim of

unjust enrichment and payment by mistake is six years); *United States ex rel. Miller v. Holzmann*, No. 95-1231 2007 WL 710134, at \*7 (D.D.C. Mar. 6, 2007) (the statute of limitations for unjust enrichment and payment by mistake is six years). Accordingly, the Government can bring claims under its federal common law theories for conduct occurring after December 1, 2011.[13]

### B. The Government Has Properly Alleged Common Law Claims Against Laufer and Whitney

Last, Laufer and Whitney contend that because they did not directly receive Medicare funds, the Government's common law claims should be dismissed. However, these claims do not fail simply because Medicare money was paid to the Facilities, and not directly to Laufer and Whitney as individuals. *See* Laufer Mem. 21-22, Whitney Mem. 20-21. To hold otherwise would mean that owners of businesses and employees actively involved in fraudulent schemes are immune from liability under these common law theories.

Laufer argues that under New York law the Government's common law claims should be dismissed because Laufer did not receive a direct benefit from Medicare. Laufer Mem. 21. However, as the Second Circuit has held, under New York law, unjust enrichment does not require a direct relationship between the parties, and it does not matter whether a "benefit is directly or indirectly conveyed." *See Myun-Uk Choi v. Tower Research Capital, LLC*, 890 F.3d 60, 69 (2d Cir. 2018) (citing *Cox v. Microsoft Corp.*, 778 N.Y.S.2d 147, 149 (N.Y. App. Div. 1st Dep't 2004)).

More fundamentally, where, as here, the Government is alleging that defendants were unjustly enriched through a federal program, the Government's claims are governed by federal

---

[13] The Government concedes that it cannot recover under its common law claims for conduct occurring in 2010.

common law, not state common law. *See United States v. Halifax Hosp. Med. Ctr.*, No. 6:09-cv-1002, 2012 WL 921147, at *6 (M.D. Fla. Mar. 19, 2012) ("the Government's rights arising under a nationwide federal program such as this one are governed by federal law, not state law."); *Omnicare*, 2021 WL 1063784 at *13 (rejecting Omnicare's argument that there is no federal common law and upholding the Government's unjust enrichment and payment by mistake claims, noting that "[f]ederal law governs questions involving the rights of the United States arising under nationwide federal programs.") (citing *United States v. Kimbell Foods.*, 440 U.S. 715, 726 (1979)); *Downey v. State Farm Fire & Cas. Co.*, 266 F.3d 675, 681 (7th Cir. 2001) ("When duties or rights of the United States are at stake under a federal program, that federal interest requires the application (and if necessary the creation) of federal law") (citing *Clearfield Trust Co. v. United States*, 318 U.S. 363 (1943)); *United States ex rel. Roberts v. Aging Care Home Health, Inc.*, 474 F. Supp. 2d 810, 820 (W.D. La. 2007) (finding that federal common law, as opposed to Louisiana common law, dictates the elements of unjust enrichment) (citing *United States v. Vernon Home Health*, 21 F.3d 693, 695 (5th Cir. 1994) ("[F]ederal law governs cases involving the rights of the United States arising under a nationwide federal program . . . .")); *United States v. Park*, 389 F. Supp. 3d 561, 580 (N.D. Ill. 2019) (applying federal common law in unjust enrichment action) (collecting cases).

Under federal common law, neither unjust enrichment nor payment by mistake requires that the wrongful or mistaken payment be made directly from Medicare to the party against whom the claim is asserted. As the Fifth Circuit held, the Government "may recover money it mistakenly, erroneously, or illegally paid from a party that received the funds without right. Moreover, the government is entitled to obtain repayment from *a third party into whose hands*

*the mistaken payments flowed* where that party participated in and benefitted from the tainted transaction." *LTV Educ. Sys., Inc. v. Bell*, 862 F.2d 1168, 1175 (5th Cir. 1989) (emphasis added).

