# Exhibit 1

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL

| Case No.: | 2:15-cv-09064-SB-AGR | Date: | November 15, 2021 |

| Title: | *United States of America et al v. Paksn, Inc. et al.* |

| Present: The Honorable | STANLEY BLUMENFELD, JR., U.S. District Judge |

| Victor Cruz | N/A |
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
| N/A | N/A |

**Proceedings:** ORDER ON MOTION TO DISMISS COMPLAINT, OR IN THE ALTERNATIVE, STRIKE CERTAIN IMMATERIAL, IMPERTINENT, AND PREJUDICIAL PARAGRAPHS FROM THE COMPLAINT (Dkt. No. 87)

Relator Trilochan Singh filed this *qui tam* action in 2015 to challenge allegedly fraudulent billing practices at skilled nursing facilities operated by Defendants. Dkt. No. 1. The United States filed its Complaint in Intervention in June 2021. Dkt. No. 72. Defendants now move to dismiss for failure to state a claim and argue in the alternative that references to Defendant Prema Thekkek's invocation of her Fifth Amendment rights should be stricken from the pleadings. Dkt. No. 87. The Court finds this matter suitable for decision without oral argument and vacates the November 19, 2021 hearing. Fed. R. Civ. P. 78; L.R. 7-15. Defendants' motion is **denied**.

## BACKGROUND

Between 2002 and 2015, Defendant Paksn, Inc. (Paksn) operated at least 17 healthcare facilities in California, including seven skilled nursing facilities (SNFs)

that are Defendants in this case: Kayal, Inc. d/b/a Bay Point Healthcare Center (Bay Point); Nadhi, Inc. d/b/a Gateway Care & Rehabilitation Center (Gateway); Oakrheem, Inc. d/b/a Hayward Convalescent Hospital (Hayward); Bayview Care, Inc. d/b/a Hilltop Care and Rehabilitation Center (Hilltop); Thekkek Health Services, Inc. d/b/a Martinez Convalescent Hospital (Martinez); Aakash, Inc. d/b/a Park Central Care & Rehabilitation Center (Park Central); and Nasaky, Inc. d/b/a Yuba Skilled Nursing Center (Yuba). Dkt. No. 72 ¶¶ 8, 10–16 (Complaint in Intervention).[1] Defendant Prema Thekkek and her husband own Paskn and many of the healthcare facilities operated by Paskn, including Bay Point, Gateway, Hilltop, Martinez, Park Central, and Yuba. *Id.* ¶¶ 9–11, 13–16. Relator Trilochan Singh worked as Paksn's Vice President of Operations and Chief Operating Officer from 2007 to 2014. *Id.* ¶ 7.

The United States alleges that Thekkek and Paksn operated the SNFs "as a single unified SNF chain, which they oversaw and closely managed. For example, every Paskn employee and every employee of a SNF Defendant used an '@thekkek.com' email address." *Id.* ¶ 60. This allegation is corroborated by numerous examples of email conversations in which Thekkek and Singh made decisions regarding the hiring and compensation of doctors to work as medical directors at the various SNFs, sometimes directing that one doctor would be hired at multiple SNFs. *E.g.*, *id.* ¶¶ 91, 93–94, 102. Thekkek also repeatedly instructed the SNFs to track patient referrals and to send her the information about referrals and admissions weekly. *Id.* ¶¶ 112–18.

According to the United States, Thekkek and Paksn conducted a scheme in which the SNFs signed dozens of contracts with physicians and paid them thousands of dollars, ostensibly in return for the doctors' services but actually as a vehicle for paying kickbacks to induce the doctors to refer patients to the SNFs. *Id.* ¶¶ 61–63. Defendants selected doctors with large patient bases and active practices at local acute care hospitals, and—contrary to the common industry practice—paid them fixed monthly stipends regardless of the fair market value of any services they actually performed. *Id.* ¶¶ 64–66. The physicians spent little or no time performing the services for which they were ostensibly hired. *Id.* ¶ 69. When contracted physicians did not refer enough patients to the SNFs, Defendants withheld or terminated their stipends. *Id.* ¶ 67.

