**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| UNITED STATES OF AMERICA *ex rel.* INTEGRA MED ANALYTICS LLC,<br><br>Plaintiff,<br><br>v.<br><br>ISAAC LAUFER, *ET AL*,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) ) **No. 7:17-cv-09424 (CS)** |
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ISSAC LAUFER, *ET AL*,<br><br>Defendants. | ) ) ) ) ) ) ) ) ) ) |

**MEMORANDUM IN SUPPORT OF**
**ISSAC LAUFER'S MOTION TO DISMISS**

Aaron M. Katz
ROPES & GRAY LLP
Prudential Tower
800 Boylston Street
Boston, MA 02199
Tel: (617) 951-7000
Aaron.Katz@ropesgray.com

# Table of Contents

**Page**

PRELIMINARY STATEMENT ................................................................................1

RELEVANT BACKGROUND ...............................................................................6

   A.   Medicare Coverage for Skilled Nursing Facility Services ................................6

   B.   The Skilled Nursing Facilities and Paragon..................................................7

   C.   The *Qui Tam*, and the Government's Three-Year Investigation.......................8

   D.   The Government's Allegations Regarding Laufer's Conduct ...........................9

APPLICABLE PLEADING STANDARDS ...........................................................12

   A.   Rule 8.........................................................................................................12

   B.   Rule 9(b) ....................................................................................................13

ARGUMENT.......................................................................................................14

   I.   The Complaint Fails to Adequately Allege That Laufer "Knowingly Caused" the Facilities to Submit False Claims to Medicare .............................................15

   II.   The Unjust Enrichment Claims Fails, Because Laufer Did Not Receive Any Payments From Medicare ............................................................................................21

   III.   Because Medicare Did Not Make Any Payments Directly to Laufer, the Government's Payment-by-Mistake Claim Against Him Fails. ..........................................22

   IV.   The Claims Against Laufer Should Be Dismissed With Prejudice .................23

CONCLUSION ...................................................................................................24

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*United States ex rel. Alt v. Anesthesia Services Associates*,
 No. 3:16-cv-0549, 2019 U.S. Dist. LEXIS 223008 (M.D. Tenn. Dec. 31,
 2019) ............................................................................................................................ 16

*Anwar v. Fairfield Greenwich, Ltd.*,
 728 F. Supp. 2d 372 (S.D.N.Y. 2010) ..................................................................... 19

*Ashcroft v. Iqbal*,
 556 U.S. 662 (2009) ......................................................................................... 11, 20

*ATSI Communs., Inc. v. Shaar Fund, Ltd.*,
 493 F.3d 87 (2d Cir. 2007) ..................................................................................... 13

*Bell Atlantic Co. v. Twombly*,
 550 U.S. 544 (2007) ............................................................................................... 12

*Blobel v. Kopfli*,
 2018 N.Y. Misc. LEXIS 549 (N.Y. Sup. Ct. Feb. 13, 2018) ................................. 21

*DirecTV Latin Am., LLC v. Park 610, LLC*,
 691 F. Supp. 2d 405 (S.D.N.Y. 2010) ..................................................................... 11

*Gold v. Morrison-Knudsen Co.*,
 68 F.3d 1475 (2d Cir. 1995) ................................................................................... 11

*United States ex rel. Grubea v. Rosicki, Rosicki & Assoc.*,
 318 F. Supp. 3d (S.D.N.Y. 2018) ............................................................................ 19

*United States ex rel. Hayward v. SavaSeniorCare, LLC*,
 No. 3:11-cv-00821, 2016 U.S. Dist. LEXIS 132336 (M.D. Tenn. Sept. 27,
 2016) ................................................................................................................... 17, 18

*United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*,
 874 F.3d 905 (6th Cir. 2017) ............................................................................ 13, 17

*Kaye v. Grossman*,
 202 F.3d 611 (2d Cir. 2000) ................................................................................... 21

*United States ex rel. Kester v. Novartis Pharms. Corp.*,
 23 F. Supp. 3d 242 (S.D.N.Y. 2014) ................................................................. 11, 12

*United States ex rel. Kolchinsky v. Moody's Corp.*,
 162 F. Supp. 3d 186 (S.D.N.Y. 2016) ...................................................... 2, 5, 15, 19

*United States ex rel. Ladas v. Exelis, Inc.*,
  824 F.3d 16 (2d Cir. 2016) ................................................................................12

*United States ex rel. Landis v. Hospice Care LLC*,
  No. 06-2455-CM, 2010 U.S. Dist. LEXIS 129484 (D. Kan. Dec. 7, 2010).............. 16, 17, 18

*M+J Savitt, Inc. v. Savitt*,
  No. 08-cv-8535, 2009 U.S. Dist. LEXIS 21321 (S.D.N.Y. Mar. 17, 2009).........................21

*Meyer v. Holley*,
  537 U.S. 280 (2003) .......................................................................................2

*Mills v. Polar Molecular Corp.*,
  12 F.3d 1170 (2d Cir. 1993) ..............................................................................13

*Natowitz v. Mehlman*,
  542 F. Supp. 674 (S.D.N.Y. 1982) .......................................................................12

*PetEdge Inc. v. Garg*,
  234 F. Supp. 3d 477 (S.D.N.Y. 2017) ...................................................................14

*Rapoport v. Asia Elecs. Holding Co.*,
  88 F. Supp. 2d 179 (S.D.N.Y. 2000) ....................................................................13