In cases similar to this one, courts have held that the Government can recover funds under these legal theories from individuals who were indirectly enriched as a result of a larger corporate scheme. For instance, in *United States ex rel. Roberts v. Aging Care Home Health, Inc.*, the Court granted the Government's motion for summary judgment against an individual who was unjustly enriched through her ownership of a healthcare provider that submitted false claims to Medicare. 474 F. Supp. 2d 810, 813-14 (W.D. La. 2007). Similarly, in *United States v. Rogan*, the Government successfully brought unjust enrichment and payment by mistake claims against a hospital administrator who conspired with others to provide kickbacks to physicians in exchange for patient referrals, thereby enhancing the hospital's revenues. 459 F. Supp. 2d 692, 697-700, 728 (N.D. Ill. 2006), *amended and superseded by*, *United States v. Rogan*, No. 02 Civ. 3310, 2006 WL 8427270 (N.D. Ill. Oct. 2, 2006).

Furthermore, other courts have refused to dismiss these common law claims against individuals who defrauded the government, so long as those individuals participated in the wrongful conduct. *See United States ex rel. Piacentile v. Wolk*, No. 93-5773, 1995 WL 20833, at *5 (E.D. Pa. Jan. 17, 1995) (rejecting argument that payment by mistake and unjust enrichment claims failed against individuals because payments were made by government to company); *see also United States ex rel. Klump v. Dynamics Corp. of Am.*, No. 95-1016, 1998 WL 34194886, at *3-4 (S.D. Ohio Nov. 17, 1998) (claims against subcontractor who did not receive payment directly from government still viable).

The reasoning of these cases applies to this matter. Where, as here, the individual defendants participated in a fraud against the Government, the Government should be able to

recover money that flowed to the individuals indirectly through their control of the company or salary.[14] *See Rogan*, 459 F. Supp. 2d at 721 (the equitable theory of unjust enrichment allows restitution where "the person sought to be charged is in possession of money or property which in good conscience he should not retain, but should deliver to another . . . .") (citing *Matarese v. Moore-McCormack Lines, Inc.*, 158 F.2d 631, 634 (2d Cir. 1946)). Here, the Government has alleged that Laufer and Whitney actively participated in the scheme to defraud Medicare. Compl. ¶¶ 51, 57-72, 75-77, 79-80, 83, 89-92. During the Covered Period, Laufer owned 10 of the 11 Facilities and Whitney drew her salary from Paragon, which managed all of the Facilities. *See* Whitney Mem. 20-21. Under these circumstances, Laufer and Whitney should not be permitted to escape liability on the common law claims simply because Medicare paid the Facilities directly before Laufer and Whitney received a portion of this money through their ownership interests and salary, respectively.

---

[14] The cases cited by Whitney and Laufer in support of this proposition are readily distinguishable. *See* Laufer Mem. 22; Whitney Mem. 20. Almost all of the cases cited by Laufer and Whitney interpret unjust enrichment and payment by mistake under New York common law as opposed to federal common law. *See Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511 (N.Y. 2012); *Blobel v. Kopfli*, 2018 N.Y. Misc. LEXIS 549, at *23 (N.Y. Sup. Ct. Feb. 13, 2018); *M+J Savitt, Inc. v. Savitt*, No. 08-cv-8535, 2009 U.S. Dist. LEXIS 21321, at *30 (S.D.N.Y. Mar. 17, 2009); *In re Int. Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 500 (S.D.N.Y. 2017); *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 306 (2d Cir. 2004). The defendants in *United States v. Spectrum Painting Corp.*, unlike Laufer and Whitney, did not cause the federal government to pay any funds. No. 19-cv-2096, 2020 U.S. Dist. LEXIS 154650, at *16 (S.D.N.Y. Aug. 25, 2020). Instead, the defendants in that action allegedly defrauded the New York City Department of Transportation and the Metropolitan Transit Authority. *See id.*

## CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

Dated: January 28, 2022
New York, New York

Respectfully submitted,

DAMIAN WILLIAMS
United States Attorney for the
Southern District of New York

By:      */s/ Jacob M. Bergman*
JACOB M. BERGMAN
DANIELLE J. LEVINE
Assistant United States Attorneys
86 Chambers Street, 3rd Floor
New York, New York 10007
Tel.:  (212) 637-2689/2663
E-mail: jacob.bergman@usdoj.gov
danielle.levine@usdoj.gov