---

[1] For purposes of Defendants' Rule 12(b)(6) motion to dismiss, the Court accepts as true all well-pleaded allegations in the Complaint in Intervention.

The Complaint recites several examples of conversations in which Thekkek and Singh discussed hiring and compensating doctors based on their ability to refer patients to the SNFs. For example, in 2011, Dr. Bhudpinder Bhandari asked Thekkek and Singh to consider hiring him for directorship positions at all five of the SNFs in Hayward and Fremont, noting that he was "a consistent referral" for the facilities and had recently "transferred several Medicare patients to each of those facilities." *Id.* ¶ 90. At the direction of Paksn and Thekkek, several of the SNFs hired Dr. Bhandari and paid him a total of at least $383,000. *Id.* ¶ 91. Singh later wrote to Thekkek in 2012 that "we have done the best thing to get bhandari since in bay area he has the most no. of patients in his private practice and he is motivated and knows how to channel the patients to nursing homes." *Id.* ¶ 93. Thekkek did not admonish Singh or instruct him not to pay for referrals, but instead replied, "very good." *Id.* ¶ 94. Thekkek also suggested to Singh that Martinez should replace its medical director with Dr. Bhandari because "We need medicare there" and the existing director, Dr. Dhugga, was not referring enough patients. *Id.* ¶ 123. "Dr. Dhugga eventually persuaded Defendants not to terminate him based in large part on his delivering a 'steady flow of patients' from a local acute care hospital." *Id.* ¶ 125.

Another example of the role of referrals in Defendants' selection and compensation of medical directors occurred in 2015, when a medical director resigned from Yuba. After a Yuba employee wrote about hiring a replacement, Thekkek immediately responded that the new director should not be paid as much as the predecessor because the predecessor "has practice in hospital and we were getting admission from him." *Id.* ¶ 102. The Complaint describes several other similar conversations involving Thekkek and Singh. Similarly, Thekkek repeatedly emphasized to the SNFs the need to track patient referrals and complained when doctors did not refer enough patients to the SNFs. *Id.* ¶¶ 112–17.

At Thekkek's and Paksn's direction, the SNF Defendants submitted Medicare claims for services provided to patients who had been referred by physicians paid in the manner described above. *Id.* ¶ 141; *see also id.* ¶ 151 (examples of seven claims submitted by the SNF Defendants). The United States alleges that these claims violated the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b(b) (AKS), which prohibits payments to induce referrals for Medicare services.[2]

---

[2] *See* 42 U.S.C. § 1320a-7b(b)(2) ("Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such

| CV-90 (12/02) | **CIVIL MINUTES – GENERAL** | Initials of Deputy Clerk VPC |

3

The SNF Defendants also submitted Medicare enrollment applications and annual Medicare cost reports that certified that they had complied with the AKS. Dkt. No. 72 ¶¶ 144–48.

Thekkek testified that since at least 2003, she was familiar with the AKS and understood that paying for referrals was not allowed. *Id.* ¶ 158. In a March 2018 deposition, Thekkek initially answered questions about the conduct at issue here, claiming that she would have instructed employees not to pay for referrals if she had paid attention to the emails and denying that Defendants tracked referrals. *Id.* ¶¶ 162, 166. When confronted with documents demonstrating her involvement in the scheme and the falsity of her testimony, Thekkek requested a continuance and then invoked her Fifth Amendment right with respect to further questions about the allegations here. *Id.* at 15 n.1. The Complaint makes repeated references to Thekkek's invocation of the Fifth Amendment in connection with specific questions about Defendants' conduct. *Id.* ¶¶ 70, 72, 77, 99–101, 103–06, 119, 121, 126–27, 131, 136, 170–72.

The United States alleges that since 2009, "Defendants knowingly submitted and caused to be submitted thousands of false claims and statements to the United States, which resulted in millions of dollars of reimbursement to the SNF Defendants by the Medicare program for claims that were ineligible for payment because of Defendants' unlawful conduct. *Id.* ¶ 2. The United States alleges claims against all Defendants for violation of the False Claims Act, 31 U.S.C. § 3729(a)(1)(A) and (B) (FCA), for which it seeks an award of treble damages and civil penalties, and against the SNF Defendants for payment by mistake. Dkt. No. 72 ¶¶ 187–99. Defendants move to dismiss the Complaint in Intervention for failure to state a claim and move in the alternative to strike the references to Thekkek's invocation of her Fifth Amendment right. Dkt. No. 87.[3]

---

person—(A) to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole or in part under a Federal health care program . . . shall be guilty of a felony and upon conviction thereof, shall be fined not more than $100,000 or imprisoned for not more than 10 years, or both.").