*United States ex rel. Ryan v. Staten Island Univ. Hosp.*,
  No. 04-cv-2483, 2011 U.S. Dist. LEXIS 51648 (E.D.N.Y. May 13, 2011).........................22

*United State ex rel. Sikkenga v. Regence Bluecross Blueshield*,
  472 F.3d 702 (10th Cir. 2006) ...........................................................................15

*Sofi Classic S.A. de C.V. v. Hurowitz*,
  444 F. Supp. 2d 231 (S.D.N.Y. 2006) ...................................................................12

*United States ex rel. Tessler v. City of New York*,
  712 F. App'x 27 (2d Cir. 2017) ........................................................................2, 12

*Twohig v. Shop-Rite Supermarkets, Inc.*,
  519 F. Supp. 3d 154 (S.D.N.Y. 2021) (Seibel, J.) .................................................12

*United States v. Aegis Therapies, Inc.*,
  No. CV 210-072, 2015 U.S. Dist. LEXIS 45221 (S.D. Ga. Mar. 31, 2015) ................... 15, 16

*United States v. Spectrum Painting Corp.*,
  No. 19-cv-2096, 2020 U.S. Dist. 154650 (S.D.N.Y. Aug. 25, 2020) ...................................20

*United States v. Strock*,
  982 F.3d 51 (2d Cir. 2020) ...............................................................................12

**Statutes**

31 U.S.C. § 3729(a)(1)(A)-(B) ................................................................................................. 2

42 C.F.R. § 409.32(c) ............................................................................................................. 6

42 C.F.R. § 409.85(a)(2) ........................................................................................................ 6

Fed. R. Civ. P. 8 ............................................................................................................ *passim*

Fed. R. Civ. P. 9(b) ....................................................................................................... *passim*

## PRELIMINARY STATEMENT

Issac Laufer is a 55 year-old resident of Monsey, New York.  His father, who recently passed away from a lengthy battle with cancer, was the co-owner of two skilled nursing facilities.[1]  Laufer worked in those facilities as a young man, performing both administrative tasks and manual labor.  Although he was not involved in the treatment of patients, Laufer's work gave him a firsthand appreciation of the positive difference that a warm, caring, and competent skilled nursing facility can make in the lives of patients and their families.

Approximately a decade ago, Laufer decided to follow in his father's footsteps and become an owner of skilled nursing facilities.  Over a period of years, Laufer acquired ownership interests in ten skilled nursing facilities, either by himself of as part of a larger investor group.  Laufer's ownership percentage varies facility-by-facility; for some facilities, he is the sole owner, while for others his ownership percentage is less than 10 percent.  Laufer is also the sole owner of defendant Paragon Management SNF LLC, which provides various support services to the facilities.  One of Paragon's employees is Tami Whitney, an experienced occupational therapist who Laufer hired to serve as Paragon's Coordinator of Rehabilitation Services.

The government's complaint alleges that the ten facilities in which Laufer holds ownership interests, as well as one facility that Laufer's father owned, violated the False Claims Act by billing Medicare for (1) skilled nursing care provided to patients who had

---

[1] The Court may take judicial notice of Laufer's father's passing.  The government's complaint refers to Laufer's father in the present tense, but this memorandum refers to him in the past tense.

no medical need for it, (2) therapy that was more intense than patients needed or could handle, and (3) care that was "unskilled." In addition to the facilities, the complaint names Paragon, Whitney, and Laufer as defendants. Prior to this lawsuit, Laufer had never been accused of any wrongdoing in his entire life. The government's claims against Laufer are a direct assault on his otherwise sterling reputation.

Laufer's ownership interests in the facilities and Paragon are not, of course, a basis to accuse him personally of Medicare fraud, or to hold him personally liable for the facilities' or Paragon's alleged violations of the False Claims Act. *Cf., e.g.*, *Meyer v. Holley*, 537 U.S. 280, 286 (2003) (holding that the owners of a corporation are not vicariously liable for the misconduct of the corporation or its employees). Instead, the government must show that Laufer himself "cause[d]" the facilities to submit false claims to Medicare and that he did so "knowingly." *See* 31 U.S.C. § 3729(a)(1)(A)-(B). This means that the government's complaint must allege, plausibly and with particularity, facts showing (1) that Laufer *personally* engaged in improper conduct the "natural, ordinary and reasonable consequence[ ]" of which was the facilities' submission of false claims, *United States ex rel. Kolchinsky v. Moody's Corp.*, 162 F. Supp. 3d 186, 195 (S.D.N.Y. 2016), and (2) a "strong inference" that Laufer *personally* acted with "fraudulent intent," *United States ex rel. Tessler v. City of New York*, 712 F. App'x 27, 29 (2d Cir. 2017). The government's complaint fails to do so.

The first paragraph of the government's complaint alleges in conclusory fashion that Laufer "instructed and pressured Facility employees" to provide and bill Medicare for skilled nursing therapy that was not medically "reasonable or necessary." Gov't Compl.,

Dkt. #13, ¶ 1.   The complaint later alleges, in equally conclusory fashion, that Laufer commanded Paragon employee Tami Whitney to "direct[ ] employees at the Facilities" to keep patients longer than reasonable or necessary and to prescribe therapy levels that were higher than reasonable or necessary.  *Id.*, ¶ 57.  Conclusory allegations, of course, do not even satisfy Rule 8's plausibility standard, let alone Rule 9(b)'s more rigorous requirement that fraud claims be pled with particularity.