[3] In his pleadings, Singh alleged additional claims—for violations of the AKS and state statutes—that are not included in the Complaint in Intervention. Dkt. No. 8 (1st. Am. Compl.). Defendants represent that "consistent with the agreement of counsel for Defendants and the Relator," the United States's Complaint in

## LEGAL STANDARD

Under Rule 12(b)(6), a defendant may move to dismiss for failure to state a claim upon which relief can be granted. A plaintiff must state "enough facts to state a claim to relief that is plausible on its face." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). A claim has "facial plausibility" if the plaintiff pleads facts that "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

In resolving a Rule 12(b)(6) motion, a court must accept all well-pleaded factual allegations as true, but "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Id. at 678. That is, a pleading must set forth allegations that have "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. Courts "are not bound to accept as true a legal conclusion couched as a factual allegation." Id. (quoting Twombly, 550 U.S. at 555). Assuming the veracity of well-pleaded factual allegations, a court next must "determine whether they plausibly give rise to an entitlement to relief." Id. at 679. There is no plausibility "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." Id.

## DISCUSSION

### A. False Claims Act

Under the FCA, "any person who—(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval [or] (B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim" . . . is liable to the United States Government" for a civil penalty "plus 3 times the amount of damages which the Government sustains because of the act of that person." 31 U.S.C. § 3729(a)(1). Noncompliance with a statute such as the AKS does not itself give rise to a cause of action under the FCA, but "the false *certification* of compliance . . . creates liability when certification is a prerequisite to obtaining a government benefit." *Ebeid ex rel. U.S. v. Lungwitz*, 616 F.3d 993, 997 (9th Cir. 2010) (quoting *U.S. ex rel. Hopper v. Anton*, 91 F.3d 1261, 1266 (9th Cir. 1996)). The Ninth Circuit has identified four

---

Intervention is "the only complaint that the parties intend to litigate." Dkt. No. 87 at 2 n.1.

elements of a false certification claim: "(1) a false statement or fraudulent course of conduct, (2) made with scienter, (3) that was material, causing (4) the government to pay out money or forfeit moneys due." Id. (quoting U.S. ex rel. Hendow v. Univ. of Phoenix, 461 F.3d 1166, 1174 (9th Cir. 2006)).

Defendants argue that the FCA claims should be dismissed because the Complaint makes only conclusory global allegations that lack sufficient details regarding the "who, what, when, where, and how" of the alleged fraud, lacks particularized facts that establish the liability of each Defendant, improperly attempts to impute Thekkek's knowledge to all the Defendants, and improperly relies on Thekkek's invocation of her Fifth Amendment rights. Defendants correctly argue that claims under the FCA are subject to Rule 9(b), which requires that a party alleging fraud must "state with particularity the circumstances constituting fraud or mistake," including "the who, what, when, where, and how of the misconduct charged." Id. at 998 (quoting Vess v. Ciba–Geigy Corp. USA, 317 F.3d 1097, 1106 (9th Cir. 2003)).

The Complaint makes no attempt to identify each of the thousands of false claims allegedly submitted by the various SNFs, nor is it required to do so. Indeed, the Ninth Circuit in *Ebeid* clarified that to survive a Rule 9(b) motion to dismiss, a complaint need not necessarily allege even representative examples of false claims. Id. Although that is one way of meeting the plaintiff's pleading obligation, it is also "sufficient to allege 'particular details of a scheme to submit false claims paired with reliable indicia that lead to a strong inference that claims were actually submitted.'" Id. at 998–99 (quoting United States ex rel. Grubbs v. Ravikumar Kanneganti, 565 F.3d 180, 190 (5th Cir. 2009)).