The government's complaint is the culmination of a three-year investigation. During the investigation, the government obtained thousands of documents, interviewed numerous employees of the facilities and Paragon, and took sworn testimony from both Whitney and Laufer.  Yet, the complaint's only particularized factual allegations regarding Laufer's conduct are thirteen electronic communications between him and Whitney, one from November 2013 and twelve from between December 2015 and April 2018.  *See id.*, ¶¶ 63-68, 75-78, 83, 91, and 92; *see also* Exhs. #1-#13 (copies of the communications, in chronological order).[2]  The government asserts that these communications sufficiently demonstrate that Laufer, through "directives" that he provided to Whitney, knowingly pressured or directed facility employees or administrators to commit Medicare fraud in order to maximize the facilities' revenue.  In fact, however, the communications described in the complaint demonstrate no such thing.

---

[2] Twelve of the communications are text message threads.  One of the communications is a voicemail from Whitney to Laufer.  A transcript of this voicemail is included as an exhibit to this memorandum.  We have also provided the Court with an audio file of the voicemail.

The communications between Laufer and Whitney show that Laufer monitored at a high level various metrics relevant to the facilities' patient care and financial performance, urged Whitney to pay close attention to and help the facilities improve upon those metrics, and encouraged the facilities to maximize their revenue opportunities. This is something that any conscientious owner would do, and it thus cannot be considered indicia of fraud. The communications also show that, when a facility's patient discharge trend appeared to be going in the wrong direction, Laufer expressed concern and asked Whitney to investigate the reason for the trend change and to focus on reducing discharges. This, however, is not indicia of fraud either, because reducing discharges does not mean retaining patients who have no legitimate need for skilled nursing care.

The unstated premise of the government's fraud theory against Laufer is that seeking to "reduce" or "curb" discharges is fraudulent *per se*. That premise is demonstrably wrong. Patients sometimes are discharged from a skilled nursing facility despite the fact that they still need skilled nursing care. For example, the patient may dislike the facility's amenities, the facility's staff, or the facility's quality of care; just as an unhappy customer might leave a restaurant in the middle of a meal or change hotels in the middle of a trip, such a patient may choose to transfer to a different facility or even to go home against medical advice. Or the facility may temporarily lack resources that the patient needs, leading the patient to transfer to a facility with the right resources. Or the facility's staff may inappropriately push the patient out because the patient is difficult and the staff is seeking to avoid aggravation. Or the facility's staff may have incorrectly assessed the patient's condition and engaged in deficient discharge planning. Or the patient

4

might simply be homesick and prefer to go home even if they would be better off continuing to receive care in the facility.

As Whitney advised Laufer on December 9, 2015, a facility that in the past had been "keeping people 'the appropriate length of stay'" was now "'quite the opposite' because the Director [of Rehabilitation] was 'discharging people too soon[.]'" *Id.*, ¶ 92. Similarly, on April 26, 2018, Whitney advised Laufer that a "handful" of the discharges at a facility were patients who simply "wanted to leave for a variety of reasons." Exh. 12 (copy of text communication described in paragraph 64 of the complaint). Laufer was entirely justified in expressing concern when Whitney apprised him of such information. Prematurely discharging patients who still need skilled nursing care adversely affects both patient outcomes and a facility's financial performance. Premature discharges are also a signal that the facility's quality of care may be lagging, which is bad for the facility's current patients and the facility's reputation in the community. It is entirely legitimate for the owner of a facility to monitor and seek to reduce premature discharges, and reducing discharges does not mean that the facility is fraudulently retaining patients who are medically fit to go home. The submission of false claims was, therefore, not the "natural, ordinary and reasonable consequence[ ]" of any of the so-called "directives" that Laufer gave to Whitney regarding patient discharges. *Kolchinsky*, 162 F. Supp. 3d at 195. Moreover, because Laufer's monitoring of census information and his communications with Whitney were consistent with legitimate oversight by a conscientious owner, they do not come close to raising the "strong inference" of fraudulent intent that is required to survive a motion to dismiss. The government's attempt to imbue benign communications

5

between Laufer and Whitney with a nefarious meaning is precisely the type of speculation that Rule 8 and Rule 9(b) do not allow.

The Court must assess the adequacy of the government's complaint on a defendant-by-defendant basis. Even if the Court concludes that the complaint's allegations are adequate as to some defendants, the Court should conclude that they are not adequate as to Laufer. The Court should dismiss the claims against Laufer with prejudice.[3]

## RELEVANT BACKGROUND

### A.    Medicare Coverage for Skilled Nursing Facility Services

Skilled nursing facilities provide care for two categories of patients: (1) elderly or disabled patients for whom the facility is their long-term home; and (2) patients who would benefit from skilled nursing care after an inpatient hospital stay for injury or illness. The facilities in which Laufer holds ownership interests care for both categories of patients, though the government's allegations only relate to the second category.

According to CMS, a patient who has been hospitalized for injury or illness would benefit from skilled nursing care if such care would help to restore the patient to her prior physical condition, to maintain or preserve the patient's current condition, or to slow the deterioration of the patient's condition. *See* 42 C.F.R. § 409.32(c). For such patients, Medicare Part A covers up to 100 days in a skilled nursing facility after the patient's

---

[3] Laufer agrees with and hereby joins the other defendants' arguments that the government's complaint fails to adequately allege the knowing submission of any false claims. Laufer's motion to dismiss, however, does not depend upon the Court granting any other defendant's motion to dismiss, nor does it depend upon the Court finding that the complaint fails to adequately allege that the facilities submitted some false claims.

discharge from the hospital.  Medicare pays the facility a *per diem* rate for each patient, and the rate depends upon the level of medically reasonable and necessary therapy that the facility provides to the patient.  The therapy levels are colloquially referred to as "RUG levels," with "ultra high" being the highest level.