Here, the Complaint identifies seven specific examples of false claims submitted by six of the SNFs between 2011 and 2015, identifying the SNF, referring physician, dates of the claimed treatment, and amount of Medicare reimbursement. Dkt. No. 72 ¶ 151.[4] The Complaint also pleads extensive facts about Thekkek's and Paksn's alleged scheme to make payments to medical doctors to induce them to refer Medicare patients to the SNFs so that the SNFs could file claims for Medicare benefits. The Complaint alleges that Defendants in fact filed thousands of such claims and received millions of dollars in payments as a result.

---

[4] The United States notes that it mistakenly included two claims from Park Central and none from Bay Point but correctly argues that pleading sample claims is not necessarily required. Dkt. No. 99 at 12 n.4.

| CV-90 (12/02) | **CIVIL MINUTES – GENERAL** | Initials of Deputy Clerk VPC |

The detailed allegations regarding Thekkek's extensive efforts to recruit doctors who would refer Medicare patients and to induce them to do so provide "reliable indicia that lead to a strong inference that claims were actually submitted" so as to satisfy Rule 9(b). *Ebeid*, 616 F.3d at 999.

The Complaint alleges that Thekkek's conduct and knowledge are imputable to Paksn, which she owned, and to the SNF Defendants, which she owned and/or were managed by Paksn. Dkt. No. 72 ¶ 59. Defendants correctly argue that these allegations are insufficient by themselves to lump all nine Defendants together and hold them liable by association. But the Complaint does not rest on conclusory allegations of ownership and management. It offers extensive factual allegations to support the allegation that Paksn and Thekkek operated the facilities "as a single unified SNG chain, which they oversaw and closely managed." *Id.* ¶ 60. It recites page after page of email conversations in which Thekkek (Paksn's owner) and Singh (Paksn's Vice President of Operations and COO) made hiring and compensation decisions for the various SNFs and directed the SNFs to report referrals to Thekkek on a weekly basis, often making decisions and giving directions for multiple SNFs at the same time. Thus, the United States has plausibly alleged specific facts showing that Thekkek, through Paksn, was personally involved in the operation of the SNFs and operated them as part of a unified scheme involving the same methods and many of the same doctors.

Under these circumstances, where specific allegations plausibly show that Thekkek directed the kickback scheme at each of the SNFs while knowing that it was improper to make payments to doctors to induce Medicare referrals, it is not unreasonable to impute Thekkek's knowledge to each of the SNF Defendants. The Complaint alleges facts establishing that Thekkek knew the payments to induce referrals were illegal and that she repeatedly lied about Defendants' conduct until confronted with documentary evidence of her involvement, at which point she invoked her Fifth Amendment rights.[5] The Complaint plausibly alleges that all of the SNF Defendants, at the direction of Paksn and Thekkek, made claims for Medicare payments while falsely representing that they were not in violation of the AKS.

Contrary to Defendants' argument, the United States is not required to identify the specific individual employees of each Defendant who signed the

---

[5] The plausibility of the United States's claims does not depend on Thekkek's invocation of her Fifth Amendment rights.

attestations and claim forms or to demonstrate those employees' knowledge that the claims were false. See U.S. ex rel. Harrison v. Westinghouse Savannah River Co., 352 F.3d 908, 919 (4th Cir. 2003) ("[W]e decline to adopt Westinghouse's view that a single employee must know both the wrongful conduct and the certification requirement. If we established such a rule, corporations would establish segregated 'certifying' offices that did nothing more than execute government contract certifications, thereby immunizing themselves against FCA liability."); United States ex rel. Ormsby v. Sutter Health, 444 F. Supp. 3d 1010, 1084 n.499 (N.D. Cal. 2020) ("Sutter and PAMF suggest that the government must (1) identify specific individuals at Sutter and PAMF who submitted claims or signed certifications to CMS and (2) allege that those individuals had knowledge that the claims or certificates were false. This is not required.") (citation omitted). Instead, "[i]t is sufficient to plead that the defendant organization had scienter (whether imputed knowledge from any employee who had scienter or otherwise), regardless of whether the individuals who submitted the claims or certifications were wholly innocent and had no scienter themselves." Ormsby, 444 F. Supp. 3d at 1084 n.499 (collecting cases);[6] see also United States ex. rel. Jacobs v. CDS, P.A., No. 4:14-CV-00301-BLW, 2015 WL 5698395, at *9 (D. Idaho Sept. 28, 2015) (finding that complaint did not need to plead details of each certification and stated sufficient claim under FCA where it alleged that defendant submitted cost report certifications and Medicaid claims while recruitment agreement that violated AKS was in effect, because relator "apparently had knowledge of this allegedly improper financial relationship, which has been sufficiently alleged, through his position as the recruited physician practicing for CDA. This is enough to allege an improper scheme to submit false claims, as well as reliable indicia that lead to a strong inference that claims were actually submitted." (citing Ebeid, 616 F.3d at 998)).