Medicare covers the entire cost of the patient's first twenty days in the facility. Beginning with the twenty-first day, the patient is subject to a copay of approximately $175 per day.  *See* 42 C.F.R. § 409.85(a)(2).

### B.    The Skilled Nursing Facilities and Paragon

Laufer has ownership interests in ten of the facilities that the complaint names as defendants.[4]  Laufer's ownership percentage varies by facility and in some instances is less than 10 percent (*e.g.*, the Glen Cove facility).[5]  Each of the facilities is separately incorporated as a limited liability company.  *Id.*, ¶ 50.  Each of the facilities is separately managed and employs its own administrator, rehabilitation director, nursing director, MDS coordinator, other department heads, a medical director, licensed nurses, therapists, and other clinical, administrative, and medical staff.  *Id.*, ¶¶ 51-52.  The employees of each facility report up to the facility's administrator, either directly or through their pertinent supervisors or department heads; and the administrator oversees and ultimately is responsible for the facility's operations.  *Id.*

---

[4] Long Island Care Center is the defendant facility in which Laufer has never held an ownership interest.

[5] For some facilities, Laufer's present ownership percentage is 100 percent but his ownership percentage during the time period relevant to the government's complaint was far less (*e.g.*, the Emerge facility, where his ownership percentage was roughly 2 percent until approximately 2018).

Laufer also owns Paragon Management SNF LLC. *Id.*, ¶¶ 13, 50-51. Laufer is the sole owner of Paragon. Paragon provides various management, marketing, and administrative support services to each of the facilities in which Laufer holds an ownership interest.

As an owner or co-owner of the facilities and Paragon, Laufer is not personally involved in patient care decisions, nor is he privy to any clinical information regarding any particular patients. *Id.*, ¶ 61. Laufer monitors each facility's performance at a high level, including receiving for each facility a daily census report that indicates, *inter alia*, the number of new admissions, the number of hospitalizations (*i.e.*, patients who needed to be transferred back to a hospital for some type of treatment), the number of patients discharged from the facility, and the number of patients who left the facility against medical advice. *Id.*, ¶ 62. This information provides Laufer some insight into the quality of the facilities' patient care, as well as their financial performance.

### C.    The *Qui Tam*, and the Government's Three-Year Investigation

On December 1, 2017, a Texas company called Integra Med Analytics filed a *qui tam* complaint against Laufer and eight facilities. Integra is essentially a professional *qui tam* relator; there are at least five other unsealed *qui tam* complaints on PACER where Integra is the relator.

Integra's *qui tam* complaint was not based on any inside information, medical expertise, or meaningful review of patient files. Instead, Integra's *qui tam* complaint was based on publicly-available Medicare claims data and what Integra calls "causal econometric methods." Integra Compl., Dkt. #14, ¶ 5. Integra compared Medicare claims

8

data for so-called "Laufer facilities" to Medicare claims data for all skilled nursing facilities nationwide. Based on this data, Integra alleged that "linear regression model[s]" showed that the amount of "Ultra High Rehab being offered at Laufer facilities" exceeded the national average. *Id.*, ¶ 12. Integra also alleged that "Laufer facilities keep patients longer" than the national average. *Id.*, ¶ 94. The unstated premise of Integra's complaint is that the national averages reflect the medically correct lengths of stay and therapy levels, such that the "Laufer facilities" must have been billing Medicare for care that was medically excessive. Integra's complaint does not provide any facts to support this unstated premise. In any event, Integra's complaint does not allege that Laufer was personally aware that the average lengths of stay and average therapy levels at the "Laufer facilities" exceeded national averages.

The government investigated Integra's allegations for more than three years. The government received thousands of documents, including patient files and electronic communications involving facility employees, Paragon employees, and Laufer. The government also interviewed current and former employees of certain facilities and Paragon. The government also took sworn testimony from Whitney and from Laufer. Laufer's sworn testimony lasted approximately eight hours.

### D. The Government's Allegations Regarding Laufer's Conduct

On June 2, 2021, the government filed its complaint-in-intervention. The complaint alleges in conclusory fashion that Laufer "instructed and pressured Facility employees to" commit Medicare fraud "in order to maximize profits . . . ." Gov't Compl, ¶ 1. The

complaint also alleges in conclusory fashion that Laufer commanded Whitney to "direct[ ] employees at the Facilities" to engage in Medicare fraud.  *Id.*, ¶¶ 57-58.

The complaint goes on to allege that "Laufer expected the administrator of each Facility to send him a daily update reporting the number of patient admissions, discharges, and hospitalizations, broken down by whether the patient had Medicare or other insurance, and to justify the number of discharges of Medicare patients."  *Id.*, ¶ 62.  According to the complaint, "[w]hen the numbers were not to his liking, Laufer instructed Whitney to prevent patients from being discharged."  *Id.*  To support these general assertions, the complaint describes thirteen electronic communications—twelve text messages threads and one voicemail—between Laufer and Whitney.  *See id.*, ¶¶ 63-68, 75-78, 83, 91, and 92.  These communications are the complaint's only particularized facts of Laufer's conduct.  Ostensibly for strategic reasons, the complaint sets out the communications in essentially random, non-chronological order.  The complaint's descriptions of the communications are consistently argumentative.  Although the complaint sometimes quotes the communications, the quotes are selective and omit significant portions of the communications.