Here, the United States plausibly alleges a widespread scheme in which Thekkek (who had knowledge that her conduct was illegal) used Paksn and at least seven SNFs over many years to file thousands of claims resulting in millions of dollars of Medicare payments to the SNFs. Of course there are many details of the specific transactions at issue that are not included in the Complaint. But the

---

[6] The court in Ormbsy persuasively distinguishes United States v. Scan Health Plan, No. CV095013JFWJEMX, 2017 WL 4564722 (C.D. Cal. Oct. 5, 2017), on which Defendants rely to argue that the United States was required to show that the individuals who submitted the claims knew they were false. Ormsby, 444 F. Supp. 3d at 1084 n.499.

allegations "provide enough detail 'to give [Defendants] notice of the particular misconduct which is alleged to constitute the fraud charged so that [they] can defend against the charge and not just deny that [they have] done anything wrong,'" which is all that is required to satisfy Rule 9(b). *Ebeid*, 616 F.3d at 999 (9th Cir. 2010) (quoting *U.S. ex rel. Lee v. SmithKline Beecham, Inc.*, 245 F.3d 1048, 1051–52 (9th Cir. 2001)).  Accordingly, Defendants have not shown that they are entitled to dismissal of the United States's claims for violations of the FCA.

### B. Payment by Mistake

Defendants summarily argue that the United States's claim for payment by mistake, based on violations of the AKS, must be dismissed for the same reasons as the FCA claims.  The United States has plausibly alleged that the SNF Defendants violated the AKS by making payments to medical doctors to induce them to refer Medicare patients to the SNFs. *See Jacobs*, 2015 WL 5698395, at *4 ("The AKS covers arrangements if even one purpose of remuneration was to obtain referrals or induce further referrals of Medicare patients.") (citing *United States v. Kats*, 871 F.2d 105, 108 (9th Cir. 1989)).  Accordingly, Defendants are not entitled to dismissal of the payment by mistake claim.

### C. Motion to Strike

Defendants also argue in the alternative that the numerous allegations regarding Thekkek's invocations of her Fifth Amendment rights during a 2018 deposition should be stricken from the Complaint in Intervention under Rule 12(f).  That rule provides that "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f).  "The burden on a party moving to strike portions of a complaint is high" and "the motion must be denied if there is any doubt as to the relevancy of the challenged allegation." *Mary Pickford Found. v. Timeline Films, LLC*, No. CV126070PSGDTBX, 2013 WL 12131550, at *1 (C.D. Cal. Jan. 11, 2013).

The parties vigorously dispute whether Thekkek's invocations of her Fifth Amendment rights during her deposition will give rise to an adverse inference under the circumstances of this case, which may depend on future developments including the alternative evidence available to the government.  It is unnecessary to decide at this stage whether Thekkek's reliance on the Fifth Amendment will later be admissible evidence.  In the meantime, Defendants have not established that they are prejudiced by references to her invocations of the Fifth Amendment.

"[C]ourts in this jurisdiction generally deny motions to strike when, as here, the moving party fails to show prejudice." *Id.*, at *2 (collecting cases). Because it is unclear at this stage whether the allegations are relevant and Defendants have not established prejudice, their motion to strike is **denied**.

## ORDER

Because the Complaint in Intervention states plausible claims that satisfy Rule 9(b) and Defendants have not shown that the allegations regarding Thekkek's invocation of the Fifth Amendment should be stricken, Defendants' motion to dismiss is **DENIED**.