The earliest communication described in the complaint is a November 22, 2013 text message in which Whitney stated to Laufer that the "rehab levels" at the Excel and Long Island Care Center facilities were "well balanced" but that there was "room for improving and prolong dropping residents down a [therapy] category."  Exh. 1 (text message described in paragraph 91 of the complaint).  Whitney told Laufer she would "stay on top of this."  *Id.*  The next earliest communication is a December 9, 2015  voicemail  in which

10

Whitney told Laufer that Long Island Care Center's director of rehabilitation previously had been placing "everyone on ultra [high therapy] appropriately" and keeping patients "the appropriate length of stay" but now was "discharging [patients] too soon" and putting patients on therapy levels that were "all off."  Exh. 2 (transcript of voicemail described in paragraph 92 of the complaint).   The remainder of the communications occurred between January 2016 and April 2018.   This includes an April 26, 2018 communication, described in paragraph 64 of the complaint, in which Laufer asked Whitney to "pls see whats [sic] going on at Lynbrook [with community discharges]." Exh. 12.   Whitney responded that "there is [definitely] an issue," that "[t]here were a handful of [patients] that wanted to leave [the facility] for [a] variety of reasons," and that she was "[d]igging to figure out why."   *Id.*   Laufer responded, "We cant [sic] have more tami! Were [sic] falling apart [sic]."   *Id.*

    None of the thirteen communications between Laufer and Whitney described in the complaint involved a discussion of any particular patients.   None of the communications involved Laufer directing Whitney that the facilities should provide or bill for medically unnecessary or medically unreasonable care.   None of the communications involved Whitney informing Laufer that the facilities' length of stays or utilization of ultra-high therapy levels significantly exceeded national averages. None of the communications involved Whitney warning Laufer that the facilities were providing medically unnecessary or medically unreasonable care.   And none of the communications involved Whitney advising Laufer that the facilities could not reduce patient discharges legitimately.

## APPLICABLE PLEADING STANDARDS

The government's statutory and common law claims against Laufer are subject both to Rule 8's plausibility standard and to Rule 9(b)'s heighted pleading requirements. *See, e.g.*, *Gold v. Morrison-Knudsen Co.*, 68 F.3d 1475, 1476-77 (2d Cir. 1995) ("[C]laims brought under the FCA fall within the express scope of Rule 9(b)."); *United States ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 269 (S.D.N.Y. 2014) (applying Rule 9(b) to unjust enrichment and "payment by mistake" claims premised on alleged "submission of fraudulent claims to government programs").

### A.    Rule 8

To satisfy Rule 8, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).  Conclusory allegations do not suffice, and "thus a court's first task is to disregard any conclusory statements in a complaint." *DirecTV Latin Am., LLC v. Park 610, LLC*, 691 F. Supp. 2d 405, 428 (S.D.N.Y. 2010).  The complaint's non-conclusory factual allegations must be sufficient to allow the district court to draw a "reasonable inference" that the defendant violated the law. *Iqbal*, 556 U.S. at 678.   Non-conclusory factual allegations that demonstrate merely a "*possibility* of misconduct" are not sufficient. *Id.* at 679 (emphasis added).  Accordingly, to satisfy Rule 8's plausibility standard, a complaint must contain more than factual allegations that are "merely consistent with" the plaintiff's theory of liability against the defendant. *Bell Atlantic Co. v. Twombly*, 550 U.S. 544, 557 (2007).

### B.      Rule 9(b)

Rule 9(b) imposes a significantly higher burden than Rule 8.  Rule 9(b) requires a complaint to allege "with particularity the circumstances constituting fraud . . . ."  Fed. R. Civ. P. 9(b).  The purpose of this heightened pleading requirement is both to provide the defendant with "fair notice of the plaintiff's claim" and "to safeguard a defendant's reputation from improvident charges of wrongdoing . . . ."  *United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016).  Rule 9(b) therefore requires the complaint to "be supported by more than 'conclusory statements' or 'hypotheses,'" and to "plead [a] factual basis which gives rise to a strong inference of fraudulent intent.'"  *Tessler*, 712 F. App'x at 29 (quoting *O'Brien v. Nat'l Prop. Analyst Partners*, 936 F.2d 674, 676 (2d Cir. 1991)); *see also United States v. Strock*, 982 F.3d 51, 66 (2d Cir. 2020) (same); *Twohig v. Shop-Rite Supermarkets, Inc.*, 519 F. Supp. 3d 154, 166 (S.D.N.Y. 2021) (Seibel, J.) (same).

To satisfy Rule 9(b), a complaint must "set forth" with particularity the "who, what, when, where, and how of the alleged fraud."  *United States ex rel. Kester v. Novartis Pharms. Corp.*, 23 F. Supp. 3d 242, 251-252 (S.D.N.Y. 2014) (internal quotations omitted).  Where a complaint accuses multiple defendants of fraud, Rule 9(b) requires the complaint to "set[ ] forth separately the acts complained of by each defendant."  *Sofi Classic S.A. de C.V. v. Hurowitz*, 444 F. Supp. 2d 231, 248 (S.D.N.Y. 2006); *see also Natowitz v. Mehlman*, 542 F. Supp. 674, 676 (S.D.N.Y. 1982) (holding that a complaint must "allege specifically the fraud perpetrated by each defendant").  The complaint cannot simply "attribute[ ] the alleged fraudulent [conduct] to 'defendants.'"  *Mills v. Polar Molecular*

13

*Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993).  Where, as here, the plaintiff's theory is that the defendant knowingly "caused" another party to submit false claims, Rule 9(b) requires the plaintiff "to adequately allege the entire [causal] chain—from start to finish—to fairly show [that the] defendant[ ] caused false claims to be filed."  *United States ex rel. Ibanez v. Bristol-Myers Squibb Co.*, 874 F.3d 905, 914 (6th Cir. 2017).

## ARGUMENT

The complaint's non-conclusory, particularized factual allegations regarding Laufer's conduct are limited to thirteen electronic communications between Laufer and Whitney.  The sufficiency of the government's complaint against Laufer, and the ability of the complaint to withstand Laufer's motion to dismiss, thus rises and falls on these communications.  Even at the motion to dismiss stage, the Court is entitled to consider the electronic communications themselves, because they are incorporated by reference into the complaint.  *See, e.g.*, *ATSI Communs., Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  In determining whether the communications raise a "strong inference" that Laufer, acting with fraudulent intent, caused the facilities to submit false claims, the actual content communications—not the complaint's argumentative descriptions of them—controls.  *See, e.g.*, *Rapoport v. Asia Elecs. Holding Co.*, 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000) (dismissing securities fraud claim where the newspaper article and prospectus on which the plaintiff's claim relied contradicted the complaint's description of the documents).

Individually and collectively, the communications are consistent with Laufer being a conscientious owner who, for wholly legitimate reasons, paid close attention to a critical metric—patient discharge trends—that impacted the facilities' financial performance and

14

was an indicator of whether the facilities needed to improve their patient care.  The facilities' alleged submission of false claims to Medicare was not an ordinary or reasonably foreseeable consequence of any of Laufer's "directives" to Whitney.  The complaint's allegations, therefore, are not sufficient to show that Laufer "caused" the facilities to submit false claims.  Moreover, none of the communications raise a "strong inference" that Laufer acted with fraudulent intent.

## I.     The Complaint Fails to Adequately Allege That Laufer "Knowingly Caused" the Facilities to Submit False Claims to Medicare

The government's overarching theory against Laufer is that, through "directives" that he gave to Whitney, Laufer "pressured" and "directed" the facilities to keep patients at the facility longer and to provide patients higher levels of therapy, thereby "causing" the facilities to provide medically unnecessary and medically unreasonable care and to submit false claims to Medicare.  The complaint's naked allegations that Laufer "pressured" and "directed" the facilities into committing Medicare fraud plainly do not satisfy the applicable pleading rules.  *See, e.g.*, *PetEdge Inc. v. Garg*, 234 F. Supp. 3d 477, 493 (S.D.N.Y. 2017) (holding that "conclusory assertions" that the defendant, the CEO of a company, directed the company's lower-level employees to make fraudulent representations were insufficient to satisfy Rule 9(b)). Moreover, the complaint's particularized allegations regarding Laufer's conduct are limited to the type of benign business communications that courts have deemed insufficient to establish False Claims Act liability against an owner or manager on a "pressuring" theory.

A defendant is deemed to have "caused" another party's submission of false claims when the submission of false claims was the "natural, ordinary and reasonable consequence[]" of the defendant's alleged conduct. *Kolchinsky*, 162 F. Supp. 3d at 195. This "proximate causation" test "separates the wheat from the chaff, . . . winnowing out those claims with only attenuated links between the defendant's specific actions and [a third party's ultimate] submission of the false claim." *United States ex rel. Sikkenga v. Regence Bluecross Blueshield*, 472 F.3d 702, 715 n.2 (10th Cir. 2006).

Where the plaintiff's theory is that the owner or manager of a healthcare facility "caused" the submission of false claims by "pressuring" lower-level employees, federal courts have required the plaintiff to show more than that the owner or manager set financial targets and monitored the facility's financial performance.  For example, in *United States v. Aegis Therapies, Inc.*, No. CV 210-072, 2015 U.S. Dist. LEXIS 45221, at *35-37 (S.D. Ga. Mar. 31, 2015), the court deemed insufficient to establish False Claims Act liability against a skilled nursing facility's manager evidence that the manager used certain "benchmarks," such as the percentage of patients that the facility was billing at the ultra-high RUG level and census trends, to "measure trends in [the facility's] billing" and to "monitor the facility's pulse."  The government had not shown that any employee "was punished or reprimanded" if the benchmarks were not met, or that the benchmarks were "used to promote or demote therapists, determine bonuses, or provide any other type of incentive to therapists." *Id.* at *36.  The court called it a "prudent business practice[ ]" for the manager to use RUG benchmarks and patient census reports to "measure trends in [the

16

facility's] billing" and identify any "deviation from past statistics" at the facility.  *Id.* at *35-36.

Similarly, in *United States ex rel. Alt v. Anesthesia Services Associates*, No. 3:16-cv-0549, 2019 U.S. Dist. LEXIS 223008, at *18-25 (M.D. Tenn. Dec. 31, 2019), the court dismissed the government's False Claims Act complaint against the manager of a chiropractic clinic because, although the complaint alleged in conclusory fashion that the manager "pressure[d] the providers in the clinics he supervised," the complaint did not allege facts demonstrating that the manager shamed or threatened providers with repercussions if they did not achieve unreasonable financial targets.

By contrast, in *United States ex rel. Landis v. Hospice Care LLC*, No. 06-2455-CM, 2010 U.S. Dist. LEXIS 129484, at *18-19 (D. Kan. Dec. 7, 2010), the court held that the government's complaint adequately alleged that a corporate owner of a hospice facility "caused" the facility to submit false claims.  The complaint alleged facts showing that the corporate owner put into place numerous formal and informal business practices that "pressured [facility] employees to certify, recertify, or not discharge patients regardless of whether they were eligible for hospice benefits . . . ."  *Id.* at *16.  Among other things, the complaint alleged particularized facts showing that the corporate owner "set[ ] aggressive census targets," provided staff with "incentives and monetary bonuses" if the targets were met, and "threaten[ed] staff with termination of reductions in hours" if the targets were not met.  *Id.* at *5-6.  The corporate owner also "instruct[ed] staff to inaccurately document the condition of patients to make them appear appropriate for hospice," "implement[ed] procedures that delayed the discharge or made it difficult to discharge ineligible patients,"

and "disregard[ed] or ignor[ed] compliance concerns raised by an outside consultant." *Id.* at *6. Similar factual allegations were present in *United States ex rel. Hayward v. SavaSeniorCare, LLC*, No. 3:11-cv-00821, 2016 U.S. Dist. LEXIS 132336 (M.D. Tenn. Sept. 27, 2016). In that case, the complaint's factual allegations showed that the corporate owner of a skilled nursing facility placed "[c]onstant pressure" on "facility-level employees to make their ever-increasing budgets," including making "threats of repercussions or termination" if a facility failed to achieve the corporate owner's billing targets and "publicly sham[ing]" facilities that failed to achieve the targets. *Id.* at *14-16.

Here, the complaint's particularized factual allegations regarding Laufer's conduct do not come close to establishing that, acting with fraudulent intent, Laufer "pressured" the facilities into submitting false claims. As an initial matter, the complaint does not allege that Laufer personally provided any directives, orders, or instructions to the facility employees who were responsible for patient treatment decisions and the submission of claims. Instead, the government's assertion is that Whitney—acting at Laufer's "behest," Gov't Compl., ¶ 57—pressured those facility employees to engage in misconduct. Yet, the complaint does not provide particularized factual allegations showing an "entire chain" of causation that proximately links together Laufer's directives to Whitney, Whitney's interactions with facility employees, and the facilities' alleged submission of false claims. *Ibanez*, 874 F.3d at 915.

Moreover, the specific communications between Laufer and Whitney described in the complaint cannot fairly be characterized as Laufer, either directly or via Whitney, "pressuring" the facilities to provide medically unnecessary and medically unreasonable

treatment, let alone to commit Medicare fraud.  Unlike the defendants in *Hospice Care* and *SavaSeniorCare*, Laufer did not threaten Whitney or facility employees with repercussions—such as termination, demotion, reduction in pay, or shaming—if the facilities failed to attain some arbitrary average length of stay metric.  Nor did Laufer dangle out rewards, such as bonuses or other financial incentives, to encourage the facilities to provide medically unnecessary or medically unreasonable care.  Laufer simply asked Whitney to "[m]ake sure [the Lynnbrook facility's administrator] knows she has a problem" with patient discharges, to "jump on" the Lynnbrook and Quantum facilities for their discharge rates, to "curb [the] pace" of patient discharges at the Marquis facility, and to make "[w]atch[ing]" discharges "priority #1."  Gov't Compl., ¶¶ 64, 66-68.  All of these communications were in response to an unexpected change in the facility's discharge trend.  Although the communications certainly demonstrate Laufer's concern (and at times exasperation) with patient discharge trends at certain facilities, this is not tantamount to directing or pressuring Whitney to have the facilities commit Medicare fraud.  Patients sometimes leave a facility despite still needing skilled nursing care.  Such premature discharges adversely impact patient outcomes and the facility's reputation amongst referring hospitals and future potential patients, not just the facility's immediate financial performance.  If a facility's discharge rate increases unexpectedly—as it did, for example, at the Lynnbrook facility in November 2017, *see* Gov't Compl., ¶ 66—it may be a signal that the facility is doing a poor job caring for or interacting with its patients, assessing its patients' medical needs, or preparing patient discharge plans.  Indeed, as Whitney informed Laufer in December 2015, the issue with the Long Island Care Center facility was that the

director of rehabilitation had begun "discharging people too soon"—that is, before it was medically "appropriate."  Exh. 2 (transcript of voicemail described in paragraph 92 of the complaint).  And as Whitney informed Laufer in April 2018, a number of discharges at the Lynnbrook facility were patients who simply "wanted to leave for a variety of reasons."  Exh. 12 (copy of text communication described in paragraph 64 of the complaint).  It would have been irresponsible for Laufer *not* to have raised concerns when Whitney or a facility administrator apprised him of such developments.

Because a facility can and should legitimately seek to reduce the premature discharges of patients who still need skilled nursing care, the submission of false claims was not the "natural, ordinary and reasonable consequence[ ]" of any of Laufer's directives to Whitney.  *Kolchinsky*, 162 F. Supp. 3d at 195.  Nor do Laufer's communications with Whitney "give rise to a strong inference of fraudulent intent."  *United States ex rel. Grubea v. Rosicki, Rosicki & Assoc.,* 318 F. Supp. 3d, 680, 694 (S.D.N.Y. 2018).  Laufer's statements to Whitney regarding his desire to maximize revenue at the facilities do not demonstrate fraudulent intent.  *See, e.g.*, *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 407 (S.D.N.Y. 2010) ("General profit-making motive alone is generally disclaimed as a sign of fraudulent intent.").  And all of Laufer's directives to Whitney regarding patient discharges can be understood as a legitimate effort to reduce the premature discharge of patients who still need skilled nursing care.

The complaint does not allege a single communication in which Whitney or anyone else expresses any concern to Laufer that the facilities were providing or billing for medically unnecessary or medically unreasonable care, or that it would be impossible for

the facilities to reduce discharges legitimately.  Although the government nevertheless seeks to give a nefarious gloss to the communications between Laufer and Whitney, this is precisely the sort of speculation and hypothesizing that neither Rule 8 nor Rule 9(b) permits.  As the Supreme Court held in *Iqbal*, "[w]here a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibly of entitlement to relief."  556 U.S. at 678.

## II.      The Unjust Enrichment Claims Fails, Because Laufer Did Not Receive Any Payments From Medicare

New York common law applies to the government's unjust enrichment claim.  To state an unjust enrichment claim against Laufer, the government is required to show that Laufer "'was enriched'" at the Medicare program's "'expense'" and that "'it is against equity and good conscience to permit [Laufer] to retain what is sought to be recovered.'" *United States v. Spectrum Painting Corp.*, No. 19-cv-2096, 2020 U.S. Dist. 154650, at *47-48 (S.D.N.Y. Aug. 25, 2020) (quoting *Georgia Malone & Co. v. Rieder*, 19 N.Y.3d 511 (2012)).

The complaint does not allege that Medicare made any payments to Laufer personally.  Indeed, it is undisputed that Medicare made payments only to the facilities. The government's theory must be that, with respect to the ten facilities in which Laufer has an ownership interest, Laufer indirectly benefitted from the allegedly wrongful payments that Medicare made to those facilities (*i.e.*, some fraction of those Medicare payments theoretically flowed through to Laufer in the form of dividend payments in *pro rata* proportion to his ownership percentage).  This theory does not state a cognizable unjust

enrichment claim against Laufer.  New York law is clear that an unjust enrichment claim cannot be brought against a corporation's owner on the theory that the owner indirectly benefitted from a payment that the plaintiff made to the corporation.  *See Blobel v. Kopfli*, 2018 N.Y. Misc. LEXIS 549, at *23 (N.Y. Sup. Ct. Feb. 13, 2018) (collecting cases holding that "a benefit directly conferred on a corporation flows [only] indirectly to its equity owners," which is "insufficient to sustain a claim of unjust enrichment" against the owners); *cf. also Kaye v. Grossman*, 202 F.3d 611, 616 (2d Cir. 2000) (holding that an unjust enrichment claim under New York common law cannot be based on an "indirect benefit" that the defendant realized from a payment the plaintiff made to another party); *M+J Savitt, Inc. v. Savitt*, No. 08-cv-8535, 2009 U.S. Dist. LEXIS 21321, at *30 (S.D.N.Y. Mar. 17, 2009) ("It is not sufficient for defendant to receive some indirect benefit—the benefit received must be 'specific and direct' to support an unjust enrichment claim.").

### III. Because Medicare Did Not Make Any Payments Directly to Laufer, the Government's Payment-by-Mistake Claim Against Him Fails

The elements of a payment-by-mistake claim are essentially identical to the elements of an unjust enrichment claim.  The plaintiff must show that it "made a payment under a mistaken apprehension of fact, the defendant derived a benefit as a result of this mistaken payment, and that equity demands restitution by [the] defendant to [the] plaintiff."  *United States ex rel. Ryan v. Staten Island Univ. Hosp.*, No. 04-cv-2483, 2011 U.S. Dist. LEXIS 51648, at *13 (E.D.N.Y. May 13, 2011).

The government's payment-by-mistake claim against Laufer fails for the same reason its unjust enrichment claim fails: Medicare did not make any payments directly to

Laufer, and the indirect benefits Laufer may have realized from the payments Medicare made to the facilities do not provide a cognizable legal basis for an equitable claim against Laufer.

## IV.    The Claims Against Laufer Should Be Dismissed With Prejudice

The government's complaint is the culmination of a multi-year investigation that included extensive document discovery, numerous witness interviews, and sworn testimony from Whitney and Laufer.  The Court previously invited the government to amend its complaint prior to the defendants' submission of dismissal motions, and the government declined.  The government declined the Court's invitation because the complaint represents the government's best efforts to plead claims against the defendants. With respect to the claims against Laufer, the government's best efforts are not nearly good enough.

This case already has imposed enormous emotional and financial stress on Laufer, not to mention reputational harm.  All of the claims against Laufer should be dismissed, and they should be dismissed with prejudice.

## <u>CONCLUSION</u>

For the reasons explained above, the government's claims against Issac Laufer should be dismissed with prejudice.

Respectfully submitted,

Dated:  October 28, 2021

By: */s/ Aaron M. Katz*

Aaron Katz
ROPES & GRAY LLP
800 Boylston St.
Boston, MA 02199
(617) 686-0677
*Aaron.Katz@ropesgray.com*

*Attorney for Defendant Issac Laufer*

24

## <u>CERTIFICATION OF COMPLIANCE</u>

I certify that the foregoing Memorandum in Support of Defendants' Motion to Dismiss Plaintiffs' Amended Complaint complies with the formatting and word count rules.  The Memorandum contains 6,204 words, exclusive of the cover page, table of contents, table of authorities, signature block, and certification of compliance.

Date: October 28, 2021                    ROPES & GRAY LLP

<u> /s/ Aaron M. Katz          </u>
Aaron M. Katz

<u>**CERTIFICATE OF SERVICE**</u>

I certify that a true and correct copy of the foregoing document was served on

government counsel via email on this 28th day of October, 2021.

<u>*/s/ Aaron M. Katz*</u>
Aaron M. Katz